# EXHIBIT "C"

Loan No. 07-0004232

# LOAN AGREEMENT

### for a loan in the amount of

### $17,200,000.00

### among

## THE PARTIES LISTED ON SCHEDULE I ATTACHED HERETO
### as Borrowers

### and

## GENERAL ELECTRIC CAPITAL CORPORATION
### as Agent and a Lender

### and

## THE OTHER FINANCIAL INSTITUTIONS WHO ARE OR HEREAFTER BECOME PARTIES TO THIS AGREEMENT

### as Lender

### Cambridge House
### Capri Retirement Villa
### Stanford House

### Dated as of January 13, 2006

DALLAS: 35130.00028: 1432156v6

# TABLE OF CONTENTS

**Page**

ARTICLE I INCORPORATION OF RECITALS, EXHIBITS AND SCHEDULES ................... 1
    Section 1.1    Incorporation of Recitals. ............................................................... 1
    Section 1.2    Incorporation of Exhibits and Schedules. ..................................... 2
    Section 1.3    Definitions. ..................................................................................... 2

ARTICLE II LOAN TERMS ............................................................................................ 2
    Section 2.1    Funding. .......................................................................................... 2
    Section 2.2    Interest Rate; Late Charge. ............................................................. 2
    Section 2.3    Payments. ........................................................................................ 2
    Section 2.4    Maturity. ......................................................................................... 3
    Section 2.5    Prepayment. .................................................................................... 3
    Section 2.6    Defeasance ...................................................................................... 4
    Section 2.7    Reserved. ......................................................................................... 6
    Section 2.8    Application of Payments .................................................................. 6
    Section 2.9    Sources and Uses. ........................................................................... 7
    Section 2.10    Security. ......................................................................................... 7

ARTICLE III INSURANCE, CONDEMNATION, AND IMPOUNDS ............................ 7
    Section 3.1    Insurance. ........................................................................................ 7
    Section 3.2    Disposition of Insurance Proceeds. ................................................ 9
    Section 3.3    Condemnation Awards. ................................................................. 10
    Section 3.4    Insurance Impounds. ..................................................................... 11
    Section 3.5    Real Estate Tax Impounds. ........................................................... 12
    Section 3.6    Replacement Reserves. ................................................................. 12

ARTICLE IV APPLICATION TO LOAN LEASING MATTERS ................................ 13
    Section 4.1    Representations and Warranties on Leases and Master Lease. ..... 13
    Section 4.2    Approval Rights. ........................................................................... 14
    Section 4.3    Covenants. ..................................................................................... 15
    Section 4.4    Estoppels. ...................................................................................... 15
    Section 4.5    Security Deposits. ......................................................................... 16

ARTICLE V REPRESENTATIONS AND WARRANTIES ......................................... 16
    Section 5.1    Organization and Power. ............................................................... 16
    Section 5.2    Sole Members. .............................................................................. 16
    Section 5.3    Borrowers' Partnership Agreements. ............................................ 17
    Section 5.4    Sole Member Formation Documents. ........................................... 17
    Section 5.5    Validity of Loan Documents. ....................................................... 17
    Section 5.6    Liabilities; Litigation. ................................................................... 18
    Section 5.7    Taxes and Assessments. ................................................................ 18
    Section 5.8    Other Agreements; Defaults. ......................................................... 18
    Section 5.9    Compliance with Law. .................................................................. 18

Section 5.10    Condemnation. ................................................................. 19
Section 5.11    Access. ........................................................................... 19
Section 5.12    Flood Hazard. .................................................................. 19
Section 5.13    Property. ......................................................................... 19
Section 5.14    Location of Borrowers. ...................................................... 20
Section 5.15    Margin Stock. .................................................................. 20
Section 5.16    Tax Filings. ..................................................................... 20
Section 5.17    Solvency. ........................................................................ 20
Section 5.18    Full and Accurate Disclosure. ............................................. 20
Section 5.19    Single Purpose Entity. ....................................................... 21
Section 5.20    No Broker. ....................................................................... 21
Section 5.21    Reserved. ........................................................................ 21
Section 5.22    Labor Disputes. ................................................................ 21
Section 5.23    Employees. ...................................................................... 21
Section 5.24    ERISA (Borrower). ........................................................... 21
Section 5.25    Intellectual Property. ......................................................... 22
Section 5.26    Anti-Terrorism and Anti-Money Laundering Compliance. ......... 22
Section 5.27    Reserved. ........................................................................ 23
Section 5.28    Master Lease. .................................................................. 23
Section 5.29    Property Management Agreement. ........................................ 23

ARTICLE VI FINANCIAL REPORTING; NOTICES ................................. 23
Section 6.1     Financial Statements. ........................................................ 23
Section 6.2     Audits. ........................................................................... 24
Section 6.3     Books and Records/Audits. ................................................. 25
Section 6.4     Notice of Litigation or Default. ............................................ 25

ARTICLE VII COVENANTS ................................................................. 26
Section 7.1     Inspection. ...................................................................... 26
Section 7.2     Due on Sale and Encumbrance; Transfers of Interests. ............ 26
Section 7.3     Taxes; Charges. ............................................................... 26
Section 7.4     Control; Management. ....................................................... 27
Section 7.5     Operation; Maintenance; Inspection. .................................... 27
Section 7.6     Taxes on Security. ............................................................ 28
Section 7.7     Single Purpose Entity; Legal Existence; Name, Etc. ............... 28
Section 7.8     Affiliate Transactions. ...................................................... 28
Section 7.9     Limitation on Other Debt. ................................................... 29
Section 7.10    Further Assurances. .......................................................... 29
Section 7.11    Estoppel Certificates. ........................................................ 29
Section 7.12    Notice of Certain Events. ................................................... 29
Section 7.13    Indemnification. ............................................................... 29
Section 7.14    Use of Proceeds, Revenues. ................................................ 30
Section 7.15    Reserved. ........................................................................ 30
Section 7.16    TIC Listing. ..................................................................... 30
Section 7.17    Reserved. ........................................................................ 30
Section 7.18    Compliance with Laws and Contractual Obligations. ............... 30

Section 7.19    Notice of Money Laundering.................................................. 31
Section 7.20    Anti-Terrorism and Anti-Money Laundering Compliance............. 31
Section 7.21    Employees............................................................................ 32
Section 7.22    Reserved.............................................................................. 32
Section 7.23    Representations and Warranties. .......................................... 33
Section 7.24    Cooperation.......................................................................... 33
Section 7.25    Master Leases. ..................................................................... 33
Section 7.26    Reserved. ............................................................................. 33
Section 7.27    Operating and Financial Covenants........................................ 34
Section 7.28    Tenancy-in-Common Covenants. ........................................... 34
Section 7.29    Single Purpose Entity Requirements ...................................... 35
Section 7.30    Partition................................................................................ 37
Section 7.31    Amendments to TIC Agreements ........................................... 37
Section 7.32    TIC Liens ............................................................................. 37

ARTICLE VIII Health Care Matters ..................................................................... 37
Section 8.1     Healthcare Laws. .................................................................. 37
Section 8.2     Representations, Warranties and Covenants Regarding Healthcare Matters. . 39
Section 8.3     Cooperation........................................................................... 41
Section 8.4     Annual Inspections. .............................................................. 42

ARTICLE IX EVENTS OF DEFAULT.................................................................. 42
Section 9.1     Events of Default .................................................................. 42
Section 9.2     Special Cure Rights .............................................................. 45

ARTICLE X REMEDIES.................................................................................... 46
Section 10.1    Remedies - Insolvency Events................................................ 46
Section 10.2    Remedies - Other Events. ..................................................... 46
Section 10.3    Agent's Right to Perform the Obligations................................. 47

ARTICLE XI MISCELLANEOUS ....................................................................... 47
Section 11.1    Notices. ................................................................................ 47
Section 11.2    Amendments and Waivers. .................................................... 49
Section 11.3    Limitation on Interest. ........................................................... 49
Section 11.4    Invalid Provisions.................................................................. 50
Section 11.5    Reimbursement of Expenses; Facility Inspection Fee.............. 50
Section 11.6    Approvals; Third Parties; Conditions. ..................................... 51
Section 11.7    Lender Not in Control; No Partnership. ................................... 51
Section 11.8    Time of the Essence. ............................................................ 52
Section 11.9    Successors and Assigns. ....................................................... 52
Section 11.10   Renewal, Extension or Rearrangement.................................... 52
Section 11.11   Waivers; Forbearance. .......................................................... 52
Section 11.12   Cumulative Rights. ............................................................... 53
Section 11.13   Singular and Plural................................................................ 53
Section 11.14   Phrases. ............................................................................... 53
Section 11.15   Reserved. ............................................................................. 53

Section 11.16    Titles of Articles, Sections and Subsections.................................................53
Section 11.17    Promotional Material.........................................................................................53
Section 11.18    Survival.............................................................................................................54
Section 11.19    WAIVER OF JURY TRIAL..............................................................................54
Section 11.20    Waiver of Punitive or Consequential Damages..............................................54
Section 11.21    Governing Law..................................................................................................54
Section 11.22    Entire Agreement..............................................................................................54
Section 11.23    Counterparts......................................................................................................55
Section 11.24    Venue.................................................................................................................55
Section 11.25    Sale of Loan, Participation................................................................................55
Section 11.26    Limitation on Liability of Agent's and Lender's Officers, Employees, etc......56
Section 11.27    Effectiveness of Facsimile Documents and Signatures....................................56
Section 11.28    Joint and Several Liability.................................................................................56
Section 11.29    Agency...............................................................................................................57
Section 11.30    Limitation on Liability.......................................................................................58
Section 11.31    Post-Closing Obligations of Borrowers.............................................................58

## LIST OF EXHIBITS AND SCHEDULES TO LOAN AGREEMENT

Exhibits:
Exhibit A-1    Cambridge House Project
Exhibit A-2    Capri Retirement Villa Project
Exhibit A-3    Standard House Project
Exhibit B      Form of Interest Holder Agreement
Exhibit C      Intellectual Property
Exhibit D      Provider Payment/Reimbursement Programs
Exhibit E      Governmental Approvals/Licenses
Exhibit F      Form of Assignment and Assumption Agreement


Schedules
Schedule I       Schedule of Borrowers
Schedule II      Certain Definitions
Schedule III     Calculation of Net Operating Income
Schedule 2.1    Advance Conditions
Schedule 2.5    Make Whole Breakage Amount
Schedule 2.9    Sources and Uses
Schedule 11.31  Post Closing Requirements

## LOAN AGREEMENT

This Loan Agreement is entered into as of January ___, 2006 among GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation (in its individual capacity, "**GECC**" and in its capacity as agent for the Lender, together with its successors, "**Agent**"), ), the financial institutions other than GECC who are or hereafter become parties to this Agreement (together with GECC collectively, or individually, as the context may require, "**Lender**"), and the PARTIES LISTED ON SCHEDULE I attached hereto (each, together with each additional entity that becomes an owner of an undivided interest in the Project [as hereinafter defined], a "**Borrower**" and collectively, the "**Borrowers**").

### RECITALS

A.     Lender and Agent have agreed to make the Loan to Borrowers subject to the terms and conditions contained herein.  The Loan is evidenced by that certain Promissory Note of even date herewith in the original principal amount of Seventeen Million Two Hundred Thousand and No/100 Dollars ($17,200,000.00) (together with all amendments thereto and substitutions therefor are hereinafter referred to collectively as the "**Note**").  The terms and provisions of the Note are hereby incorporated herein by reference in this Agreement.

B.     Each Borrower is the owner of an undivided interest in real property more particularly described on <u>Exhibit A-1</u> through <u>A-3</u> attached hereto (each a "**Property**" and collectively, the "**Properties**"), and the improvements located thereon (the "**Improvements**"), including assisted living, Alzheimer's and independent living facilities.  Each Property along with its respective Improvements is referred to herein as a "**Project**" and collectively as the "**Projects**".

C.     Borrowers will use the proceeds of the Loan for the purpose of acquiring the Projects.

D.     Borrowers' obligations under the Loan will be secured by, among other things, the Security Documents.

NOW, THEREFORE, in consideration of the foregoing and the mutual conditions and agreements contained herein, the parties agree as follows:

### ARTICLE I
### INCORPORATION OF RECITALS, EXHIBITS AND SCHEDULES

Section 1.1     <u>Incorporation of Recitals</u>.

The foregoing preambles and all other recitals set forth herein are made a part hereof by this reference.

Section 1.2        Incorporation of Exhibits and Schedules.

Exhibits A-1 through A-3, B, C, D and E and Schedules 2.1, 2.5, 2.9, 3.2 and 11.31 and Schedules I, II and III to this Agreement, attached hereto are incorporated in this Agreement and expressly made a part hereof by this reference.

Section 1.3        Definitions.

All terms defined in Schedule II or otherwise in this Agreement shall, unless otherwise defined therein, have the same meanings when used in any other Loan Document, or any certificate or other document made or delivered pursuant hereto. The words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole. The words "include" and "include(s)" when used in this Agreement and the other Loan Documents means "include(s), without limitation," and the word "including" means "including, but not limited to."

## ARTICLE II
## LOAN TERMS

Section 2.1        Funding.

(a)        The Loan shall be funded and repaid in accordance with this Agreement and the other Loan Documents. On the Closing Date, and subject to the terms, provisions and conditions of this Agreement (including, without limitation Borrowers' satisfaction of the conditions to initial advance described in Schedule 2.1 attached hereto) and the other Loan Documents, Lender shall disburse to Borrowers from the proceeds of the Loan the amount of Seventeen Million Two Hundred Thousand and No/100 Dollars ($17,200,000.00) (the "**Funding Amount**").

Section 2.2        Interest Rate; Late Charge.

The outstanding principal balance of the Loan (including any amounts added to principal under the Loan Documents) shall bear interest at six and ninety-one hundredths percent (6.91%) per annum (the "**Interest Rate**"). Interest shall be computed on the basis of a fraction, the denominator of which is three hundred sixty (360) and the numerator of which is the actual number of days elapsed from the date of the initial advance or the date on which the immediately preceding payment was due. If Borrowers fail to pay any installment of interest or principal within five (5) days after the date on which the same is due, Borrowers shall pay to Agent a late charge on such past-due amount, as liquidated damages and not as a penalty, equal to the greater of (a) interest at the Default Rate on such amount from the date when due until paid, and (b) five percent (5%) of such amount, but not in excess of the maximum amount of interest allowed by applicable law. While any Event of Default exists, the Loan shall bear interest at the Default Rate.

Section 2.3        Payments.

(a)        Commencing on February 15, 2006 and continuing on the fifteenth (15th) day of each month thereafter until all amounts due under the Loan Documents are paid in full

(each, a **"Payment Date"**, Borrowers shall make installments of principal and interest in the amount of One Hundred Twenty Thousand Five Hundred Eighty and 30/100 Dollars ($120,580.00) each, to be applied first to accrued interest outstanding under the Note and then to principal outstanding under the Note. If the fifteenth day of a month is not a Business Day, then the applicable payment due hereunder shall be made on the first Business Day immediately following the fifteenth day of such month.

Section 2.4        Maturity.

The Loan shall mature and Borrowers shall pay to Agent all outstanding principal, accrued and unpaid interest, and any other amounts due under the Loan Documents on January 12, 2013.

Section 2.5        Prepayment.

(a)        Lock-Out Period; Defeasance Option.  Borrowers may not voluntarily prepay the Loan in whole or in part prior to the Maturity Date.  After the expiration of the Lock-Out Period through the Maturity Date (such period herein called the **"Defeasance Period"**), Borrowers may, however, obtain a release of the Collateral securing the Loan pursuant to the terms of Section 2.6 below.

(b)        Conditions of Voluntary Prepayment.  In the event of any such voluntary prepayment permitted hereunder, Borrowers shall give Agent and the Lender written notice (or telephonic notice promptly confirmed in writing) of their intent to prepay, which notice shall be given at least thirty (30) days' prior to the date upon which prepayment is to be made and shall specify the Payment Date on which such prepayment is to be made and the amount of such prepayment.  If any such notice is given, the Loan and all other amounts as aforesaid shall be due and payable on the Payment Date specified therein (unless such notice is revoked by Borrowers not less than five (5) days prior to the date specified therein in which event Borrowers shall immediately reimburse Agent and the Lender for any reasonable out-of-pocket costs incurred in connection with the giving of such notice and its revocation).

(c)        Involuntary Prepayment.  If the Maturity Date of the Loan is accelerated by Agent during the Lock-Out Period or the Defeasance Period for any reason, except pursuant to the terms of Section 7.6 hereof, there shall be due and payable upon such acceleration and payment (including any amount bid or credited at a foreclosure sale of the Property or pursuant to a deed-in-lieu of foreclosure), the following amounts:  (i) the Make-Whole Breakage Amount, (ii) the Prepayment Premium, and (iii) all other amounts outstanding under the Loan Documents.

(d)        Casualty and Condemnation Proceeds.  Anything herein to the contrary notwithstanding, any prepayment of any of the principal balance of the Loan during the Lock-Out Period or the Defeasance Period as a result of the application of insurance or condemnation proceeds by Agent to such principal pursuant to Section 3.2 hereof shall be at "par" and no Make-Whole Breakage Amount or Prepayment Premium shall be due with respect to any such principal that is prepaid.

(e)        Option of Lender to Accept Prepayment.  Agent may, in its sole discretion and option, elect to accept a voluntary prepayment of the Loan during the Defeasance Period in

lieu of requiring Defeasance. Any such prepayment shall be accompanied by the payment of the Make-Whole Breakage Amount and the Prepayment Premium.

      (f)    Character of Prepayment Fees. The Make-Whole Breakage Amount and Prepayment Premium do not constitute a penalty, but rather represent the reasonable estimate, agreed to between Borrowers and Lender, of fair compensation for the loss that may be sustained by Lender due to the payment of the principal Indebtedness prior to the Maturity Date. Any Make-Whole Breakage Amount or Prepayment Premium shall be paid without prejudice to the right of Agent to collect on behalf of Lender any of the amounts owing under the Note, this Loan Agreement or the other Loan Documents or otherwise, to enforce any of its rights or remedies arising out of an Event of Default.

      Section 2.6    Defeasance. At any time during the Defeasance Period, so long as no Event of Default exists and is continuing, Borrowers may obtain the release of the Projects from the lien of the Security Documents upon the satisfaction of the following conditions precedent ("**Defeasance**"):

      (a)    not less than thirty (30) days prior written notice delivered to Agent specifying a regularly scheduled Payment Date (the "**Release Date**") on which the Defeasance Deposit (hereinafter defined) is to be made, provided that the Release Date may be any date other than a regularly scheduled Payment Date as long as the interest is paid through the next succeeding Payment Date following the Release Date;

      (b)    the payment to Agent of interest accrued and unpaid on the principal balance of the Loan to and including the Release Date;

      (c)    the payment to Agent of all other sums, not including scheduled interest or principal payments, due under the Note, the Security Documents, and the other Loan Documents;

      (d)    the payment to Agent of the Defeasance Deposit and a $5,000 non-refundable processing fee;

      (e)    the delivery by Borrowers to Agent at Borrowers' sole cost and expense of:

      (i)    a security agreement in form and substance satisfactory to Agent, creating a first priority lien in favor of Agent on the Defeasance Deposit and the U.S. Obligations (hereinafter defined) purchased on behalf of Borrowers with the Defeasance Deposit in accordance with this Section 2.6 (the "**Security Agreement**");

      (ii)    releases of the Projects from the lien of each Security Document (for execution by Agent) in a form appropriate for the jurisdiction in which each Project is located and otherwise acceptable to Agent;

      (iii)    an Officer's Certificate certifying that the requirements set forth in this clause (e) have been satisfied;

(iv)    an opinion of counsel in form and substance, and rendered by counsel reasonably satisfactory to Agent, at Borrowers' expense, stating, among other things, that Agent has a perfected first priority security interest in the Defeasance Deposit and the U.S. Obligations purchased by or on behalf of Borrowers and pledged to Agent and as to enforceability of the Assignment Agreement, the Security Agreement and other documents delivered in connection therewith, and if required by the Rating Agencies or Agent, a substantive non-consolidation opinion with respect to the Successor Borrower;

(v)    if required by the Rating Agencies and/or pooling and servicing agreement relating to the Secondary Market Transaction, a Rating Confirmation; and

(vi)    such other certificates, documents, opinions or instruments as Agent may reasonably request; and

(f)    if the Loan has been sold in a Secondary Market Transaction, Agent shall have received an opinion of counsel reasonably acceptable to Agent in form satisfactory to Agent, at Borrowers' expense, stating, among other things, that the Defeasance shall not cause the holder of the Loan to fail to maintain its status as a real estate mortgage investment conduit ("**REMIC**"); and

(g)    Agent shall have received, at Borrowers' expense, a certificate from a nationally recognized independent certified public accountant acceptable to Agent, in form and substance satisfactory to Agent, certifying that the U.S. Obligations purchased with the Defeasance Deposit will generate sufficient sums to satisfy the obligations of Borrowers under the Note and this Section 2.6 as and when such obligations become due.

In connection with the conditions set forth above, Borrowers hereby appoint Agent as its agent and attorney-in-fact for the purpose of using the Defeasance Deposit to purchase or cause to be purchased U.S. Obligations which provide payments on or prior to, but as close as possible to, all successive scheduled Payment Dates after the Release Date upon which interest and principal payments are required under the Note, including the amounts due on the Maturity Date and in amounts equal to the scheduled payments due on such dates under the Note plus Agent's estimate of administrative expenses and applicable federal income taxes associated with or to be incurred by the Successor Borrower during the remaining term of the Loan with respect to interest earned on the Defeasance Deposit (the "**Scheduled Defeasance Payments**").  Borrowers, pursuant to the Security Agreement or other appropriate document, shall authorize and direct that the payments received from the U.S. Obligations may be made directly to Agent and applied to satisfy the obligations of Borrowers under the Note and this Section 2.6.

Upon compliance with the requirements of this Section 2.6, the Projects shall be released from the lien of the Security Documents and the pledged U.S. Obligations shall be the sole source of collateral securing the Note.  Any portion of the Defeasance Deposit in excess of the amount necessary to purchase the U.S. Obligations required by the preceding paragraph and to otherwise satisfy the Borrowers' obligations under this Section 2.6 shall be remitted to Borrowers with the release of the Projects from the lien of the Security Documents.  In connection with such release, a successor entity meeting the Single-Purpose Entity Requirements

and otherwise reasonably acceptable to Agent, adjusted, as applicable, for the Defeasance contemplated by this <u>Section 2.6</u> (the "**Successor Borrower**"), shall be established by Borrowers subject to Agent's reasonable approval (or at Agent's option, by Agent) and Borrowers shall transfer and assign all obligations, rights and duties under and to the Note together with the pledged U.S. Obligations to such Successor Borrower pursuant to an assignment and assumption agreement in form and substance satisfactory to Agent (the "**Assignment Agreement**").  Such Successor Borrower shall assume the obligations under the Note, the Security Agreement and the other Loan Documents and Borrowers shall be relieved of their obligations thereunder, except (i) that Borrowers shall be required to perform their obligations pursuant to this <u>Section 2.6</u>, including maintenance of the Successor Borrower, if applicable, and (ii) for those obligations of Borrowers which survive repayment of the Loan.  Borrowers shall pay $1,000.00 to any such Successor Borrower as consideration for assuming the obligations under the Note, the Security Agreement and the other Loan Documents pursuant to the Assignment Agreement.  Borrowers shall pay all reasonable costs and expenses incurred by Agent in connection with this <u>Section 2.6</u>, including Agent's reasonable attorneys' fees and expenses, cost and expenses in obtaining review and confirmation by the applicable Rating Agencies as required herein, and any administrative and tax expenses associated with or incurred by the Successor Borrower.

For purposes of this <u>Section 2.6</u>, the following terms shall have the following meanings:

(x)     The term "**Defeasance Deposit**" shall mean an amount equal to the Yield Maintenance Amount, any costs and expenses incurred or to be incurred in the purchase of U.S. Obligations necessary to meet the Scheduled Defeasance Payments (including Agent's estimate of administrative expenses and applicable federal, state or local income taxes associated with or to be incurred by the Successor Borrower during the remaining term of the Loan) and any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of this <u>Section 2.6</u>, all as estimated by Agent.

(y)     The term "**Yield Maintenance Amount**" shall mean the amount estimated by Agent which will be sufficient to purchase U.S. Obligations providing the required Scheduled Defeasance Payments.

(z)     The term "**U.S. Obligations**" shall mean "Government Securities" as defined in the REMIC regulations, specifically, Treasury Regulation § 1.860G-2(a)(8)(i), as chosen by Agent.

Section 2.7     <u>Reserved</u>.

Section 2.8     <u>Application of Payments</u>.

All payments received by Agent or Lender under the Loan Documents shall be applied: <u>first</u>, to any fees, expenses and indemnification payments due to Agent or Lender under the Loan Documents; <u>second</u>, to any Default Rate interest or late charges; <u>third</u>, to other accrued and unpaid interest; <u>fourth</u>, to the principal sum and other amounts due under the Loan

Documents, and <u>fifth</u> to the Make Whole Breakage Amount and Prepayment Premium, as applicable.

Section 2.9    <u>Sources and Uses</u>.

The sources and uses of funds for the contemplated transaction are as described on <u>Schedule 2.9</u> attached hereto. Borrowers shall deliver such information and documentation as Agent shall request to verify that the sources and uses are as indicated on <u>Schedule 2.9</u>. A reduction in the amounts necessary for any of the uses may, at Agent's election, shall result in an equal reduction in the amount of the Loan.

Section 2.10    <u>Security</u>.

The Loan and all other indebtedness and obligations under the Loan Documents (other than the Environmental Indemnity) shall be secured by liens and security interests granted to Lender in the following (collectively, the **"Collateral"**): (a) the Projects and other collateral as set forth in the Security Document and (b) any other collateral or security described in this Agreement or the other Loan Documents or required by Agent or Lender pursuant to the Loan Documents in connection with the Loan.

## ARTICLE III
## INSURANCE, CONDEMNATION, AND IMPOUNDS

Section 3.1    <u>Insurance</u>.

Borrowers shall maintain insurance as follows:

(a)    <u>Property</u>. Borrowers, Master Tenant or Property Manager shall keep the Projects insured against damage by fire and the other hazards covered by a standard extended coverage and "special perils" insurance policy (including a separate policy for broad form boiler and machinery coverage (without exclusion for explosion)) for the full insurable value thereof, with the term "full insurable value" to mean the actual replacement cost of the improvements and the personal property located at the Projects (without taking into account depreciation or co-insurance), and shall maintain such other casualty insurance as reasonably required by Agent, including, without limitation, ordinance or law coverage, in amounts and in form and with carrier(s) approved by Agent as of the Closing Date which carrier(s), amounts and form shall not be changed without the prior written consent of Agent, which consent shall not be unreasonably withheld. Borrowers, Master Tenant or Property Manager shall keep the Projects insured against loss by flood if any Project is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 and the National Flood Insurance Reform Act of 1994 (and any successor acts thereto) in an amount at least equal to the amount approved by Agent as of the Closing Date. The proceeds of insurance paid on account of any damage or destruction to any Project shall be paid to Agent to be applied as provided in <u>Section 3.2</u>.

(b)    <u>Liability</u>. Borrowers, Master Tenant or Property Manager shall maintain (i) commercial general liability insurance with respect to the Projects; (ii) worker's compensation

insurance and employer's liability insurance covering employees at the Projects employed by Master Tenant or Property Manager on behalf of Master Tenants (to the extent required, and in the amounts required by applicable laws); (iii) business interruption insurance, including use and occupancy, rental income loss and extra expense, against all periods covered by Borrowers' property insurance; (iv) umbrella liability, (v) builder's risk insurance, as applicable, and (vi) Terrorism insurance (subject to the requirements of this Section 3.1). All of the above shall be maintained at all times during the term of the Loan with coverages, in the amounts and forms and with limits and carrier(s) approved by Agent as of the Closing Date which carrier(s), amounts, limits and form shall not be changed or reduced without the prior written consent of Agent.

(c)    Without limiting the foregoing and notwithstanding anything to the contrary contained in this Agreement, if on the Closing Date, terrorism, terrorist acts or similar perils (collectively, **"Terrorism"**) is an exclusion from coverage in the insurance policies described in Sections 3.1(a) and (b) above, then Borrowers shall, upon Agent's request, obtain a separate policy or policies insuring specifically against Terrorism; provided such coverage is (i) customarily obtained by owners of property similar to the Projects in use, character and geographic location, and (ii) readily available at a cost which, in Agent's opinion, exercised reasonably, is commercially reasonable. Any such liability insurance shall name Agent, Borrowers, Master Tenant and Property Manager as insureds or additional insureds, as appropriate.

(d)    Other Insurance. Borrowers shall maintain such other insurance with respect to the Projects as reasonably required by Agent, provided that Agent is requiring such other insurance for loans similar to the Loan and secured by property comparable to, and in the vicinity of, the Projects.

(e)    Form and Quality. All insurance policies shall be endorsed in form and substance acceptable to Agent to name Agent as an additional insured, loss payee or mortgagee thereunder, as its interest may appear, with loss payable to Agent, without contribution, under a standard New York (or local equivalent) mortgagee clause. All such insurance policies and endorsements shall be fully paid for and contain such provisions and expiration dates and be in such form and issued by such insurance companies licensed to do business in the state where each Project is located, with a rating of "A-IX" or better as established by Best's Rating Guide (or an equivalent rating approved in writing by Agent). Each policy shall provide that such policy may not be cancelled or materially changed except upon thirty (30) days' prior written notice of intention of non-renewal, cancellation or material change to Agent and that no act or thing done by Borrowers shall invalidate any policy as against Agent. Borrowers shall assign the policies or proofs of insurance to Agent, in such manner and form that Agent and its successors and assigns shall at all times have and hold the same as security for the payment of the Loan. Borrowers shall deliver copies of all original policies certified to Agent by the insurance company or authorized agent as being true copies, together with the endorsements required hereunder. The proceeds of insurance policies coming into the possession of Agent shall not be deemed trust funds, and Agent shall be entitled to apply such proceeds as herein provided. Borrowers shall not maintain any separate or additional property insurance which is contributing in the event of loss unless it is properly endorsed and otherwise satisfactory to Agent in all respects.

(f)    Agent's Right to Purchase Insurance.  In the event Borrowers fail to provide Agent with evidence of the insurance coverage required by this Agreement, Agent may purchase insurance at Borrowers' expense to protect Agent's interests in the Projects.  This insurance may, but need not, protect Borrowers' interests.  The coverage purchased by Agent may not pay any claim made by any Borrower or any claim that is made against any Borrower in connection with the Projects.  Borrowers may later cancel any insurance purchased by Agent, but only after providing Agent with evidence that Borrowers have obtained insurance as required by this Agreement.  If Agent purchases insurance for the Projects, Borrowers will be responsible for the costs of that insurance, including interest and other charges imposed by Agent in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance may be added to the Loan.  The costs of the insurance may be more than the cost of insurance Borrowers are able to obtain on their own.

Section 3.2      Disposition of Insurance Proceeds.

(a)    Notice of Loss; Adjustments.  Borrowers shall give immediate written notice of any loss to Agent.  Borrowers hereby irrevocably authorize and empower Agent, as attorney-in-fact for Borrowers coupled with an interest, to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Agent's expenses incurred in the collection of such proceeds.  Notwithstanding the foregoing, provided no Event of Default or Potential Default exists, (i) Borrowers shall have the right to (or to permit Master Tenant to) exercise the rights specified in the prior sentence with respect to claims of $150,000 or less (herein, a "**Minor Claim**") and (ii) with respect to all claims other than Minor Claims, Agent and Borrowers shall jointly and reasonably agree on the prompt adjustment and compromise of such loss, to collect and receive such proceeds or awards and to endorse any check in payment thereof.  Furthermore, with respect to Minor Claims, Agent agrees that insurance proceeds may be made available directly to the Borrowers provided that no Event of Default is then in existence and so long as Borrowers promptly commence and diligently pursue to completion any required restoration work utilizing such insurance proceeds.  Nothing contained in this Section 3.2, however, shall require Agent to incur any expense or take any action hereunder.

(b)    Use and Application.  Except as set forth hereinbelow or in case of a Minor Claim, Beneficiary, in its absolute discretion, may decide whether and to what extent, if any, proceeds of insurance will be made available to Borrowers for repair or restoration of the Projects.  Notwithstanding the foregoing, Agent agrees to make insurance proceeds available to Borrowers for repair or restoration provided the following conditions are satisfied:

(i)    the cost to repair the affected Project or Projects (as determined by Agent) is not more than 25% of the replacement value of the affected improvements (for projects containing multiple phases or stand alone structures, such calculation to be based on the damaged phase or structure, not the Project or Projects as a whole);

(ii)   no Event of Default or Potential Default exists;

(iii)    Agent determines that there are sufficient funds available to restore and repair the Projects to a condition substantially the same as existed prior to the casualty;

(iv)    Agent determines that the Net Operating Income of the Projects during restoration plus the collectible proceeds of business interruption insurance will be sufficient to pay Debt Service;

(v)    Agent determines that after restoration the Debt Service Coverage Ratio will be at least 1.25:1.00 and the Project Yield will be at least ten and two-tenths percent (10.2%);

(vi)    Agent determines that restoration and repair of the affected Project or Projects to a condition approved by Agent will be completed within nine (9) months after the date of loss or casualty and in any event ninety (90) days prior to the Maturity Date; and

(vii)    Borrowers promptly commence and are diligently pursuing restoration of the affected Project or Projects.

(c)    Application to Loan Balance.  If the conditions set forth in Section 3.2(b) above are not satisfied or an Event of Default or Potential Default exists (regardless of whether the loss relates to a Minor Claim), Agent may, in Agent's sole discretion, elect to either (i) apply (without payment of any Make Whole Breakage Amount or Prepayment Premium as to the principal prepaid with such proceeds) any insurance proceeds it may receive to the payment of the Loan in whatever order Agent elects or (ii) allow all or a portion of such proceeds to be used for the restoration of the affected Project or Projects.  Any principal reduction resulting from an early involuntary prepayment as a result of a condemnation proceeding or insurance settlement will cause a re-calculation of debt service payments based upon the reduced Loan balance, the remaining amortization schedule and the Interest Rate.

(d)    Disbursements of Proceeds.  Insurance proceeds applied to restoration will be disbursed on receipt of reasonably satisfactory plans and specifications, contracts and subcontracts, schedules, budgets, lien waivers and architects' certificates, and otherwise in accordance with prudent commercial construction lending practices for construction loan advances, including, as applicable, the advance conditions under Part C of Schedule 2.1 with respect to disbursement of insurance proceeds.

Section 3.3        Condemnation Awards.

Borrowers shall immediately notify Agent of the institution of any proceeding for the condemnation or other taking of any Project or any portion thereof.  With respect to any claim other than a Minor Claim, Agent may participate in any such proceeding and Borrowers will deliver to Agent all instruments necessary or required by Agent to permit such participation.  Without Agent's prior consent, with respect to any claim other than a Minor Claim, Borrowers (a) shall not agree to any compensation or award, and (b) shall not take any action or fail to take any action which would cause the compensation to be determined.  All awards and compensation for the taking or purchase in lieu of condemnation of the Projects or any part thereof are hereby assigned to and shall be paid to Agent.  Borrowers authorize Agent to collect and receive such awards and compensation and to give proper receipts and acquittances therefor.  Agent agrees

that proceeds of any Minor Claim may be made available directly to the Borrowers provided that no Event of Default is then in existence and so long as Borrowers promptly commence and diligently pursue to completion any required restoration work utilizing such proceeds. With respect to any other claim associated with a condemnation or taking of any Project, Agent may elect, in Agent's sole discretion, to either (a) apply the proceeds of any claim related to the same (after deduction of Lender's reasonable costs and expenses, if any in collecting the same) toward the payment of the Loan in such order and manner as Agent may elect, notwithstanding that the Loan may not then be due and payable (but without payment of any Make Whole Breakage Amount or Prepayment Premium with respect to the amount so applied), or (b) make the same available to Borrowers for the restoration or repair of the Projects. If the net proceeds of the condemnation award are made available to Borrowers for restoration or repair, such proceeds shall be disbursed upon satisfaction of and in accordance with the terms and conditions set forth in Section 3.2. Borrowers, upon request by Agent, shall execute all instruments requested to confirm the assignment of the awards and compensation to Agent, free and clear of all liens, charges or encumbrances.

Section 3.4   Insurance Impounds.

   (a)  Deposits. Borrowers shall deposit (or shall cause Master Tenant to deposit) with Agent, monthly, on each Payment Date, an amount (the "**Insurance Impound**") equal to one-twelfth (1/12th) of the annual charges for insurance premiums relating to the insurance coverages required by this Agreement. In addition, at or before the initial advance of the Loan, Borrowers shall deposit with Agent a sum of money which together with the monthly installments will be sufficient to make each of such payments thirty (30) days prior to the date any delinquency or penalty becomes due with respect to such payments. Deposits shall be made on the basis of Agent's estimate from time to time of the charges for the current year. All funds so deposited shall be held by Agent. These sums may be commingled with the general funds of Agent, and shall not be deemed to be held in trust for the benefit of Borrowers. So long as no Potential Default or Event of Default exists hereunder, Agent shall credit for Borrowers' account interest on such funds held by Agent from time to time at the money market account rate announced from time to time by The Northern Trust Company or any other national banking association selected by Agent in its sole discretion (the "**Money Market Rate**"). All interest paid on such funds shall be deemed to be a part of the Insurance Impound and shall be applied in accordance with this Section 3.4. Borrowers hereby grant to Agent for the benefit of Lender and Agent a security interest in all funds so deposited with Agent for the purpose of securing the Loan. While an Event of Default exists, the funds deposited may be applied in payment of the charges for which such funds have been deposited, or to the payment of the Loan or any other charges affecting the security of Agent, as Agent may elect, but no such application shall be deemed to have been made by operation of law or otherwise until actually made by Agent. Borrowers shall furnish Agent with bills for the charges for which such deposits are required at least thirty (30) days prior to the date on which the charges first become payable. If at any time the amount on deposit with Agent, together with amounts to be deposited by Borrowers before such charges are payable, is insufficient to pay such charges, Borrowers shall deposit any deficiency with Agent immediately upon demand. Agent shall pay such charges when the amount on deposit with Agent is sufficient to pay such charges and Agent has received a bill for such charges.

(b)    Conditional Waiver of Impound Requirement.  Anything herein to the contrary notwithstanding, so long as Master Tenant is making monthly deposits equal to the Insurance Impound on a timely basis and in the amounts as required by Agent under Section 3.4(a) above, the Borrowers shall not be required to deposit the Insurance Impound with Agent.

Section 3.5        Real Estate Tax Impounds.

(a)    Deposits.  Borrowers shall deposit (or shall cause Master Tenant to deposit) with Agent, monthly, on each Payment Date, an amount (the "Tax Impound") equal to one-twelfth (1/12th) of the annual charges for real estate taxes, assessments, franchise taxes and changes, impositions and other charges and obligations relating to the Projects (collectively, the "Taxes").  In addition, at or before the initial advance of the Loan, Borrowers shall deposit with Agent a sum of money which together with the monthly installments will be sufficient to make each of such payments thirty (30) days prior to the date any delinquency or penalty becomes due with respect to such payments.  Deposits shall be made on the basis of Agent's estimate from time to time of the charges for the current year (after giving effect to any reassessment or, at Agent's election, on the basis of the charges for the prior year, with adjustments when the charges are fixed for the then current year).  All funds so deposited shall be held by Agent.  These sums may be commingled with Agent's general funds and shall not be deemed to be held in trust for the benefit of Borrowers.  So long as no Potential Default or Event of Default exists hereunder, Agent shall credit for Borrowers' account interest on such funds held by Agent from time to time at the Money Market Rate.  All interest paid on such funds shall be deemed to be a part of the Tax Impound and shall be applied in accordance with this Section 3.5.  Borrowers hereby grant to Agent for the benefit of Lender and Agent a security interest in all funds so deposited with Agent for the purpose of securing the Loan.  While an Event of Default exists, the funds deposited may be applied in payment of the charges for which such funds have been deposited, or to the payment of the Loan or any other charges affecting the security of Agent, as Agent may elect, but no such application shall be deemed to have been made by operation of law or otherwise until actually made by Agent.  Borrowers shall furnish Agent with bills for the charges for which such deposits are required at least thirty (30) days prior to the date on which the charges first become payable.  If at any time the amount on deposit with Agent, together with amounts to be deposited by Borrowers before such charges are payable, is insufficient to pay such charges, Borrowers shall deposit any deficiency with Agent immediately upon demand.  Agent shall pay such charges when the amount on deposit with Agent is sufficient to pay such charges and Agent has received a bill for such charges.  The obligation of Borrowers to pay the Taxes, as set forth in the Security Documents, is not affected or modified by the provision of this paragraph.

(b)    Conditional Waiver of Impound Requirement.  Anything herein to the contrary notwithstanding, so long as Master Tenant is making monthly deposits equal to the Tax Impound on a timely basis and in the amounts as required by Agent under Section 3.5(a) above, the Borrowers shall not be required to deposit the Tax Impound with Agent.

Section 3.6        Replacement Reserves.

(a)    Deposits.  Borrowers shall deposit (or shall cause Master Tenant to deposit) with Agent on each Payment Date an amount equal to the product of Thirty Dollars

($30.00) multiplied by the number of Licensed Units in each Project (the "**Replacement Deposit**"). Provided no Potential Default or Event of Default exists hereunder, Agent shall credit for Borrowers' account interest on the sum of the Replacement Deposit held by Agent from time to time, which interest shall accrue monthly at the Money Market Rate. The undisbursed amount of the Replacement Deposit and any interest earned thereon is hereinafter referred to as the "**Replacement Reserve**". Borrowers hereby grant to Agent for the benefit of Lender and Agent a security interest in the Replacement Reserve for the purpose of securing the Loan. On the Maturity Date, the monies then remaining on deposit with Agent shall, at Agent's option, be applied against the Indebtedness or if no Potential Default or Event of Default exists hereunder, returned to Borrowers. The Replacement Reserve may be commingled with the general funds of the Agent, and these sums shall not be deemed to be held in trust for the benefit of Borrowers.

(b) Disbursements. So long as no Potential Default or Event of Default hereunder or under any of the other Loan Documents has occurred and is continuing, Borrowers may request, from time to time, Agent to disburse funds from the Replacement Reserve (which request will include a reasonably detailed description of the capital expenditures at the Projects which Borrowers intend to pay for with such funds), which request shall not be unreasonably denied by Agent. If requested by Agent, each disbursement request will be accompanied by copies of invoices, lien waivers and other evidence reasonably required by Agent.

(c) Application to Loan. If an Event of Default occurs and is continuing, Agent shall have the right to apply all or any portion of the Replacement Reserve to the obligations evidenced by the Loan Documents in such order as Agent in its sole discretion determines.

(d) Conditional Waiver of Reserve Requirement. Anything herein to the contrary notwithstanding, so long as Master Tenant is making monthly deposits equal to the Replacement Reserve on a timely basis and in the amounts as required by Agent under Section 3.6(a) above, (i) the Borrowers shall not be required to deposit the Replacement Deposit with Agent and (ii) the disbursement of the such deposits shall be made to Master Tenant in accordance with the terms of the Master Lease Subordination Agreement.

## ARTICLE IV
## APPLICATION TO LOAN LEASING MATTERS

Section 4.1        Representations and Warranties on Leases and Master Lease.

(a) Leases. Borrowers represent and warrant to Agent with respect to Leases of the Projects that: (i) the rent roll separately delivered to Agent at or prior to Closing is true and correct as of the date hereof, and the Leases are valid and in and full force and effect; (ii) the Leases (including amendments) are in writing, and there are no oral agreements with respect thereto; (iii) the copies of the Leases delivered to Agent are true and complete; (iv) neither the landlord nor, to the Borrowers' knowledge, any tenant is in default under any of the Leases; (v) no Borrower has any knowledge of any notice of termination or default with respect to any Lease; (vi) no Borrower has assigned or pledged any of the Leases, the rents or any interests therein, except to Agent; (vii) no tenant under the Leases has an option to purchase all or any

portion of the Projects; (viii) no tenant has the right to terminate its Lease prior to expiration of the stated term of such Lease (unless due to casualty or condemnation of the Projects); and (ix) no tenant has prepaid more than one month's rent in advance (except for bona fide security deposits not in excess of an amount equal to two month's rent).

(b)    Master Lease.  Borrowers represent and warrant to Agent with respect to the Master Lease that:  (i) the Master Lease is valid and in and full force and effect; (ii) the Master Lease (including amendments) is in writing, and there are no oral agreements with respect thereto; (iii) the copy of the Master Lease delivered to Agent is true and complete; (iv) neither the Borrowers nor Master Tenant is in default under any Master Lease; (v) no Borrower has any knowledge of any notice of termination or default with respect to the Master Lease; (vi) no Borrower has assigned or pledged the Master Lease, the rents or any interests therein, except to Agent or except in connection with a Permitted Transfer, (vii) Master Tenant does not have an option to purchase all or any portion of the Projects; (viii) except as set forth in the Master Lease, Master Tenant does not have the right to terminate the Master Lease prior to expiration of the stated term of the Master Lease (unless due to casualty or condemnation of the Project); and (ix) Master Tenant has not prepaid more than one month's rent in advance.

Section 4.2        Approval Rights.

(a)    Borrowers shall not and shall not permit Master Tenant to, without Agent's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed, enter into or amend (in any material respect) any Lease or other rental or occupancy agreement or concession agreement with respect to a Project except as expressly permitted hereunder.

(b)    Borrowers shall have the right to and to permit Master Tenant to, enter into, amend and/or modify non-residential Leases without Agent's consent provided (i) the economic terms of the Lease conform to those of the market, (ii) the form of the non-residential Lease is that of the standard lease form approved by Agent, with no material modifications, (iii) the initial term is not longer than five (5) years, and (iv) the leased premises are not greater than 10% of the square footage of the applicable Project.  To the extent Agent's consent is required under this Section 4.2(b), Agent's consent shall not be unreasonably withheld or delayed and provided the request for consent is presented in writing with the following language:  THIS LETTER CONTAINS A REQUEST FOR CONSENT WHICH WILL BE DEEMED GIVEN IF NOT DENIED IN WRITING TOGETHER WITH THE REASON FOR SUCH DENIAL WITHIN TEN (10) BUSINESS DAYS, consent shall be deemed given if not denied in writing (together with the reasons for such denial) within ten (10) business days of written request.  Agent's consent shall not be required for Borrowers to terminate or to permit Master Tenant to terminate a Lease as a result of the tenant's default thereunder.  Borrowers shall provide Agent copies of all Leases and amendments thereof promptly after execution, including those Leases for which Agent's consent is not required.

(c)    Anything herein to the contrary notwithstanding, any Lease Party shall have the right to enter into or amend any residential Lease so long as such residential Lease (i) has a term of no more than one (1) year, (ii) is at market rates and (iii) is on the form previously approved by Agent without any material modifications.

Section 4.3          Covenants.

(a)     Borrowers shall, or shall cause Master Tenant to (i) perform the obligations which such Lease Party is required to perform under the Leases; (ii) enforce the material obligations to be performed by the tenants under the Leases; (iii) not collect any rents for more than one month in advance of the time when the same shall become due, except for bona fide security deposits not in excess of an amount equal to two months rent; (iv) not assign or encumber any Lease; and (v) not, except with Agent's prior written consent, cancel or accept surrender or termination of any non-residential Lease; and (vi) not, except with Agent's written consent, modify or amend any non-residential Lease (except for minor modifications and amendments entered into in the ordinary course of business, consistent with prudent property management practices, not affecting the economic terms of the Lease), and any action in violation of clauses (iv), (v), and (vi) of this Section 4.3(a) shall be void at the election of Agent. Borrowers will not suffer or permit any breach or default to occur in any of any Lease Party's obligations under any of the Leases, nor suffer or permit the same to terminate by reason of any failure of Lease Party to meet any requirement of any Lease.

(b)     Borrowers shall (i) perform the obligations which Borrowers are required to perform under the Master Lease; (ii) enforce the material obligations to be performed by the Master Tenant under the Master Lease; (iii) promptly furnish to Agent any notice of default or termination received by any Borrower from Master Tenant, and any notice of default or termination given by any Borrower to Master Tenant under the Master Lease; (iv) not collect any rents for more than one month in advance of the time when the same shall become due under the Master Lease, except for bona fide security deposits not in excess of an amount equal to two months rent; (v) not enter into any ground lease or master lease of any part of the Projects other than the Master Lease; (vi) not further assign (except in connection with a Permitted Transfer) or encumber the Master Lease; (vii) not, except with Agent's prior written consent, cancel or accept surrender or termination of the Master Lease; and (viii) not, except with Agent's prior written consent, modify or amend the Master Lease, and any action in violation of clauses (v), (vi), (vii), and (viii) of this Section 4.3(b) shall be void at the election of Agent. Borrowers will not suffer or permit any breach or default to occur in any of any Borrower's obligations under the Master Lease nor suffer or permit the same to terminate by reason of any failure of any Borrower to meet any requirement of the Master Lease.

Section 4.4          Estoppels.

(a)     At Agent's request, Borrowers shall obtain and furnish to Agent, written estoppels in form and substance satisfactory to Agent, executed by non-residential tenants under Leases in the Projects and confirming the term, rent, and other provisions and matters relating to the non-residential Leases.

(b)     At Agent's request, Borrowers shall obtain and furnish to Agent, a written estoppel in form and substance satisfactory to Agent, executed by Master Tenant and confirming the term, rent and other provisions and matters relating to the Master Lease.

Section 4.5        Security Deposits.

(a) Existence of Security Deposits.  None of any Borrower nor Master Tenant has collected or is in receipt of any security deposit from any tenant of any Project, except as described on the rent rolls previously provided to Agent at or prior to the Closing Date. Borrowers and/or Master Tenant, as applicable shall hold, in trust, all tenant security deposits in a segregated account, and, to the extent required by applicable law, shall not commingle any such funds with any other funds of Borrowers or Master Tenant.

(b) Lien on Security Deposits.  Upon the request of Agent, Borrowers or Master Tenant shall at all times have on deposit with Agent, as cash collateral for the Loan and all amounts payable under the Loan Documents, an amount of cash equal to the aggregate amount of security deposits which are or may become refundable to tenants of the Projects from time to time.  Agent agrees to allow Borrowers or Master Tenant, if applicable, to use such funds solely to repay such amounts to tenants of the Projects, as and when the same are due; provided Agent may, but shall not be obligated to, pay such amounts directly to the tenants upon Agent's receipt of evidence reasonably satisfactory to Agent that such amounts are due; and provided further, upon payment in full of the Loan and all other amounts due Agent under the Loan Documents, Agent shall pay any remaining amounts on deposit (including any interest earned thereon as hereinafter provided) with Agent pursuant to this Section 4.5(b) to Borrowers or Master Tenant, if applicable.  Agent shall not be obligated to pay Borrowers or Master Tenant, if applicable, interest on any amounts on deposit with Agent pursuant to this Section 4.5(b), but if such funds are placed in an interest-bearing account, such interest will be added to and become part of the funds in the account.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Borrowers represent and warrant to Agent as follows:

Section 5.1        Organization and Power.

Each Borrower and each Loan Party (other than a natural person) is duly organized, validly existing and in good standing under the laws of the state of its formation or existence, and is in compliance with legal requirements applicable to doing business in the state of its formation.  Each Borrower and each Loan Party (other than a natural person and to the extent required by law) is in good standing under the laws of and is in compliance with legal requirements applicable to doing business in the state where each Project is located.  No Borrower is a "foreign person" within the meaning of § 1445(f)(3) of the Internal Revenue Code.

Section 5.2        Sole Members.

(a)        Sole Members.  The sole member of each Borrower (each a "Sole Member" and collectively, the "Sole Members"), if other than an individual, is duly organized, validly existing and in good standing under the laws of the state of its formation with its principal place of business as specified in the Borrower's Certificate for such Borrower.  Each Sole Member is the sole member of such Borrower and owns the percentage interest in such Borrower as set forth in the Borrower's Certificate for such Borrower, free and clear of all liens,

claims, and encumbrances.  Each Borrower has appointed Capital Resources Fund, LLC, as its Vice-President, and Capital Resources Fund, LLC has full right, power and authority to execute the Loan Documents on behalf of each Borrower.

(b)    Ownership of Borrowers.  Each Borrower has provided on Borrower's Certificate the names of each member of the Borrower and such member's percentage interest in such Borrower and the ownership interests in each Sole Member.  All such interests are free and clear of all liens, claims, encumbrances and rights of others.

Section 5.3    Borrowers' Partnership Agreements.

A true and complete copy of the limited liability company agreement creating each Borrower and any and all amendments thereto (collectively, the **"Operating Agreements"**) has been furnished to Agent.  Each Operating Agreement constitutes the entire agreement among the members of each Borrower and is binding upon and enforceable against each of the partners in accordance with its terms.  There are no other agreements, oral or written, among any of the members relating to any Borrower.  No breach exists under any Operating Agreement and no condition exists which, with the giving of notice or the passage of time would constitute a breach under any Operating Agreement.

Section 5.4    Sole Member Formation Documents.

With respect to any Sole Members that are not individuals, a true and complete copy of the agreement of each Sole Member and all other documents creating and governing each Sole Member (collectively, the **"Sole Member Formation Documents"**) have been furnished to Agent.  There are no other agreements, oral or written, relating to any Sole Member. The Sole Member Formation Documents were duly executed and delivered, are in full force and effect, and binding upon and enforceable in accordance with their terms.  No breach exists under the Sole Member Formation Documents and no act has occurred and no condition exists which, with the giving of notice or the passage of time would constitute a breach under the Sole Member Formation Documents.

Section 5.5    Validity of Loan Documents.

(a)    Due Execution.  The execution, delivery and performance by each Borrower and each Loan Party of the Loan Documents: (i) are duly authorized and do not require the consent or approval of any other party or governmental authority which has not been obtained; and (ii) will not violate any law or result in the imposition of any lien, charge or encumbrance upon the assets of any such party, except as contemplated by the Loan Documents.

(b)    Enforceability.  The Loan Documents constitute the legal, valid and binding obligations of each Borrower and the Principals, enforceable in accordance with their respective terms, subject to principles of equity and applicable bankruptcy, insolvency, or similar laws generally affecting the enforcement of creditors' rights.

Section 5.6        Liabilities; Litigation.

(a)        The financial statements delivered by each Borrower, Master Tenant, and Property Manager are true and correct with no significant change since the date of preparation. Except as disclosed in such financial statements, there are no liabilities (fixed or contingent) affecting any Project, any Borrower, Master Tenant or Property Manager. Except as disclosed in such financial statements, there is no litigation, administrative proceeding, investigation or other legal action (including any proceeding under any state or federal bankruptcy or insolvency law) pending or, to the knowledge of any Borrower, threatened, against any Project, any Borrower, any Loan Party, Master Tenant, or Property Manager which if adversely determined could have a material adverse effect on such party, any Project or the Loan.

(b)        None of any Borrower, the Master Tenant, or the Property Manager is contemplating either the filing of a petition by it under state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and none of any Borrower, Master Tenant, or Property Manager has knowledge of any Person contemplating the filing of any such petition against it.

Section 5.7        Taxes and Assessments.

There are no unpaid or outstanding real estate or other taxes or assessments on or against the Projects or any part thereof, except general real estate taxes not due or payable or that are being contested in accordance with the requirements of the Loan Documents. Copies of the current general real estate tax bills with respect to the Projects have been delivered to Agent. Each Project is comprised of one or more parcels, each of which constitutes a separate tax lot and none of which constitutes a portion of any other tax lot. There are no pending or, to Borrowers' knowledge, proposed, special or other assessments for public improvements or otherwise affecting any Project, nor are there any contemplated improvements to any Project that may result in such special or other assessments.

Section 5.8        Other Agreements; Defaults.

None of any Borrower, Master Tenant or Property Manager is a party to any agreement or instrument or subject to any court order, injunction, permit, or restriction which might adversely affect any Project or the business, operations, or condition (financial or otherwise) of any Borrower, Master Tenant, or Property Manager. None of any Borrower, Master Tenant or Property Manager is in violation of any agreement which violation would have an adverse effect on any Project, any Borrower, Master Tenant or Property Manager or any Borrower's, Master Tenant's or Property Manager's business, properties, or assets, operations or condition, financial or otherwise.

Section 5.9        Compliance with Law.

(a)        Entity Compliance. Each Borrower, each Loan Party, Master Tenant and Property Manager has all requisite licenses, permits, franchises, qualifications, certificates of occupancy or other governmental authorizations to own, lease and operate the Projects and carry on its business.

(b)    Project Compliance. Each Project is in compliance with all applicable legal requirements and is free of structural defects, and all building systems contained therein are in good working order, subject to ordinary wear and tear. No Project constitutes, in whole or in part, a legally non-conforming use under applicable legal requirements.

Section 5.10    Condemnation.

No condemnation has been commenced or, to Borrowers' knowledge, is contemplated with respect to all or any portion of any Project or for the relocation of roadways providing access to any Project.

Section 5.11    Access.

To the best of Borrowers' knowledge, each Project has adequate rights of access to public ways and is served by adequate water, sewer, sanitary sewer and storm drain facilities. All public utilities necessary or convenient to the full use and enjoyment of each Project are located in the public right-of-way abutting the applicable Project, and all such utilities are connected so as to serve such Project without passing over other property, except to the extent such other property is subject to a perpetual easement for such utility benefiting such Project. To the best of Borrowers' knowledge, all roads necessary for the full utilization of each Project for its current purpose have been completed and dedicated to public use and accepted by all governmental authorities.

Section 5.12    Flood Hazard.

No Project is situated in an area designated as having special flood hazards as defined by the Flood Disaster Protection Act of 1973, as amended, or as a wetlands by any governmental entity having jurisdiction over any Project.

Section 5.13    Property.

(a)    Fee Interest. An undivided interest in the fee estate of each Project is, or contemporaneously with the initial funding of the Loan will be, owned by each Borrower free and clear of all liens, claims, encumbrances, covenants, conditions and restrictions, security interests and claims of others, except only such exceptions to title as have been approved by Agent.

(b)    Compliance with Zoning, Etc. To the best of Borrowers' knowledge, the Projects are in compliance with all zoning requirements, building codes, subdivision improvement agreements, declarations, ground leases, and all covenants, conditions and restrictions of record. Except as set forth in the exceptions to title approved by Agent, the zoning and subdivision approval of the Projects and the right and ability to, use or operate the Projects are not in any way dependent on or related to any real estate other than the Properties where the same are to be made. Except as previously disclosed to Agent in writing as of the date hereof, (i) there are no, nor are there any alleged or asserted, violations of law, regulations, ordinances, codes, permits, licenses, declarations, ground leases, covenants, conditions, or restrictions of record, or other agreements relating to the Projects, or any part thereof, (ii) the Projects are in good condition and repair with no deferred maintenance and are free from damage caused by fire

or other casualty, (iii) there is no latent or patent structural or other significant defect or deficiency in the Projects, (iv) design and as-built conditions of the Projects are such that no drainage or surface or other water will drain across or rest upon either the Projects or land of others except in areas designated for such purpose and for which a benefiting or burdening easement has been established, and (v) none of the Improvements on the Projects create an encroachment over, across or upon any of the Projects' boundary lines, rights of way or easements, and no buildings or other improvements on adjoining land create such an encroachment.

Section 5.14    Location of Borrowers.

Each Borrower's principal place of business and chief executive offices are located at the address set forth in the Borrower's Certificate provided by such Borrower to Agent.

Section 5.15    Margin Stock.

No part of proceeds of the Loan will be used for purchasing or acquiring any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System.

Section 5.16    Tax Filings.

Each Borrower has filed (or have obtained effective extensions for filing) all federal, state and local tax returns required to be filed and have paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by each Borrower.

Section 5.17    Solvency.

(a)    After giving effect to the Loan, the fair saleable value of each Borrower's assets exceeds and will, immediately following the making of the Loan, exceed such Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of each Borrower's assets is and will, immediately following the making of the Loan, be greater than each Borrower's probable liabilities, including the maximum amount of their contingent liabilities on their Debts as such Debts become absolute and matured.

(b)    No Borrower's assets constitute and, immediately following the making of the Loan will not constitute, unreasonably small capital to carry out its business as conducted or as proposed to be conducted. No Borrower intends to, nor believes that it will, incur Debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Debts as they mature (taking into account the timing and amounts of cash to be received by such Borrower and the amounts to be payable on or in respect of obligations of such Borrower).

Section 5.18    Full and Accurate Disclosure.

(a)    No statement of fact made by any Borrower or any Loan Party in this Agreement or in any of the other Loan Documents contains any untrue statement of a material

fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.

(b)    There is no fact presently known to any Borrower which has not been disclosed to Agent which materially adversely affects, nor as far as any Borrower can foresee, might materially adversely affect, any Project or the business, operations or condition (financial or otherwise) of any Borrower.

Section 5.19    Single Purpose Entity.

Each Borrower is and has at all times since its formation been a Single Purpose Entity and in compliance with the Single Purpose Entity Requirements.

Section 5.20    No Broker.

No brokerage commission or finder's fee is owing to any broker or finder arising out of any actions or activity of any Borrower in connection with the Loan, other than as disclosed to Agent in such Borrower's Certificate.

Section 5.21    Reserved.

Section 5.22    Labor Disputes.

To Borrowers' knowledge, there are no strikes, boycotts, or labor disputes which could reasonably be anticipated to have a material adverse effect on the operation of any Project.

Section 5.23    Employees.

No Borrower has any employees.

Section 5.24    ERISA (Borrower).

(a)    No Borrower is an "employee benefit plan" as defined in Section 3(3) of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (b) no Borrower is subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (c) the assets of each Borrower do not constitute "plan assets" of one or more plans within the meaning of 29 C.F.R. Section 2510.3-101. Each Borrower shall deliver to Agent such certifications and/or other evidence periodically requested by Agent, in its reasonable discretion, to verify these representations and warranties. Failure to deliver these certifications or evidence, breach of these representations and warranties, or consummation of any transaction which would cause the Loan Documents or any exercise of Agent's or Lender's rights under the Loan Documents to (1) constitute a non-exempt prohibited transaction under ERISA or (2) violate ERISA or any state statute regulating governmental plans (collectively, a "**Violation**"), which failure continues for thirty (30) days after written notice, shall be an Event of Default.    Notwithstanding anything in the Loan Documents to the contrary, no sale, assignment, or transfer of any direct or indirect right, title, or interest in any Borrower or the Projects (including creation of a junior lien, encumbrance or leasehold interest) shall be permitted which would negate any Borrower's representations in this Section 5.24 or cause a

Violation. At least fifteen (15) days before consummation of any of the foregoing, Borrower shall obtain from the proposed transferee or lienholder (1) a certification to Agent that the representations and warranties of this subparagraph will be true after consummation and (2) an agreement to comply with this Section 5.24.

Section 5.25    Intellectual Property.

Except as set forth on Exhibit C, Borrowers have no interest in any trademarks, copyrights, patents or other intellectual property with respect to the Projects.

Section 5.26    Anti-Terrorism and Anti-Money Laundering Compliance.

(a)    Compliance with Anti-Terrorism Laws. Borrowers are not, and, after making due inquiry, no Person who owns a controlling interest in or otherwise controls Borrowers is, (i) listed on the Specially Designated Nationals and Blocked Persons List (the "**SDN List**") maintained by the Office of Foreign Assets Control ("**OFAC**"), Department of the Treasury, and/or on any other similar list ("**Other Lists**" and, collectively with the SDN List, the "**Lists**") maintained by the OFAC pursuant to any authorizing statute, Executive Order or regulation (collectively, "**OFAC Laws and Regulations**"); or (ii) a Person (a "**Designated Person**") either (A) included within the term "designated national" as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (B) designated under Sections 1(a), 1(b), 1(c) or 1(d) of Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) or similarly designated under any related enabling legislation or any other similar Executive Orders (collectively, the "**Executive Orders**"). The OFAC Laws and Regulations and the Executive Orders are collectively referred to in this Amendment as the "**Anti-Terrorism Laws**". Borrowers require, and have taken reasonable measures to ensure compliance with the requirement, that no Person who owns any other direct interest in Borrowers is or shall be listed on any of the Lists or is or shall be a Designated Person. This Section 5.26 shall not apply to any Person to the extent that such Person's interest in the Borrowers is through a U.S. Publicly-Traded Entity. As used in this Agreement, "**U.S. Publicly-Traded Entity**" means a Person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a Person.

(b)    Funds Invested in Borrowers. Borrowers have taken reasonable measures appropriate to the circumstances (and in any event as required by law), with respect to each holder of a direct or indirect interest in any Borrower, to assure that funds invested by such holders in Borrowers are derived from legal sources ("**Anti-Money Laundering Measures**"). The Anti-Money Laundering Measures have been undertaken in accordance with the Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.* ("**BSA**"), and all applicable laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations under 18 U.S.C. §§ 1956 and 1957 (collectively with the BSA, "**Anti-Money Laundering Laws**").

(c)    No Violation of Anti-Money Laundering Laws. To Borrower's knowledge, neither any Borrower nor any holder of a direct or indirect interest in any Borrower (i) is under investigation by any governmental authority for, or has been charged with, or

convicted of, money laundering under 18 U.S.C. §§ 1956 and 1957, drug trafficking, terrorist-related activities or other money laundering predicate crimes, or any violation of the BSA, (ii) has been assessed civil penalties under any Anti-Money Laundering Laws, or (iii) has had any of its funds seized or forfeited in an action under any Anti-Money Laundering Laws.

(d)     Borrower's Compliance with Anti-Money Laundering Laws.     Each Borrower has taken reasonable measures appropriate to the circumstances (in any event as required by law), to ensure that such Borrower is in compliance with all current and future Anti-Money Laundering Laws and laws, regulations and government guidance for the prevention of terrorism, terrorist financing and drug trafficking.

Section 5.27     Reserved.

Section 5.28     Master Lease.

A true, correct and complete copy of the Master Lease, together with all amendments thereto, has been delivered to Agent and the Master Lease, and all amendments thereto is in full force and effect as of the Closing Date.

Section 5.29     Property Management Agreement.

A true, correct and complete copy of each Management Agreement, together with all amendments thereto, has been delivered to Agent; and each Management Agreement and all amendments thereto is in full force and effect as of the Closing Date.

## ARTICLE VI
## FINANCIAL REPORTING; NOTICES

Section 6.1     Financial Statements.

Borrowers shall furnish to Agent such financial statements and other financial information as Agent may from time to time reasonably request with respect to the Borrowers or the Projects.     All such financial statements regarding Borrowers shall show all material contingent liabilities and shall accurately and fairly present the financial condition of Borrowers at the dates and for the period indicated.     All financial statements regarding the Projects shall show all material contingent liabilities and shall accurately and fairly present the result of operations at the Projects and shall be sufficient to permit Agent to calculate and/or verify the calculation of Debt Service Coverage Ratio, Project Yield and Net Operating Income.     Without limitation of the foregoing, Borrowers shall furnish to Agent the following statements:

(a)     Monthly Reports.

(i)     Borrowers shall deliver or cause to be delivered to Agent on or prior to the twentieth (20th) day of each calendar month, the following reports in respect of the Projects:

(A)     Statements of the operations of the Projects (including a current rent roll, operating statement, delinquency report and a schedule of delinquency of receipts and payments) as of the last day of each calendar month;

(B)    For the preceding calendar month and calendar year-to-date (i) a cash summary detailing all cash activity and reconciling beginning and end cash balances on a Project-by-Project basis, and (ii) aged accounts receivable and accounts payable;

(C)    Statements of Net Operating Income.

(ii)    Upon request by Agent, Borrowers shall deliver or cause to be delivered to Agent the following (together with the reports described in subparagraph (i) above, hereinafter collectively referred to as the **"Monthly Reports"**):

(A)    A true, correct and complete copy of the check register showing all paid invoices, indicating date paid, amount paid and check number;

(B)    A true, correct and complete copy of the cash disbursements journal; and

(C)    Evidence of the timely payment of all taxes and insurance premiums.

(iii)    The Monthly Reports shall (a) be certified pursuant to an Officer's Certificate as true, correct and complete, (b) be derived from the books and records maintained by Borrowers and/or Master Tenant or Property Manager at the Projects, and (c) be accompanied with copies of supporting documentation to the extent that Agent shall request.

(iv)    Each financial statement, report or other information required to be delivered or caused to be delivered by Borrowers to Agent under this Agreement and required hereunder to be certified pursuant to an Officer's Certificate shall certify that: (A) all of the covenants set forth in Article VII are fully performed and (B) the representations and warranties set forth in the this Loan Agreement and the Security Documents are and remain true, correct and complete except as disclosed in writing in the certificate. Each financial statement, report or other information required to be delivered by Borrowers to Agent under this Agreement shall show all material contingent liabilities, shall be prepared in accordance with sound accounting practices and shall accurately and fairly present the results of operations and the financial condition of the person(s) referred to therein as of the dates and for the period indicated.

(b)    Annual Statements.  Within ninety (90) days after the end of each calendar year, Borrowers shall deliver or cause to be delivered to Agent (i) if requested by Agent a balance sheet and financial statements of each Borrower as to itself, certified as true and correct in all respects, and prepared in accordance with sound accounting principles and fairly presenting the financial condition(s) of the person(s) referred to therein as of the date(s) indicated and (ii) the financial information described in subsections (A) through (C) of Section 6.1(a)(i) above for such calendar year.

Section 6.2    Audits.

If Borrowers fail to furnish or cause to be furnished promptly any report required by Section 6.1, or if Agent reasonably deems such reports to be unacceptable or unreliable, Agent may elect (in addition to exercising any other right and remedy) to conduct an audit of (a) all books and records of Borrowers which in any way pertain to the Projects and (b) the Projects, and to prepare such reports.  Such audit shall be made and such reports shall be

prepared by an independent firm of certified public accountants to be selected by Agent or another auditor of Agent's choice (which may be an affiliate of Agent). Borrowers shall pay all reasonable expenses of the audit and other services, which expenses shall be immediately due and payable with interest thereon at the Default Rate.

Section 6.3        <u>Books and Records/Audits</u>.

Borrowers shall keep and maintain or cause to be kept and maintained at all times at the Projects, or such other place as Agent may approve in writing, complete and accurate books of accounts and records adequate to reflect the results of the operation of the Projects and to provide the financial statements required to be provided to Agent pursuant to <u>Section 6.1</u> above and copies of all written contracts, correspondence, reports of Agent's independent consultant, if any, and other documents affecting the Projects. Agent and its designated agents shall have the right to inspect and copy any of the foregoing. Additionally, Agent may audit and determine, in Agent's sole and absolute discretion, the accuracy of Borrowers' records and computations. The costs and expenses of the audit shall be paid by Borrowers if either (a) the audit discloses a monetary variance in any financial information or computation equal to or greater than the greater of: (i) five percent (5%) or (ii) Five Thousand and No/100 Dollars ($5,000.00) more than any computation submitted by Borrowers or (b) an Event of Default or Potential Event of Default.

Section 6.4        <u>Notice of Litigation or Default</u>.

Borrowers shall promptly provide Agent with:

(a)        written notice of any litigation, arbitration, or other proceeding or governmental investigation (including any survey results or inspection reports from any Governmental Authority) pending or, to any Borrower's knowledge, threatened against or relating to such Borrower or its Sole Member, Principals, any Project or Master Tenant, (but with respect to matters affecting only Principals, only such matters which could reasonably be expected to have a material adverse effect on the financial condition of such Person and with respect to matters affecting only the Master Tenant, only such matters which pertain to a Project or which could reasonably be expected to have a material adverse effect on the Master Tenant's financial condition or its ability to operate the Projects), provided, that with respect to any such litigation, arbitration or other proceeding condition relating solely to a monetary claim of less than $10,000, Borrowers shall not be required to provide notice (written or otherwise) of such claim in accordance with the terms of this <u>Section 6.4</u>.

(b)        a copy of all notices of violations of laws, regulations, codes, ordinances and the like received by any Borrower from the Master Tenant relating to the Collateral or the Projects; and

(c)        a copy of all notices sent by any Borrower to or received by any Borrower from the Master Tenant under the Master Lease.

## ARTICLE VII
## COVENANTS

Each Borrower covenants and agrees with Agent as follows:

Section 7.1        Inspection.

Subject to the rights of tenants under the Leases, Agent and its authorized agents may enter upon and inspect the Projects at all reasonable times upon notice given orally or in writing to Borrowers. Agent, at Borrowers' expense, shall retain one or more independent consultants to periodically inspect the Projects and all documents, drawings, plans, and consultants' reports relating thereto.

Section 7.2        Due on Sale and Encumbrance; Transfers of Interests.

Without the prior written consent of Agent,

(a)        Except in connection with a Permitted Transfer, no Borrower nor any other Person having a direct or indirect ownership or beneficial interest in any Borrower shall:

(i)        create, or permit the creation of, any new direct or indirect ownership interest in any Borrower or any Principal, or

(ii)        transfer, or permit the transfer of (A) all or any part of the Projects, or any interest therein (other than Leases and the Master Lease permitted hereunder), or (B) any direct or indirect ownership interest in any Borrower or any Principal, (including any interest in the profits, losses or cash distributions in any way relating to the Projects or any Borrower), or

(iii)        subject to Borrowers' contest rights under Section 7.3, encumber, alienate, grant a Lien or grant any other interest in any Project or any part thereof (other than Leases permitted hereunder) or take or fail to take any other action which would result in a Lien against the Projects or the interest of any Borrower in any Project or any ownership interest in any Borrower or any Principal, whether voluntarily or involuntarily except Liens in favor of Agent for the benefit of Lender and Agent, or

(iv)        enter into any easement or other agreement granting rights in or restricting the use or development of any Project.

Section 7.3        Taxes; Charges.

Borrowers shall pay before any fine, penalty, interest or cost may be added thereto, and shall not enter into any agreement to defer, any Taxes that may become a Lien upon any Project or become payable during the term of the Loan, and will promptly furnish Agent with evidence of such payment; however, Borrowers' compliance with Section 3.5 of this Agreement relating to impounds for taxes and assessments shall, with respect to payment of such taxes and assessments, be deemed compliance with this Section 7.3. Borrowers shall not suffer or permit the joint assessment of any Project with any other real property constituting a separate tax lot or with any other real or personal property. Borrowers shall pay or cause to be paid when

due all Taxes, claims and demands of mechanics, materialmen, laborers and others which, if unpaid, might result in a Lien on any Project (collectively, the **"Charges"**); however, Borrowers or Master Tenant may contest, in good faith by appropriate proceedings, the amount or validity of any such Charges or Liens so long as (a) Borrowers and/or Master Tenant have given prior written notice to Agent of the intent to so contest or object to any such Charges or Liens, (b) such contest stays the enforcement or collection of the Charges or any Lien created, (c) Borrowers and/or Master Tenant provide Agent with a bond or other security satisfactory to Agent (including an endorsement to Agent's Title Policies insuring against such claim, demand or lien) assuring the discharge of Borrowers' or Master Tenant's obligations for such claims, demands or lien, including interest and penalties, and (d) Borrowers and/or Master Tenant are diligently contesting the same by appropriate legal proceedings in good faith and at their own expense and concludes such contest prior to the tenth (10th) day preceding the earlier to occur of the Maturity Date or the date on which a Project is scheduled to be sold for non-payment.

Section 7.4    Control; Management.

(a)    Borrowers.    There shall be no change in the day-to-day control and management of any Borrower or Master Tenant without the written consent of Agent. Borrower shall be governed by the TIC Agreement approved by Agent in its reasonable discretion. Borrowers acknowledge that the Notice Agent (as defined in Section 11.1 hereof) is authorized as the sole contact and notice party for Agent and Lender. Agent and Lender shall not be required to give notice to any other co-tenant, and Notice Agent shall have all authority to deal with Agent and Lender. Borrower shall not terminate, replace or appoint the Notice Agent without Lender's prior written approval, which approval may not be unreasonably withheld or delayed.

(b)    Master Tenant.    Borrower will not permit, or give any consent or approval for, any change in the management or operational control of the Projects that would result in the Master Tenant no longer controlling the operation and management of the Projects pursuant to the Master Lease.

(c)    Property Manager.    Borrowers acknowledge that Lender is making the Loan, in part, based upon the operational expertise of the Property Manager. Consequently, any change in Property Manager without Agent's prior consent shall be a default under the Loan. Agent's consent under the preceding sentence shall not be unreasonably withheld, conditioned or delayed and shall be based upon Agent's evaluation of the proposed substitute manager's and operator's financial condition, credit history and credit worthiness, experience in operating and managing properties similar to the Projects, performance and compliance history in connection with healthcare facilities, reputation for honesty and integrity and prior experience with Lender and Agent.

Section 7.5    Operation; Maintenance; Inspection.

Each Borrower shall observe and comply with (or cause observance and compliance with) all legal requirements applicable to the ownership, use and operation of the Projects. Borrowers shall maintain (or cause to be maintained) the Projects in good condition and promptly repair any damage or casualty. Borrower shall permit Agent, Lender and their

respective agents, representatives and employees, upon reasonable prior notice to Borrowers, to inspect the Projects, provided such inspections and studies do not materially interfere with the use and operation of the Projects.

Section 7.6      Taxes on Security.

Borrowers shall pay all taxes, charges, filing, registration and recording fees, excises and levies payable with respect to the Note or the Liens created or secured by the Loan Documents, other than income, franchise and doing business taxes imposed on Agent or Lender. If there shall be enacted any law (1) deducting the Loan from the value of any Project for the purpose of taxation, (2) affecting any Lien on the Projects, or (3) changing existing laws of taxation of mortgages, deeds of trust, security deeds, or debts secured by real property, or changing the manner of collecting any such taxes, Borrowers shall promptly pay to Agent, on demand, all taxes, costs and charges for which Agent or Lender is or may be liable as a result thereof; however, if such payment would be prohibited by law or would render the Loan usurious, then instead of collecting such payment, Lender may declare all amounts owing under the Loan Documents to be immediately due and payable.

Section 7.7      Single Purpose Entity; Legal Existence; Name, Etc.

Each Borrower and Master Tenant shall preserve and keep in full force and effect its existence as a Single Purpose Entity. Each Borrower and Master Tenant shall preserve and keep in full force and effect its entity status, franchises, rights and privileges under the laws of the state of its formation, and all qualifications, licenses and permits applicable to the ownership, use and operation of the Projects. Except in connection with a Permitted Transfer, neither any Borrower nor Master Tenant shall wind up, liquidate, dissolve, reorganize, merge, or consolidate with or into, or convey, sell, assign, transfer, lease, or otherwise dispose of all or substantially all of its assets, or acquire all or substantially all of the assets of the business of any Person, or permit any subsidiary of Borrowers to do so. No Borrower will amend or terminate or permit the amendment or termination of such Borrower's partnership agreement without the prior written consent of Agent. Each Borrower and Master Tenant shall conduct business only in its own name and neither any Borrower nor Master Tenant shall change its name, identity, or organizational structure, the location of its chief executive office or principal place of business or its state of organization unless Borrowers (a) shall have obtained the prior written consent of Agent to such change (which consent shall not be unreasonably withheld or delayed), and (b) shall have taken all actions necessary or requested by Agent to file or amend any financing statement or continuation statement to assure perfection and continuation of perfection of security interests under the Loan Documents. Each Borrower shall maintain its separateness as an entity, including maintaining separate books, records, and accounts and observing corporate and partnership formalities independent of any other entity, shall pay its obligations with its own funds and shall not commingle funds or assets with those of any other Borrower or entity.

Section 7.8      Affiliate Transactions.

Without the prior written consent of Agent, no Borrower shall engage in any transaction affecting any Project with an Affiliate of Borrowers, except pursuant to the TIC Agreement and the Master Lease.

Section 7.9          Limitation on Other Debt.

No Borrower shall, without the prior written consent of Agent, incur any Debt other than the Loan and, except for trade payables in the ordinary course of business.

Section 7.10          Further Assurances.

Borrowers shall promptly (a) cure any defects in the execution and delivery of the Loan Documents, and (b) execute and deliver, or cause to be executed and delivered, all such other documents, agreements and instruments as Agent may reasonably request to further evidence and more fully describe the collateral for the Loan, to correct any omissions in the Loan Documents, to perfect, protect or preserve any liens created under any of the Loan Documents, or to make any recordings, file any notices, or obtain any consents, as may be necessary or appropriate in connection therewith.

Section 7.11          Estoppel Certificates.

Borrowers, within ten (10) days after request, shall furnish to Agent an Officer's Certificate certifying the amount due on the Loan, the terms of payment of the Loan, the date to which interest has been paid, whether any offsets or defenses exist against the Loan and, if any are alleged to exist, the nature thereof in detail, and such other matters as Agent reasonably may request.

Section 7.12          Notice of Certain Events.

Promptly upon becoming aware of or receiving notice of any of the following, Borrowers shall (a) notify Agent of (i) any Potential Default or Event of Default, together with a detailed statement of the steps being taken to cure such Potential Default or Event of Default; (ii) any notice of default received by any Borrower under other obligations relating to any Project or otherwise material to any Borrower's business, including any notices of violations of any laws, regulations, codes or ordinances; (iii) any threatened or pending legal, judicial or regulatory proceedings, including any dispute between any Borrower and any governmental authority, affecting any Borrower or any Project; (b) provide to Agent a copy of each notice of default or termination given or made to Master Tenant by any Borrower or received by any Borrower from Master Tenant; and (c) provide to Agent a copy of each notice of default or termination under any license or permit necessary for the operation of the Projects in the manner required by this Agreement; and in the case of clauses (a) (ii), (b) or (c), promptly provide Agent with copies of such notices referred to therein.

Section 7.13          Indemnification.

BORROWERS SHALL INDEMNIFY, DEFEND AND HOLD AGENT AND LENDER HARMLESS FROM AND AGAINST ANY AND ALL LOSSES, LIABILITIES, CLAIMS, DAMAGES, EXPENSES, OBLIGATIONS, PENALTIES, ACTIONS, JUDGMENTS, SUITS, COSTS OR DISBURSEMENTS OF ANY KIND OR NATURE WHATSOEVER, INCLUDING THE REASONABLE FEES AND ACTUAL EXPENSES OF AGENT'S AND LENDER'S COUNSEL, IN CONNECTION WITH (A) ANY INSPECTION, REVIEW OR TESTING OF OR WITH RESPECT TO ANY PROJECT,

**(B) ANY INVESTIGATIVE, ADMINISTRATIVE, MEDIATION, ARBITRATION, OR JUDICIAL PROCEEDING, WHETHER OR NOT AGENT OR A LENDER IS DESIGNATED A PARTY THERETO, COMMENCED OR THREATENED AT ANY TIME (INCLUDING AFTER THE REPAYMENT OF THE LOAN) IN ANY WAY RELATED TO THE EXECUTION, DELIVERY OR PERFORMANCE OF ANY LOAN DOCUMENT OR TO ANY PROJECT (SUBJECT TO THE PROVISIONS REGARDING THE COSTS TO BE PAID BY AGENT PURSUANT TO SECTION 6.3 AND SECTION 5 OF THE ENVIRONMENTAL INDEMNITY, (C) ANY PROCEEDING INSTITUTED BY ANY PERSON CLAIMING A LIEN, AND (D) ANY BROKERAGE COMMISSIONS OR FINDER'S FEES CLAIMED BY ANY BROKER OR OTHER PARTY IN CONNECTION WITH THE LOAN, ANY PROJECT, OR ANY OF THE TRANSACTIONS CONTEMPLATED IN THE LOAN DOCUMENTS, INCLUDING THOSE ARISING FROM THE JOINT, CONCURRENT, OR COMPARATIVE NEGLIGENCE OF AGENT OR LENDER, EXCEPT TO THE EXTENT ANY OF THE FOREGOING IS CAUSED BY AN AGENT'S OR LENDER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.**

Section 7.14    Use of Proceeds, Revenues.

Borrowers shall use the proceeds of the Loan for proper business purposes. No portion of the proceeds of the Loan shall be used by Borrowers in any manner that might cause the borrowing or the application of such proceeds to violate Regulation U, Regulation T or Regulation X or any other regulation of the Board of Governors of the Federal Reserve System or to violate the Securities Act of 1933 or the Securities Exchange Act of 1934. Except as otherwise specifically provided in the Loan Documents, Revenues, and other proceeds from the Projects received by Borrowers shall be applied to the Indebtedness then due and payable, Expenses or other Project capital improvements, repairs or replacements before distribution by Borrowers to any partner of any Borrower.

Section 7.15    Reserved.

Section 7.16    TIC Listing. Borrowers shall provide Lender a listing of all Persons comprising the Borrowers as soon as available, but no more than forty-five (45) days after the Closing Date and from time to time thereafter at Agent's request.

Section 7.17    Reserved.

Section 7.18    Compliance with Laws and Contractual Obligations.

(a)    The Projects and the operations at the Projects will comply with (i) the requirements of all applicable laws, rules, regulations and order of any governmental authority (including, without limitation, laws, rules, regulations and orders relating to all building, zoning, density, land use, covenants, conditions and restrictions, subdivision requirements, taxes, employer and employee contributions, securities, employee retirement and welfare benefits, environmental protection matters, employee health and safety, quality and safety standards, accreditation standards and requirements of the applicable state department of health or other applicable state regulatory agency (each a "**State Regulator**"), quality and adequacy of medical care, distribution of pharmaceuticals, rate setting, equipment, personnel, operating policies,

additions to facilities and services and fee splitting) as are now in effect and which may be imposed upon any Borrower, Master Tenant, or Property Manager or the maintenance, use or operation of the Projects or the provision of services to the occupants of the Projects and (ii) the obligations, covenants and conditions contained in all other material contractual obligations of any Borrower and as it relates to any Project; and

(b)    Borrowers will obtain and maintain or will cause to be maintained or obtained, all licenses, qualifications and permits now held or hereafter required to be held by any Person for which the loss, suspension, revocation or failure to obtain or renew, could reasonably be expected to have a material adverse effect upon the financial condition of any Borrower or the ability to operate the Projects in compliance with the requirements of the Loan Documents and as it has been operated prior to the date hereof.

Section 7.19      Notice of Money Laundering.

If a tenant under any Lease or Master Tenant is charged with crimes involving money laundering or predicate crimes to money laundering, and such charges are not dismissed without further investigation within thirty (30) days, then Borrowers shall give notice of such charges to Agent. In addition, with respect to any tenant under a Lease, Agent may require that the rental payments received from said tenant or resident be excluded from the calculation of Net Operating Income.

Section 7.20      Anti-Terrorism and Anti-Money Laundering Compliance.

(a)    Compliance with Anti-Terrorism Laws. Each Borrower covenants for itself that it shall not be, and, after making due inquiry, that no Person who owns a controlling interest in or otherwise controls such Borrower shall be, (i) listed on the Lists; or (ii) a Designated Person. Each Borrower also shall require, and shall take reasonable measures to ensure compliance with the requirement, that no Person who owns any other direct interest in such Borrower shall be listed on any of the Lists or is or shall be a Designated Person. This Section 7.20(a) shall not apply to any Person to the extent that such Person's interest in the Borrower is through a U.S. Publicly-Traded Entity.

(b)    Compliance by Interest Holders. Each Borrower shall require each Person that proposes to become a partner, member or shareholder in such Borrower after the date hereof and that is not a U.S. Publicly-Traded Entity to sign, and to deliver to such Borrower (and such Borrower shall deliver to Agent), (i) an Interest Holder Certification and Agreement, substantially in the form attached as Exhibit B ("Interest Holder Agreement") and (ii) if requested by Agent, each Borrower shall deliver to Agent a schedule of the name, legal domicile address and (for entities) place of organization of each holder of a direct or indirect legal or beneficial interest in such Borrower.

(c)    Anti-Terrorism Policies. Each Borrower agrees to adopt and maintain adequate policies, procedures and controls to ensure that it is in compliance with all Anti-Terrorism Laws and related government guidance (such policies, procedures and controls are collectively referred to in this Agreement as "Borrower Anti-Terrorism Policies"). Each Borrower further agrees to make such Borrower Anti-Terrorism Policies, and the respective

policies, procedures and controls for Persons who are or are to become partners, members or shareholders in such Borrower (such policies, procedures and controls are collectively referred to as **"Investor Anti-Terrorism Policies"**), together with the information collected thereby concerning such Borrower and such partners, members or shareholders (but not information about indirect members that do not have the power to direct the management or policies of such Borrower, whether through the ownership of voting stock, agreement or otherwise), available to Agent for review and inspection by Agent from time to time during normal business hours and upon reasonable prior notice, and each Borrower agrees to deliver copies of the same to Agent from time to time upon request. Agent and Lender will keep the Borrower Anti-Terrorism Policies and the Investor Anti-Terrorism Policies, and the information collected thereby, confidential subject to customary exceptions for legal process, auditors, regulators, or as otherwise reasonably required by Agent and Lender for enforcement of its rights and/or in connection with reasonable business us in the management, administration and disposition of its assets and investments. Each Borrower consents to the disclosure to U.S. regulators and law enforcement authorities by Agent or Lender or any of their affiliates or agents of such information about such Borrower and the owners of direct and indirect interests in such Borrower that Agent or Lender reasonably deems necessary or appropriate to comply with applicable Anti-Terrorism Laws and Anti-Money Laundering Laws.

(d)    Funds Invested in Borrowers. Each Borrower covenants for itself that it will take Anti-Money Laundering Measures in accordance with Anti-Money Laundering Laws with respect to each holder of a direct or indirect interest in such Borrower.

(e)    Borrower Compliance with Anti-Money Laundering Laws. Each Borrower covenants for itself that it shall take reasonable measures appropriate to the circumstances (in any event as required by law), to ensure that such Borrower is in compliance with all current and future Anti-Money Laundering Laws and laws, regulations and government guidance for the prevention of terrorism, terrorist financing and drug trafficking.

(f)    Notification of Agent; Quarantine Steps. Each Borrower shall immediately notify Agent if such Borrower obtains actual knowledge that any holder of a direct or indirect interest in such Borrower, or any director, manager or officer of any of such holder, (i) has been listed on any of the Lists, (ii) has become a Designated Person, (iii) is under investigation by any governmental authority for, or has been charged with or convicted of, money laundering drug trafficking, terrorist-related activities or other money laundering predicate crimes, or any violation of the BSA, (iv) has been assessed civil penalties under any Anti-Money Laundering Laws, or (v) has had funds seized or forfeited in an action under any Anti-Money Laundering Laws.

Section 7.21    Employees.

No Borrower shall have any employees while any portion of the Loan is outstanding.

Section 7.22    Reserved.

Section 7.23      Representations and Warranties.

Borrowers will cause all representations and warranties to remain true and correct all times during the term of this Agreement and while any portion of the Loan remains outstanding.

Section 7.24      Cooperation.

Borrowers acknowledge that Lender and its successors and assigns may (a) sell, transfer or assign this Agreement, the Note and the other Loan Documents to one or more investors as a whole loan, in a rated or unrated public offering or private placement, (b) participate the Loan to one or more investors in a rated or unrated public offering or private placement, (c) deposit the Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets in a rated or unrated public offering or private placement, or (d) otherwise sell the Loan or interest therein to investors in a rated or unrated public offering or private placement (the transactions referred to in clauses (a) through (d) are hereinafter referred to as "**Secondary Market Transactions**").    Borrowers shall cooperate in good faith with Agent and Lender in effecting any such Secondary Market Transaction and shall cooperate in good faith to implement all requirements reasonably imposed by the participants involved in any Secondary Market Transaction (including without limitation, an institutional purchaser, participant or investor) including, without limitation, all structural or other changes to the Loan, modifications to any documents evidencing or securing the Loan, delivery of opinions of counsel reasonably acceptable to such other purchasers, participants or investors may reasonably require; provided, however, that Borrowers shall not be required to modify any documents evidencing or securing the Loan which would (i) modify the interest rate payable under the Note, (ii) modify the stated maturity of the Note, (iii) modify the amortization of principal of the Note, (iv) modify or conflict with any other material terms or covenants of the Loan, (v) conflict with the Master Lease or (vi) increase the Borrowers' liability or obligations under the Loan Documents. Borrowers shall provide such information and documents relating to Borrowers, Principals, the Projects, the Master Tenant and the Property Manager. Borrowers acknowledge that certain information regarding the Loan and the Principals and the Projects may be included in a private placement memorandum, prospectus or other disclosure documents and thus various investors may also see some or all of the information.

Section 7.25      Master Lease.

Borrowers shall not, without Agent's prior written consent, amend or terminate the Master Lease (except for any assignment of an undivided interest in the Projects in the Master Lease to a Permitted Transferee). Borrowers will not give any consent, exercise any right or option, or approve any undertaking by the Master Tenant under the Master Lease that is a departure from the terms of, or beyond the scope of, the Master Lease, without the prior written consent of Agent, which consent shall not be unreasonably withheld or delayed.

Section 7.26      Reserved.

Section 7.27    Operating and Financial Covenants.

The Projects and/or Borrowers shall satisfy each of the following covenants, to be determined as of the end of each calendar quarter (the "**Determination Date**") during the term of the Loan:

(a)    Occupancy. The Projects shall have maintained average occupancy during the calendar quarter prior to the Determination Date equal to 90% of the occupancy of each Project as of the Closing Date hereof. For purposes of this calculation, the parties agree to the following occupancy levels as of the Closing Date:

| Project | Occupancy Level |
|---------|-----------------|
| Cambridge House | 50% |
| Capri Retirement Village | 98% |
| Stanford House | 73% |

(b)    Debt Service Coverage. The Projects shall have achieved an annualized Debt Service Coverage Ratio of at least 1.25 to 1.00 based upon the trailing twelve (12) full calendar months prior to the Determination Date.

(c)    Project Yield. The Projects shall have achieved a Project Yield for the trailing twelve (12) full calendar months prior to the Determination Date of 10.2%.

Section 7.28    Tenancy-in-Common Covenants.

(a)    Borrowers shall, at Borrowers' cost and expense, promptly and fully perform each and every covenant, condition, promise and obligation of the owners of the Projects under that certain Tenancy In Common Agreement by and among each of the Borrowers (sometimes herein called a "**TIC**") dated as of October 7, 2005 (the "**TIC Agreement**").

(b)    None of the Borrowers shall cancel, modify or assign the TIC Agreement without the prior written consent of Lender, except in connection with a Permitted Transfer.

(c)    Each Borrower hereby irrevocably and unconditionally subordinates any and all amounts owed to such Borrower from any other Borrower pursuant to the TIC Agreement, to the payment in full of all amounts then due and payable under the Loan Documents, and each Borrower agrees that (i) it will not receive, collect or accept any payment of any such amount from any other Borrower until all amounts then due and payable, to Lender and/or Agent under the Loan Documents have been paid in full, and (ii) if such Borrower nevertheless receives any such payment from any other Borrower, such receiving Borrower shall receive such payment in trust for Lender and shall immediately remit such payment to Lender to be applied toward such amounts then due and payable to Lender and/or Agent under the Loan Documents as Lender shall determine in its sole and absolute discretion.

(d)    Each Borrower further subordinates any and all Liens which it now has or may hereafter acquire on any or all of the assets of any other Borrower to the Liens, if any, which Lender and/or Agent now has or may hereafter acquire on such assets (provided, however,

that nothing herein shall be construed to permit any such Liens upon any such asset in favor of a Borrower, nor shall anything herein be deemed to negate or cure any Event of Default that may arise by reason of any such Lien upon any such asset in favor of a Borrower).

(e)      Borrowers agree that they will not partition the Projects and hereby irrevocably waive their right to partition the Projects at any time while the Loan Documents remain in effect and any such partition in violation of this subsection (e) shall be deemed void and of no effect.   At no time shall Lender be prohibited or prevented from foreclosing pursuant to the Security Documents on less the whole of the Projects.

(f)      Borrowers acknowledge that Lender and Agent have consented to the Tenancy in Common structure of Borrowers at Borrowers' request in order to accommodate certain business and tax requirements of Borrowers, notwithstanding that such structure creates certain risks to Lender.  In consideration of such consent, Borrowers agree that they will not engage in the filing of "serial" bankruptcies to thwart Agent's and/or Lender's exercise of its remedies hereunder or under any of the Security Documents.  Accordingly, Borrowers agree that upon the filing of bankruptcy by any Borrower and if Agent and/or Lender obtains a lift of the stay and proceeds to exercise its remedies hereunder and under any of the Security Documents, any subsequent filing of bankruptcy within a one (1) year period by any Borrower shall be deemed a filing in bad faith and entitle Beneficiary to an immediate lift of the stay in such Borrower's bankruptcy proceeding.

(g)      Borrowers shall furnish to Agent, within five (5) Business Days after receipt thereof, or after the mailing or service thereof by any one or more of Borrowers, as the case may be, a copy of each notice of default which any Borrower shall give to, or receive from any person, based upon the occurrence, or alleged occurrence, of any default or defaults in the performance of any covenant, condition, promise or obligation under the TIC Agreement.

The subordination provided for in this Section 7.28 shall be applicable irrespective of the time or order of attachment or perfection of liens referred to herein, the time or order of filing of any financing statement or recording of the Security Documents, or the acquisition of or the time of giving or failing to give notice of the acquisition or expected acquisition purchase money or other liens.  Each Borrower agrees that it shall not undertake any action which would have the effect, directly or indirectly, of frustrating or impairing the intended operation and effect of this Section 7.28.  The provisions of this Section 7.28 shall not be altered or otherwise affected by any modification, renewal or extension of any obligation or by any action or inaction Agent or Lender may take or fail to take.

Section 7.29      Single Purpose Entity Requirements.  Each Borrower shall comply with the following Single Purpose Entity Requirements (herein so called):

(a)      Borrower shall not engage in any business or activity other than the ownership, operation and maintenance of the Projects, and activities incidental thereto;

(b)      Borrower shall not acquire or own any material assets other than an undivided interest in (A) the Project, and (B) such incidental collateral as may be necessary for the operation of the Project;

(c)    Borrower shall not merge into or consolidate with any person or entity or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure, without in each case Mortgagee's prior written consent, except in the connection with a Permitted Transfer;

(d)    Borrower shall preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, and shall not amend, modify, terminate or fail to comply with the provisions of Borrower's partnership agreement, articles or certificate of incorporation, articles of organization, operating agreement, or similar organizational documents, as the case may be, as same may be further amended or supplemented, if such amendment, modification, termination or failure to comply would adversely affect the ability of Borrower to perform its obligations hereunder, under the Note or under the other Loan Documents;

(e)    Borrower shall not own any subsidiary or make any investment in, any person or entity without the consent of Mortgagee;

(f)    Borrower shall not commingle its assets with the assets of any of its general partners, managing members, shareholders, affiliates, principals or of any other person or entity;

(g)    Borrower shall not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Loan, except with respect to trade payables incurred in the ordinary course of its business of owning and operating the Projects, provided that such debt is paid when due;

(h)    Borrower shall maintain its records, books of account and bank accounts separate and apart from those of the general partners, managing members, shareholders, principals and affiliates of Borrower, the affiliates of a general partner or managing member of Borrower, and any other person or entity;

(i)    Borrower shall not enter into any contract or agreement with any general partner, managing member, shareholder, principal or affiliate of Borrower,  or any general partner, managing member, shareholder, principal or affiliate thereof, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any general partner, managing member, shareholder, principal or affiliate of Borrower, or any general partner, managing member, shareholder, principal or affiliate thereof, provided that Agent agrees that the execution by any Borrower of the TIC Agreement and the Master Lease does not violate this subsection (i);

(j)    Borrower shall not seek the dissolution or winding up in whole, or in part, of Borrower;

(k)    Subject to subsection (f) above, Borrower shall not maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain its individual assets from those of any general partner, managing member, shareholder, principal or affiliate of Borrower, or any general partner, managing member, shareholder, principal or affiliate thereof or any other person;

(l)    Borrower shall not hold itself out to be responsible for the debts of another person except pursuant to the Loan Documents;

(m)    Borrower shall not make any loans to any third party;

(n)    Borrower shall not fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (A) to mislead others as to the identity with which such other party is transacting business, or (B) to suggest that Borrower is responsible for the debts of any third party (including any general partner, managing member, shareholder, principal or affiliate of Borrower, or any general partner, managing member, shareholder, principal or affiliate thereof);

(o)    Borrower shall maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; and

(p)    Borrower shall not file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors.

Section 7.30    Partition.  None of the Borrowers will file, or join in the filing of, an action or proceeding seeking to partition any Project, it being understood and agreed that so long as the Loan remains outstanding, Borrowers hereby acknowledge that any and all rights that it may now or hereafter have under the TIC Agreement, applicable law or equity, or otherwise to institute an action or proceeding seeking to partition any Project are superceded by and are subordinate to the Security Documents.

Section 7.31    Amendments to TIC Agreements.  Borrowers will not amend, modify or terminate the TIC Agreement or assign any interest therein without the prior written consent of Agent, which consent shall not be unreasonably withheld, except in connection with a Permitted Transfer.

Section 7.32    TIC Liens.  None of the Borrowers will file a Lien, or cause a lien to be filed, against any Project, or against any undivided interest in any Project owned by a TIC pursuant to the TIC Agreement or under applicable law; it being understood and agreed that each Borrower hereby waives, until all of the Obligations are paid and satisfied in full, any right it may now or hereafter have to file a Lien against any Project or against the undivided interest in any Project owned by any other TIC whether provided for in a TIC Agreement or otherwise.

## ARTICLE VIII
## Health Care Matters

Section 8.1    Healthcare Laws.

(a)    Without limiting the generality of any other provision of this Agreement, each Borrower, Master Tenant and Property Manager and their employees and contractors (other than contracted agencies) in the exercise of their duties on behalf of any Borrower, Master Tenant or Property Manager (with respect to their operation and management of the Projects)

shall be in compliance with all applicable Laws relating to patient healthcare and/or patient healthcare information, including without limitation the Health Insurance Portability and Accountability Act of 1996, as amended, and the rules and regulations promulgated thereunder ("HIPAA") (collectively, "**Healthcare Laws**")). Each Borrower, Master Tenant and Property Manager, as applicable, has maintained and shall continue to maintain in all material respects all records required to be maintained by any Governmental Authority or otherwise under the Healthcare Laws and there are no presently existing circumstances which would result or likely would result in material violations of the Healthcare Laws. Each Borrower, Master Tenant and Property Manager has and will maintain all Governmental Approvals necessary under applicable Laws to own, lease and/or operate the Projects, as applicable (including such Governmental Approvals as are required under the Healthcare Laws).

(b)    If (i) any Borrower, Master Tenant or Property Manager is (or becomes) a "covered entity" within the meaning of HIPAA or (ii) any Borrower, Master Tenant or Property Manager (with respect to its operation of the Projects) is (or becomes) subject to the "Administrative Simplification" provisions of HIPAA, then such Persons (x) have undertaken or will promptly undertake all necessary surveys, audits, inventories, reviews, analyses and/or assessments (including any necessary risk assessments) of all areas of its business and operations required by HIPAA and/or that could be adversely affected by the failure of such Persons to be HIPAA Compliant (as defined below); (y) has developed or will promptly develop a detailed plan and time line for becoming HIPAA Compliant (a "**HIPAA Compliance Plan**"); and (z) have implemented or will implement those provisions of such HIPAA Compliance Plan in all material respects necessary to ensure that such Persons are or become HIPAA Compliant. For purposes hereof, "**HIPAA Compliant**" shall mean that each Borrower, Master Tenant and Property Manager, as applicable (A) are or will be in compliance with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA on and as of each date that any part thereof, or any final rule or regulation thereunder, becomes effective in accordance with its or their terms, as the case may be (each such date, a "**HIPAA Compliance Date**") if and to the extent any Borrower, Master Tenant or Property Manager is subjected to such provisions, rules or regulations, and (B) are not and could not reasonably be expected to become, as of any date following any such HIPAA Compliance Date, the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could result in any of the foregoing or that could reasonably be expected to adversely affect any Borrower's, Master Tenant's or Property Manager's business, operations, assets, properties or condition (financial or otherwise), in connection with any actual or potential violation by any Borrower, Master Tenant or Property Manager of the then effective provisions of HIPAA.

(c)    If required under applicable Law, each Borrower, Master Tenant and Property Manager has and shall maintain in full force and effect a valid certificate of need ("CON") or similar certificate, license, or approval issued by the State Regulator for the requisite number of beds and units in the Projects (as shown on Exhibits A-1 through A-3 attached hereto), and a provider agreement or other required documentation of approved provider status for each provider payment or reimbursement program listed in Exhibit D hereto, if applicable. All required Government Approvals necessary for operation of the Projects are listed on Exhibit E hereto (collectively with the CON, if applicable, the "**Licenses**"). Each Borrower,

Master Tenant and Property Manager shall operate the Projects in a manner such that the Licenses shall remain in full force and effect. True and complete copies of the Licenses have been delivered to Agent.

Section 8.2     Representations,     Warranties     and     Covenants     Regarding Healthcare Matters.

Each Borrower represents, warrants covenants and agrees with Agent and Lender that:

(a)     The Projects are being used and operated as assisted living, Alzheimer's and/or independent living facilities, having the number of Licensed Units as set forth in Exhibits A-1 through A-3 attached hereto (as modified from time to time with Agent's consent).

(b)     All Licenses necessary or desirable for using and operating the Projects for the uses described in Section 8.2(a) above and as required under applicable law are either held by Master Tenant or Master Tenant is operating the Projects under the License of its predecessor in title and will obtain Licenses in its own name within thirty (30) days following the Closing Date. All such Licenses on each CON and are in full force and effect.

(c)     The Licenses:

(i)     Are not now and will not be pledged as collateral security for any loan or indebtedness, other than the Loan; and

(ii)     Shall continue in full force and effect throughout the term of the Loan and are held free and will remain free from restrictions or known conflicts which would materially impair the use or operation of the Projects for the uses described in Section 8.2(a) above, and shall not be provisional, probationary or restricted in any way.

(d)     None of any Borrower, Master Tenant and Property Manager shall do (or suffer to be done) any of the following:

(i)     Rescind, withdraw, revoke, or amend the number of Licensed Units permitted under the Licenses or otherwise amend the Licenses in such a manner that results in a material adverse effect on the rates charged or otherwise diminish or impair the nature, tenor or scope of the Licenses without Agent's consent;

(ii)     Amend or otherwise change any Project's Licensed Units capacity and/or the number of Licensed Units approved by the State Regulator;

(iii)     Replace or transfer all or any part of any Project's units or beds to another site or location; or

(iv)     Voluntarily transfer or encourage the transfer of any resident of any Project to any other facility, unless such transfer is at the request of the resident or is for reasons relating to the health, required level of medical care or safety of the resident to be transferred.

(e)    If and when any Borrower, Master Tenant or Property Manager participates in any Medicare or Medicaid or other Third-Party Payor Programs with respect to any Project, the Project will remain in compliance with all requirements for participation in Medicare and Medicaid, including the Medicare and Medicaid Patient Protection Act of 1987, as it may be amended, and such other third party payor programs. Each Project is and will remain in conformance in all material respects with all insurance, reimbursement and cost reporting requirements, and, if applicable, have a current provider agreement that is in full force and effect under Medicare and Medicaid.

(f)    There is no, and during the term of the Loan there shall be no, threatened, existing or pending revocation, suspension, termination, probation, restriction, limitation, or nonrenewal affecting any Borrower, Master Tenant or Property Manager or any Project or any participation or provider agreement with any third-party payor, including Medicare, Medicaid, Blue Cross and/or Blue Shield, and any other private commercial insurance managed care and employee assistance program (such programs, the **"Third-Party Payor Programs"**) to which any Borrower, Master Tenant or Property Manager may presently be subject with respect to any Project, or at any time hereafter is subject. None of any Borrower, Master Tenant and Property Manager, other than in the normal course of business, shall change the terms of any of the Third-Party Payor Programs now or hereinafter in effect or their normal billing payment or reimbursement policies and procedures with respect thereto (including the amount and timing of finance charges, fees and write-offs). All Medicaid, Medicare and private insurance cost reports and financial reports submitted by any Borrower, Master Tenant or Property Manager, if any, are and will be materially accurate and complete and have not been and will not be misleading in any material respects. No cost reports for any Project remain open or unsettled.

(g)    None of any Borrower, any Project, Master Tenant or, Property Manager is or will be the subject of any proceeding by any Governmental Authority, and to any Borrower's best knowledge, no notice of any violation has been or will be issued by a Governmental Authority that would, directly or indirectly, or with the passage of time:

(i)    Have a material adverse impact on Borrowers', Master Tenant's, Property Manager's ability to accept and/or retain patients or residents or operate the Projects for their current use or result in the imposition of a fine, a sanction, a lower rate certification or a lower reimbursement rate for services rendered to eligible patients or residents;

(ii)    Modify, limit or annul or result in the transfer, suspension, revocation or imposition of probationary use of any of the Licenses; or

(iii)    If applicable, affect any Borrower's, Master Tenant's or Property Manager's (as applicable) continued participation in the Medicaid or Medicare programs or any other of the Third-Party Payors Programs, or any successor programs thereto, at then current rate certifications.

(h)    No Project has received notice of any violation, and no statement of charges or deficiencies has been made or penalty enforcement action has been undertaken against any Project, any Borrower, Master Tenant or Property Manager or against any officer, director, partner, member or stockholder of any Borrower, Master Tenant or Property Manager,

by any Governmental Authority during the last five calendar years, and there have been no violations over the past five years which have threatened any Project's, any Borrower's, Property Manager's or Master Tenant's certification for participation in Medicare or Medicaid or the other Third-Party Payor Programs.

(i)    To Borrowers' best knowledge, there are no current, pending or outstanding Medicaid, Medicare or Third-Party Payor Programs reimbursement audits or appeals pending at the Projects, and there are no years that are subject to audit.

(j)    To Borrowers' best knowledge, there are no current or pending Medicaid or Medicare or Third-Party Payor Programs recoupment efforts at the Projects. No Borrower, no Master Tenant and no Property Manager is a participant in any federal program whereby any Governmental Authority may have the right to recover funds by reason of the advance of federal funds, including those authorized under the Hill-Burton Act (42 U.S.C. 291, *et seq.*), as it may be amended.

(k)    There are no and there will remain no patient or resident care agreements with patients or residents which deviate in any material adverse respect from the form agreements which have been delivered to and approved by Agent prior to the Closing Date.

(l)    In the event the Master Lease is terminated or in the event of foreclosure or other acquisition of the Projects by Agent or its designee or any purchaser at a foreclosure sale or by acceptance of a deed in lieu of foreclosure, Borrowers, Agent, any subsequent tenant or any subsequent purchaser need not obtain a CON prior to applying for and receiving Medicare or Medicaid payments.

(m)    All patient or resident records at each Project, including patient or resident trust fund accounts, are true and correct in all material respects, and will remain true and correct in all material respects.

Section 8.3    Cooperation.

From time to time, upon the request of Agent, regardless of whether or not an Event of Default hereunder or under the other Loan Documents is then continuing, Borrowers shall or shall cause the holders of the Licenses to complete, execute and deliver to Agent any applications, notices, documentation, and other information necessary or desirable, in Agent's judgment, to permit Agent or its designee (including a receiver) to obtain, maintain or renew any one or more of the Licenses for the Projects (or to become the owner of the existing Licenses for the Projects) and to the extent permitted by applicable Laws to obtain any other provider agreements or Governmental Approvals then necessary or desirable for the operation of the Projects by Agent or its designee for their current use (including, without limitation, any applications for change of ownership of the existing Licenses or change of control of the owner of the existing Licenses).   To the extent permitted by applicable Laws, (i) Agent is hereby authorized (without the consent of Borrowers, Master Tenant or Property Manager) to submit any such applications, notices, documentation or other information which Borrowers delivered or caused to be delivered to Agent in accordance with the above provisions to the applicable Governmental Authorities, or to take such other steps as Agent may deem advisable to obtain,

maintain or renew any License or other Governmental Approvals in connection with the operation of the Projects for their current use, and Borrowers agree to cooperate and to cause Master Tenant and Property Manager to cooperate with Agent in connection with the same and (ii) Borrowers, upon demand by Agent, shall take any action and cause Master Tenant to take any action necessary or desirable, in Agent's sole judgment, to permit Agent or its designee (including a receiver) to use, operate and maintain the Projects for their current use. If Borrowers fail to comply with the provisions of this Section 8.3 for any reason whatsoever, Borrowers hereby irrevocably appoint Agent and its designee as Borrowers' attorney-in-fact, with full power of substitution, to take any action and execute any documents and instruments necessary or desirable in Agent's sole judgment to permit Agent or its designee to undertake Borrowers' obligations under this Section 8.3, including obtaining or (causing Master Tenant or Property Manager to obtain) any Licenses or Governmental Approvals then required for the operation of the Projects by Agent or its designee for their current use. The foregoing power of attorney is coupled with an interest and is irrevocable and Agent may exercise its rights thereunder in addition to any other remedies which Agent may have against Borrowers or Principals as a result of a Borrower's breach of the obligations contained in this Section 8.3.

Section 8.4       Annual Inspections.

Within ten (10) days after receipt by either of the Property Manager or Master Tenant, Borrowers shall provide to Agent a copy of each inspection report issued by the State Regulator with respect to their annual (or any lesser time period) inspection of the operation of the Projects (the **"Inspection Reports"**). If any Inspection Report contains a violation at a level that under applicable law requires the immediate or accelerated filing of a plan of correction, Borrowers shall provide to Agent the following: (a) all correspondence with the State Regulator (whether issued by Property Manager, Master Tenant or Borrowers) regarding such violation, including any request for re-inspection or re-classification of the violation or request for dispute resolution, (b) a copy of the plan of correction that addresses the violation cited, and evidence that such plan has been delivered to the State Regulator within the time period required under applicable Healthcare Laws or by the State Regulator and (c) evidence satisfactory to Agent that the Property Manager, Master Tenant and/or Borrowers have completed the plan of correction within the time frame required by the State Regulator or under applicable Healthcare Laws.

## ARTICLE IX
## EVENTS OF DEFAULT

Section 9.1       Events of Default.  Each of the following shall constitute an Event of Default hereunder:

(a)       Payments.  Failure of Borrowers to pay within five (5) days after the date when due any of the payment obligations of Borrowers due under the Loan Documents, or Borrowers' failure to pay the Loan at the Maturity Date, whether by acceleration or otherwise.

(b)       Certain Covenants.  Borrowers' failure to (a) maintain insurance as required under Section 3.1 of this Agreement; (b) maintain its status as a Single Purpose Entity as required by Section 7.7 and Section 7.29; (c) permit inspections as required by Section 7.1; (d) strictly comply with the provisions of Section 7.2(a); (e) strictly comply with the provisions

of Section 7.17; (f) strictly comply with the provisions of Section 8.1(c) (Licenses and other matters), Section 8.2(b) and (c) (Licenses), Section 7.21 (employees), and Section 7.25 (Master Lease); (g) failure of Borrower to strictly comply with Section 8 (no additional liens) and Section 6(g)(iii) (no interference with Agent's liens on Leases and Rents) of the Security Documents; and (h) provide Agent with ten (10) days prior written notice of changes of the state of any Borrower's formation or any Borrower's name.

        (c)     Financial Information.  Borrower's failure to deliver financial statements and reports as required by Article VI and the continuance of such failure for five (5) days after notice by Agent to Borrowers.

        (d)     Sale, Encumbrance, Etc.  The sale, transfer, conveyance, pledge, mortgage or assignment of any part or all of any Project, or any interest therein, or of any interest in any Borrower, in violation of Section 7.2 of this Agreement.

        (e)     Covenants.  Borrowers' failure to perform or observe any of the agreements and covenants contained in this Agreement or in any of the other Loan Documents, and the continuance of such failure for ten (10) days after notice by Agent to Borrowers; however, subject to any shorter period for curing any failure by Borrowers as specified in any of the other Loan Documents, Borrowers shall have an additional forty-five (45) days to cure such failure if (a) such failure does not involve the failure to make payments on a monetary obligation; (b) such failure cannot reasonably be cured within ten (10) days; (c) Borrowers commenced to cure such failure promptly after written notice thereof and are diligently undertaking to cure such default, and (d) Borrowers have provided Agent with security reasonably satisfactory to Agent against any interruption of payment or impairment of collateral as a result of such continuing failure; provided that the notice and cure provisions of this Section 9.1(e) do not apply to the Events of Default described in any other section of this Article IX.

        (f)     Representations and Warranties.  Any representation or warranty made in any Loan Document proves to be untrue in any material respect when made or deemed made.

        (g)     Other Encumbrances.  Any default under any document or instrument (other than the Loan Documents) evidencing or creating a Lien on any Project or any part thereof, not covered within any applicable grace or cure period therein.

        (h)     Involuntary Bankruptcy or Other Proceeding.  Commencement of an involuntary case or other proceeding against any Borrower, any Principal or Master Tenant (each, a "**Bankruptcy Party**") which seeks liquidation, reorganization or other relief with respect to it or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeks the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any of its property, and such involuntary case or other proceeding shall remain undismissed or unstayed for a period of sixty (60) days; or an order for relief against a Bankruptcy Party shall be entered in any such case under the Federal Bankruptcy Code.

        (i)     Voluntary Petitions, etc.  Commencement by a Bankruptcy Party of a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect

to itself or its Debts or other liabilities under any bankruptcy, insolvency or other similar law or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official for it or any of its property, or consent by a Bankruptcy Party to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or the making by a Bankruptcy Party of a general assignment for the benefit of creditors, or the failure by a Bankruptcy Party, or the admission by a Bankruptcy Party in writing of its inability to pay its debts generally as they become due, or any action by a Bankruptcy Party to authorize or effect any of the foregoing.

(j)     False Reports.  Any written statement, report or certificate prepared by any Borrower or Master Tenant made or delivered to Agent by Borrowers or any Principal is not materially true and complete when made or delivered.

(k)     Single-Purpose Entity Requirements.  Any TIC comprising Borrower fails to comply with the Single Purpose Entity Requirements.

(l)     Money Laundering.

(i)     Any Borrower, Master Tenant or Property Manager is listed on the Lists or (A) is convicted or (B) pleads *nolo contendere* to charges involving money laundering or predicate crimes to money laundering.

(ii)     Any Borrower, Master Tenant, any Principal, or Property Manager is charged with crimes involving money laundering or predicate crimes to money laundering, and such Person does not, within thirty (30) days, obtain the dismissal of such charges without further investigation.

(iii)     If a tenant under any Lease or Property Manager is listed on the Lists or (A) is convicted, or (B) pleads *nolo contendere* to charges involving money laundering or predicate crimes to money laundering, and proceeds from the rents of such tenant are used to pay debt service and Borrowers fail to give Agent such representations and verifications as Agent shall reasonably request that such rents are not being used to pay Debt Service.

(m)     Loan Documents.  The occurrence of a default under any of the other Loan Documents, which continues uncured beyond any applicable notice and grace periods provided under such Loan Document, or the occurrence of an "Event of Default" as defined in any other Loan Document.

(n)     TIC Agreement.  The occurrence of a default by any Borrower under the TIC Agreement which continues uncured beyond any applicable notice and grace period provided under such TIC Agreement and such defaulting Borrower's interest is not acquired by existing Borrowers within the time period specified for such acquisition in the TIC Agreement in accordance with the provisions hereof governing Permitted Transfers.

(o)     Master Lease.  The occurrence of a default under the Master Lease which continues uncured beyond any applicable notice and grace period provided under the Master Lease.

(p)    Master Lease Subordination. The occurrence of a default or breach under the Master Lease Subordination Agreement which continues uncured beyond any applicable notice or grace period provided under the Master Lease Subordination.

(q)    Junior Loan Default. The occurrence of an event of default or the occurrence of any event or condition which, with the giving of notice, the passage of time, or both, would constitute an event of default, under the Junior Loan Documents.

Section 9.2    Special Cure Rights. Notwithstanding anything contained herein to the contrary, if a non-monetary default described in Section 9.1 results from an act or omission of a Master Tenant (and such act or omission is outside of Borrowers' control) and such act or omission also results in or, with the giving of notice or passage of time, would result in a default beyond applicable notice and cure periods under the Master Lease, then absent any other continuing Event of Default hereunder, such non-monetary default shall not constitute an "Event of Default" hereunder if (and only if) (a) all debt service payments and all other amounts due under the Loan Documents are paid current at all times (regardless of whether or not there is available revenue from the Projects or rent from the Master Lease to make such payments), (b) the value of the Collateral is not materially impaired as a result of the act or omission that caused the default or termination under the Master Lease (any such default is referred to as a "**Master Lease Default**"), (c) Borrowers diligently prosecute all rights and remedies available to Borrowers under the Master Lease and under applicable Laws to (1) cure (or cause the applicable Master Tenant to cure) such Master Lease Default (and cause such Master Lease to remain in full force and effect), and if Borrowers elect to cure (or cause the applicable Master Tenant to cure) such Master Lease Default, such Master Lease Default is actually cured within ninety (90) days of the occurrence of such Master Lease Default (such ninety (90) day period from the occurrence of the Master Lease Default is referred to as the "**Extended Cure Period**") or (2) terminate the applicable Master Lease, remove the Master Tenant and install a new master tenant (the "**Replacement Master Tenant**") to manage and operate the applicable Project (which Replacement Master Tenant shall be acceptable to Lender in its sole discretion and which Replacement Master Tenant shall thereafter be deemed to be a "Master Tenant" for all purposes hereunder and under the other Loan Documents), (d) not later than the end of the Extended Cure Period, provided Borrowers elect to install a Replacement Master Tenant as provided above (and not cure the Master Lease Default) Borrowers cause such Replacement Master Tenant to execute a master lease (such replacement lease is referred to herein as the "**Replacement Master Lease**") in a form substantially similar to the Master Lease and otherwise acceptable to Agent in its reasonable discretion which Replacement Master Lease shall thereafter be deemed to be a "Master Lease" for all purposes hereunder and under the other Loan Documents, (e) concurrently with the execution of the Replacement Master Lease, provided Borrower elects to install a Replacement Master Tenant as provided above (and not cure the Master Lease Default), Borrower causes the Replacement Master Tenant to execute and deliver to Agent a Subordination Agreement substantially similar to the Master Lease Subordination Agreement and otherwise acceptable to Agent in its reasonable discretion, (f) the Licenses required to operate the Projects as assisted living facilities and the reimbursement agreements with respect to the Projects remain in full force and effect under applicable Laws, (g) Borrower pays all of Agent's reasonable costs and expenses (including, without limitation, reasonable attorneys' fees) in connection with the matters set forth in this Section 9.2, (h) on a weekly basis during the pendency of the Extended Cure Period, Borrower furnishes Agent with a detailed written

statement summarizing the then current status of Borrowers' attempts to (1) cure such Master Lease Default or (2) remove such Master Tenant and appoint a Replacement Master Tenant, and otherwise comply with the terms of this <u>Section 9.2</u>, and (i) Borrowers at all times during the Extended Cure Period take such additional action and/or execute such additional documents (and or causes Replacement Master Tenant to take such additional action and/or execute such additional documents, as applicable) as Agent may reasonably require in connection with the matters set forth in this <u>Section 9.2</u>.

Borrowers acknowledge that for purposes of this <u>Section 9.2</u>, a Potential Default resulting from non-payment of any amounts (including, without limitation, debt service and all other amounts) due at any time under the Loan Documents or a Potential Default that could be cured solely with the payment of money is within Borrowers' control (regardless of whether or not there is available revenue from the Project or rent from the Master Lease to make such payments) and under no circumstances shall such default be deemed hereunder to result from an act or omission of a Master Tenant.

If a monetary default under the Master Lease (and the expiration of any notice and cure period applicable thereto) occurs twice in any twelve month period and in each case, Borrowers satisfy all terms and conditions set forth in this <u>Section 9.2</u>, then upon the occurrence of any further monetary default under the Master Lease (and the expiration of any notice and cure period applicable thereto) in such twelve month period, Borrowers shall only be in compliance with this <u>Section 9.2</u> if Borrowers satisfy <u>all</u> terms and conditions contained herein, including, without limitation, removing the Master Tenant and installing a Replacement Master Tenant and causing the Replacement Master Tenant to execute the Replacement Master Lease (and Borrowers shall not be entitled to cure any such monetary default as provided in <u>Section 9.2(c)(1)</u>).

## ARTICLE X
## REMEDIES

Section 10.1      <u>Remedies - Insolvency Events</u>.

Upon the occurrence of any Event of Default described in <u>Section 9.1(h)</u> or <u>9.1(i)</u>, the obligations of Lender to advance amounts hereunder shall immediately terminate, and all amounts due under the Loan Documents immediately shall become due and payable, all without written notice and without presentment, demand, protest, notice of protest or dishonor, notice of intent to accelerate the maturity thereof, notice of acceleration of the maturity thereof, or any other notice of default of any kind, all of which are hereby expressly waived by Borrowers; however, if the Bankruptcy Party under <u>Section 9.1(h)</u> or <u>9.1(i)</u> is other than a Borrower, then all amounts due under the Loan Documents shall become immediately due and payable at Lender's election, in Agent's sole discretion.

Section 10.2      <u>Remedies - Other Events</u>.

Except as set forth in <u>Section 10.1</u> above, while any Event of Default exists, Agent may (a) by written notice to Borrowers, declare the entire Loan to be immediately due and payable without presentment, demand, protest, notice of protest or dishonor, notice of intent to

127

accelerate the maturity thereof, notice of acceleration of the maturity thereof, or other notice of default of any kind, all of which are hereby expressly waived by Borrowers, (b) terminate the obligation, if any, of Lender to advance amounts hereunder, and (c) exercise all rights and remedies therefore under the Loan Documents and at law or in equity.

Section 10.3        Agent's Right to Perform the Obligations.

If Borrowers shall fail, refuse or neglect to make any payment or perform any act required by the Loan Documents, then while any Event of Default exists, and without notice to or demand upon Borrowers and without waiving or releasing any other right, remedy or recourse Agent or Lender may have because of such Event of Default, Agent may (but shall not be obligated to) make such payment or perform such act for the account of and at the expense of Borrowers, and shall have the right to enter upon the Projects for such purpose and to take all such action thereon and with respect to the Projects as it may deem necessary or appropriate. If Agent shall elect to pay any sum due with reference to the Projects, Agent may do so in reliance on any bill, statement or assessment procured from the appropriate governmental authority or other issuer thereof without inquiring into the accuracy or validity thereof. Similarly, in making any payments to protect the security intended to be created by the Loan Documents, Agent shall not be bound to inquire into the validity of any apparent or threatened adverse title, lien, encumbrance, claim or charge before making an advance for the purpose of preventing or removing the same. Additionally, if any Hazardous Materials (as defined in the Environmental Indemnity) affect or threaten to affect any Project, Agent may (but shall not be obligated to) give such notices and take such actions as it deems necessary or advisable in order to abate the discharge of any Hazardous Materials or remove the Hazardous Materials. In exercising any rights under the Loan Documents or taking any actions provided for therein, Agent may act through its employees, agents or independent contractors as authorized by Agent. Borrowers shall indemnify Agent and Lender for all losses, expenses, damages, claims and causes of action, including reasonable attorneys' fees, incurred or accruing by reason of any acts performed by Agent or Lender pursuant to the provisions of this Section 10.3, including those arising from the joint, concurrent, or comparative negligence of Agent or Lender, except as a result of Agent or Lender's gross negligence or willful misconduct. All sums paid by Agent or Lender pursuant to this Section 10.3, and all other sums expended by Agent or Lender to which they shall be entitled to be indemnified, together with interest thereon at the Default Rate from the date of such payment or expenditure until paid, shall constitute additions to the Loan, shall be secured by the Loan Documents and shall be paid by Borrowers to Agent upon demand.

## ARTICLE XI
## MISCELLANEOUS

Section 11.1        Notices.

Any notice required or permitted to be given under this Agreement shall be in writing and either shall be mailed by certified mail, postage prepaid, return receipt requested, or sent by overnight air courier service, or personally delivered to a representative of the receiving party, or sent by telecopy (provided an identical notice is also sent simultaneously by mail, overnight courier, or personal delivery as otherwise provided in this Section 11.1). All such

communications shall be mailed, sent or delivered, addressed to the party for whom it is intended at its address set forth below.

| If to Borrowers: | c/o Capital Resources Fund, LLC |
| | 443 Redcliff Drive, Suite 100 |
| | Redding, California 96002 |
| | Attention:    Adam Peterson, CFO |
| | Facsimile:    (530) 226-1480 |

| With a copy to: | Hirschler Fleisher |
| | Federal Reserve Bank Building |
| | 701 East Byrd Street |
| | Richmond, Virginia 23219 |
| | Attention:    Bill Tate |
| | Facsimile:    (804) 644-0957 |

| If to Agent: | General Electric Capital Corporation |
| | Loan No. 07-0004232 |
| | 2 Bethesda Metro Center, Suite 600 |
| | Bethesda, Maryland 20814 |
| | Attention:    Manager, Portfolio Management Group |
| | Facsimile:    (301) 347-3150 |

| With a copy to: | General Electric Capital Corporation |
| | Loan No. 07-0004232 |
| | 500 West Monroe Street |
| | Chicago, Illinois 60661 |
| | Attention:    John D. Cobb, Senior Vice President |
| | Facsimile:    (312) 441-6755 |

| And a copy to: | General Electric Capital Corporation |
| | Loan No. 07-0004232 |
| | 4314 Shoalwood Avenue |
| | Austin, Texas 78756 |
| | Attention:    Diana Pennington, Chief Counsel |
| | Facsimile:    (866) 221-0433 |

Notices shall be deemed given when actually delivered, (2) on the first Business Day after deposit with an overnight air courier service for delivery on the next Business Day, or (3) on the third Business Day after deposit in the United States mail, postage prepaid, in each case to the address of the intended addressee (except as otherwise provided in the Security Document), and any communication so delivered in person shall be deemed to be given when receipted for by, or actually received by Agent or Borrowers, as the case may be. If given by telecopy, a notice shall be deemed given and received when the telecopy is transmitted to the party's telecopy number specified above, and confirmation of complete receipt is received by the transmitting party during normal business hours or on the next Business Day if not confirmed during normal business hours, and an identical notice is also sent simultaneously by mail, overnight courier, or

personal delivery as otherwise provided in this Section 11.1. Either party may designate a change of address by written notice to the other by giving at least ten (10) days prior written notice of such change of address.

Capital Resources Fund, LLC ("**Notice Agent**") hereby accepts appointment as the notice agent with respect to notices, demands, requests or other communications between Borrowers and Lender. Notice Agent hereby agrees to serve as attorney-in-fact for all Borrowers for the limited purpose of receiving all notices with respect to the Indebtedness. Notice Agent acknowledges that it will be the only party to be shown in the Loan Documents as to which notices from Lender shall be delivered. Each Borrower acknowledges that notice from Lender to Notice Agent shall be deemed notice to all Borrowers. Each Borrower agrees that Notice Agent may be discharged or replaced only with Lender's prior written consent not to be unreasonably withheld; provided in no event shall Lender be required to send notice to more than one notice agent for the Borrowers.

Section 11.2        Amendments and Waivers.

No amendment or waiver of any provision of the Loan Documents shall be effective unless in writing and signed by the party against whom enforcement is sought.

Section 11.3        Limitation on Interest.

It is the intention of the parties hereto to conform strictly to applicable usury laws. Accordingly, all agreements between Borrowers, Agent and Lender with respect to the Loan are hereby expressly limited so that in no event, whether by reason of acceleration of maturity or otherwise, shall the amount paid or agreed to be paid to Lender or charged by Lender for the use, forbearance or detention of the money to be lent hereunder or otherwise, exceed the maximum amount allowed by law. If the Loan would be usurious under applicable law, then, notwithstanding anything to the contrary in the Loan Documents: (a) the aggregate of all consideration which constitutes interest under applicable law that is contracted for, taken, reserved, charged or received under the Loan Documents shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited on the Note the holder thereof (or, if the Note has been paid in full, refunded to Borrowers); and (b) if maturity is accelerated by reason of an election by Agent or Lender, or in the event of any prepayment, then any consideration which constitutes interest may never include more than the maximum amount allowed by applicable law. In such case, excess interest, if any, provided for in the Loan Documents or otherwise, to the extent permitted by applicable law, shall be amortized, prorated, allocated and spread from the date of advance until payment in full so that the actual rate of interest is uniform through the term hereof. If such amortization, proration, allocation and spreading is not permitted under applicable law, then such excess interest shall be cancelled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited on the Note (or, if the Note has been paid in full, refunded to Borrowers). The terms and provisions of this Section 11.3 shall control and supersede every other provision of the Loan Documents. The Loan Documents are contracts made under and shall be construed in accordance with and governed by the laws of the State of Illinois, except that (1) if at any time the laws of the United States of America permit Lender to contract for, take, reserve, charge or receive a higher rate of interest than is allowed by the laws of the State of Illinois (whether such

federal laws directly so provide or refer to the law of any state), then such federal laws shall to such extent govern as to the rate of interest which Lender may contract for, take, reserve, charge or receive under the Loan Documents and (2) to the extent otherwise specified in any of the Loan Documents.

Section 11.4    <u>Invalid Provisions.</u>

If any provision of any Loan Document is held to be illegal, invalid or unenforceable, such provision shall be fully severable; the Loan Documents shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part thereof; the remaining provisions thereof shall remain in full effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance therefrom; and in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as a part of such Loan Document a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible to be legal, valid and enforceable.

Section 11.5    <u>Reimbursement of Expenses; Facility Inspection Fee.</u>

(a)    Except as otherwise provided in <u>Sections 11.5(b)</u> and <u>(c)</u>, Borrowers shall pay all expenses incurred by Agent and Lender in connection with the Loan, including, without limitation, (i) out-of-pocket costs and expenses of Agent and Lender in connection with (a) the negotiation, preparation, execution and delivery of the Loan Documents and the documents and instruments referred to therein; (b) due diligence with respect to the Collateral and the creation, perfection or protection of Agent's liens in the Collateral (including, without limitation, fees and expenses for title and lien searches, premiums for title insurance and endorsements thereto, amended or replacement Security Documents, Uniform Commercial Code financing statements or other collateral security instruments, title insurance premiums and filing and recording fees, third party due diligence expenses for the Projects plus travel expenses, accounting firm fees, costs of the appraisals and Site Assessments (and the environmental consultant), the engineering reports, audit costs and costs and fees incurred in connection with arranging, setting up, servicing any pledged accounts or similar collateral); (c) the negotiation, preparation, execution and delivery of any amendment, waiver, restructuring, workout or consent relating to any of the Loan Documents, (d) the settlement of or dispute regarding condemnation and casualty awards and (e) the preservation of rights under and enforcement of the Loan Documents and the documents and instruments referred to therein, including any communications or discussions relating to any action that any Borrower shall from time to time request Agent to take, as well as any restructuring or rescheduling of the Loan and (ii) the fees, expenses and other charges of counsel to Agent and the Lender in connection with all of the foregoing. Borrowers shall, upon request, promptly reimburse Agent and Lender for all amounts expended, advanced or incurred by Agent and Lender to collect the Note, or to enforce the rights of Agent and Lender under this Agreement or any other Loan Document, or to defend or assert the rights and claims of Agent and Lender under the Loan Documents or with respect to the Projects (by litigation or other proceedings), which amounts will include all court costs, attorneys' fees and expenses, fees of auditors and accountants, and investigation expenses as may be incurred by Agent and Lender in connection with any such matters (whether or not litigation is instituted), together with interest at the Default Rate on each such amount from the date of disbursement until the date of

reimbursement to Agent, all of which shall constitute part of the Loan and shall be secured by the Loan Documents.

(b)     Borrowers shall also pay to Agent on the first (1st) day of each month during the term of the Loan, in addition to all other amounts due under the Loan Documents, a collateral inspection fee in the amount of Two Hundred Fifty Dollars ($250.00) per month.

(c)     Agent shall have the right to charge administrative fees as Agent may determine in its commercially reasonable discretion, in connection with any special servicing requests made by Borrower requiring Agent's evaluation, preparation and processing of any such requests that are beyond the normal, day-to-day servicing functions under the Loan.

Section 11.6     Approvals; Third Parties; Conditions.

All approval rights retained or exercised by Agent with respect to leases, contracts, plans, studies and other matters are solely to facilitate Lender's credit underwriting, and shall not be deemed or construed as a determination that Agent or Lender has passed on the adequacy thereof for any other purpose and may not be relied upon by Borrowers or any other Person. This Agreement is for the sole and exclusive use of Agent, Lender and Borrowers and may not be enforced, nor relied upon, by any Person other than Agent, Lender and Borrowers. All conditions of the obligations of Agent or Lender hereunder, including the obligation to make advances, are imposed solely and exclusively for the benefit of Agent and Lender, and their respective successors and assigns, and no other Person shall have standing to require satisfaction of such conditions or be entitled to assume that Lender will refuse to make advances in the absence of strict compliance with any or all of such conditions, and no other Person shall, under any circumstances, be deemed to be a beneficiary of such conditions, any and all of which may be freely waived in whole or in part by Agent or Lender, as applicable, at any time in Agent's or Lender's sole discretion.

Section 11.7     Lender Not in Control; No Partnership.

None of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Agent or Lender the right or power to exercise control over the affairs or management of Borrowers, the power of Agent and Lender being limited to the rights to exercise the remedies referred to in the Loan Documents. The relationship between Borrowers, on the one hand, and Agent and Lender, on the other hand, is, and at all times shall remain, solely that of debtor and creditor. No covenant or provision of the Loan Documents is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest in profits or income between Agent and Lender, on the one hand, and Borrowers, on the other hand, or to create an equity in the Projects in Lender or Agent. Neither Agent nor Lender either undertakes or assumes any responsibility or duty to Borrowers or to any other person with respect to the Projects or the Loan, except as expressly provided in the Loan Documents; and notwithstanding any other provision of the Loan Documents (a) neither Agent nor Lender is nor shall be construed as, a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Borrowers or their stockholders, members, or partners and neither Agent nor Lender intends to ever assume such status; (b) Neither Agent nor Lender shall in any event be liable for any Debts, expenses or losses incurred or sustained by

Borrowers; and (c) neither Agent nor Lender shall be deemed responsible for or a participant in any acts, omissions or decisions of Borrowers or their stockholders, members, or partners. Agent, and Lender, on the one hand, and Borrowers, on the other hand, disclaim any intention to create any partnership, joint venture, agency or common interest in profits or income between Agent and Lender, on the one hand, and Borrowers, on the other hand, or to create an equity in the Projects in Agent or Lender, or any sharing of liabilities, losses, costs or expenses.

   Section 11.8  Time of the Essence.

   Time is of the essence with respect to this Agreement.

   Section 11.9  Successors and Assigns.

   This Agreement shall be binding upon and inure to the benefit of Agent, Lender and Borrowers and the respective successors and assigns of Agent, Lender and Borrowers, provided that neither any Borrower nor any other Loan Party shall, without the prior written consent of Agent, assign any rights, duties or obligations hereunder.

   Section 11.10  Renewal, Extension or Rearrangement.

   All provisions of the Loan Documents shall apply with equal effect to each and all promissory notes and amendments thereof hereinafter executed which in whole or in part represent a renewal, extension, increase or rearrangement of the Loan. For portfolio management purposes, Agent and Lender may elect to divide the Loan into two or more separate loans evidenced by separate promissory notes so long as the payment and other obligations of Borrowers are not effectively increased or otherwise modified. Borrowers agree to cooperate with Agent and to execute such documents as Agent reasonably may request to effect such division of the Loan.

   Section 11.11  Waivers; Forbearance.

   No advance of Loan proceeds hereunder shall constitute a waiver of any of the conditions of Lender's obligation to make advances nor, in the event Borrowers are unable to satisfy any such condition, shall any such advance have the effect of precluding Lender or Agent from thereafter requiring such condition to be satisfied prior to any future advance to which such condition otherwise applies. No course of dealing on the part of Agent or Lender, or their respective officers, employees, consultants or agents, nor any failure or delay by Agent or Lender with respect to exercising any right, power or privilege of Agent or Lender under any of the Loan Documents, shall operate as a waiver thereof. Any forbearance by Agent or Lender in exercising any right or remedy under any of the Loan Documents, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. Agent's acceptance of payment of any sum secured by any of the Loan Documents after the due date of such payment shall not be a waiver of Agent's or Lender's right to either require prompt payment when due of all other sums so secured or to declare a Potential Default for failure to make prompt payment. The procurement of insurance or the payment of taxes or other liens or charges by Agent or Lender shall not be a waiver of Agent's or Lender's right to accelerate the maturity of the Loan, nor shall Agent's or Lender's receipt of any awards, proceeds, or damages under this

Agreement or the Security Document operate to cure or waive Borrowers' or any Principal's Potential Default in payment of sums secured by any of the Loan Documents.

Section 11.12    Cumulative Rights.

Rights and remedies of Agent and Lender under the Loan Documents shall be cumulative, and the exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy.

Section 11.13    Singular and Plural.

Words used in this Agreement and the other Loan Documents in the singular, where the context so permits, shall be deemed to include the plural and vice versa. The definitions of words in the singular in this Agreement and the other Loan Documents shall apply to such words when used in the plural where the context so permits and vice versa.

Section 11.14    Phrases.

When used in this Agreement and the other Loan Documents, the phrase "including" shall mean "including, but not limited to," the phrase "satisfactory to Agent" or "satisfactory to Lender" shall mean "in form and substance satisfactory to Agent in all respects" or "in form and substance satisfactory to Lender in all respects" (as applicable), the phrase "with Agent's consent", "with Agent's approval", "with Lender's consent" or "with Lender's approval" shall mean such consent or approval at Agent's or Lender's discretion (as applicable), and the phrase "acceptable to Agent" or "acceptable to Lender" shall mean "acceptable to Agent at Agent's sole discretion" or "acceptable to Lender at Lender's sole discretion" (as applicable), except to the extent expressly otherwise provided herein.

Section 11.15    Reserved.

Section 11.16    Titles of Articles, Sections and Subsections.

All titles or headings to articles, sections, subsections or other divisions of this Agreement and the other Loan Documents or the exhibits hereto and thereto are only for the convenience of the parties and shall not be construed to have any effect or meaning with respect to the other content of such articles, sections, subsections or other divisions, such other content being controlling as to the agreement between the parties hereto.

Section 11.17    Promotional Material.

Borrowers authorize Agent and Lender to issue press releases, advertisements and other promotional materials in connection with Lender's own promotional and marketing activities, and describing the Loan in general terms or in detail and Lender's and Agents participation in the Loan. All references to Lender or Agent contained in any press release, advertisement or promotional material issued by any Borrower or Affiliate of Borrowers shall be approved in writing by Agent in advance of issuance.

Section 11.18    Survival.

All of the representations, warranties, indemnities and covenants hereunder, and under the indemnification provisions of the other Loan Documents shall survive the repayment in full of the Loan and the release of the liens evidencing or securing the Loan, and shall survive the transfer (by sale, foreclosure, conveyance in lieu of foreclosure or otherwise) of any or all right, title and interest in and to the Projects to any party, whether or not an Affiliate of Borrowers.

Section 11.19    WAIVER OF JURY TRIAL.

TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH BORROWER, AGENT AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ANY EXERCISE BY ANY PARTY OF THEIR RESPECTIVE RIGHTS UNDER THE LOAN DOCUMENTS OR IN ANY WAY RELATING TO THE LOAN OR THE PROJECTS (INCLUDING, WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT, AND ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).    THIS WAIVER IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER THIS AGREEMENT.

Section 11.20    Waiver of Punitive or Consequential Damages.

Neither Agent, Lender nor any Borrower shall be responsible or liable to the other or to any other Person for any punitive, exemplary or consequential damages which may be alleged as a result of the Loan or the transaction contemplated hereby, including any breach or other Potential Default or Event of Default by any party hereto.

Section 11.21    Governing Law.

The laws of the State of Illinois and of the United States of America shall govern the rights and duties of the parties hereto and the validity, construction, enforcement and interpretation of the Loan Documents, except to the extent otherwise specified in any of the Loan Documents.

Section 11.22    Entire Agreement.

This Agreement and the other Loan Documents embody the entire agreement and understanding between Agent, Lender and Borrowers and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof. Accordingly, the Loan Documents may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.  There are no unwritten oral agreements among the parties.  If any conflict or inconsistency exists between the Term Sheet

and this Agreement or any of the other Loan Documents, the terms of this Agreement and the other Loan Documents shall control.

Section 11.23    Counterparts.

This Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document.

Section 11.24    Venue.

EACH BORROWER HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE COUNTY OF COOK, STATE OF ILLINOIS AND IRREVOCABLY AGREES THAT, SUBJECT TO AGENT OR LENDER'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS. EACH BORROWER EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. EACH BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON BORROWERS BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWERS, AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

Section 11.25    Sale of Loan, Participation.

Lender or Agent, at any time and without the consent of Borrowers or any Principal, may grant participations in or sell, transfer, assign and convey all or any portion of its right, title and interest in and to the Loan, and in connection with such sale or participation, to sell, transfer, assign and convey all or any portion of its right, title and interest in and to this Agreement and the other Loan Documents, any guaranties given in connection with the Loan and any collateral given to secure the Loan with respect to the portion of the Loan so sold or participated. Agent and Lender shall have the right (but shall be under no obligation) to make available to any party for the purpose of granting participations in or selling, transferring, assigning or conveying all or any part of the Loan (including any governmental agency or authority and any prospective bidder at any foreclosure sale of any Project) any and all information which Agent or Lender may have with respect to the Projects and Borrowers, whether provided by Borrowers or any third party or obtained as a result of any environmental assessments. Each Borrower agrees that Agent and Lender shall have no liability whatsoever as a result of delivering any such information to any third party for such purpose, and each Borrower, on behalf of itself and its successors and assigns, hereby releases and discharges Agent and Lender from any and all liability, claims, damages, or causes of action, arising out of, connected with or incidental to the delivery of any such information to any third party in connection with such sale or participation.

Section 11.26    <u>Limitation on Liability of Agent's and Lender's Officers, Employees, etc.</u>

Any obligation or liability whatsoever of Agent or Lender which may arise at any time under this Agreement or any other Loan Document shall be satisfied, if at all, out of the Agent's or Lender's assets only. No such obligation or liability shall be personally binding upon, nor shall resort for the enforcement thereof be had to, the property of any of Agent's or Lender's shareholders, directors, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

Section 11.27    <u>Effectiveness of Facsimile Documents and Signatures.</u>

The Loan Documents may be transmitted and/or signed by facsimile. The effectiveness of any such documents and signatures shall, subject to applicable law, have the same force and effect as manually signed originals and shall be binding on all parties to the Loan Documents. Agent may also require that any such documents and signatures be confirmed by a manually signed original thereof; provided, however, that the failure to request or deliver the same shall not limit the effectiveness of any facsimile document or signature.

Section 11.28    <u>Joint and Several Liability.</u>

(a)    The obligation to pay the Indebtedness and to perform all other obligations of Borrowers under the Loan Documents (collectively, the "**Obligations**") shall be the joint and several obligations and liabilities of Borrowers. Hence, each Borrower shall be primarily and directly liable for repayment of the Indebtedness and the performance of all other Obligations.

(b)    Notwithstanding any provisions of this Agreement to the contrary, it is intended that the joint and several nature of the liability of each Borrower for the Obligations and the liens and security interests granted by Borrowers to secure the Obligations, not constitute a "Fraudulent Conveyance" (as defined below). Consequently, Lender and each Borrower agree that if the liability of a Borrower for the Obligations, or any liens or security interests granted by such Borrower securing the Obligations would, but for the application of this sentence, constitute a Fraudulent Conveyance, the liability of such Borrower and the liens and security interests securing such liability shall be valid and enforceable only to the maximum extent that would not cause such liability or such lien or security interest to constitute a Fraudulent Conveyance, and the liability of such Borrower and this Agreement shall automatically be deemed to have been amended accordingly. For purposes hereof, "**Fraudulent Conveyance**" means a fraudulent conveyance under <u>Section 548</u> of the Federal Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the applicable provisions of any fraudulent conveyance or fraudulent transfer law or similar law of any state, nation or other governmental unit, as in effect from time to time.

(c)    Agent is hereby authorized, without notice or demand and without affecting the liability of any Borrower hereunder, to, at any time and from time to time, (i) renew, extend or otherwise increase the time for payment of the Obligations; (ii) with the written agreement of any Borrower accelerate or otherwise change the terms relating to the Obligations or otherwise modify, amend or change the terms of any promissory note or other

agreement, document or instrument now or hereafter executed by any Borrower and delivered to Agent as they relate to such Borrower; (iii) accept partial payments of the Obligations; (iv) take and hold security or collateral for the payment of the Obligations or for the payment of any guaranties of the Obligations and exchange, enforce, waive and release any such security or collateral; (v) apply such security or collateral and direct the order or manner of sale thereof Agent, in its sole discretion, may determine; and (vi) settle, release, compromise, collect or otherwise liquidate the Obligations and any security or collateral therefor in any manner, without affecting or impairing the obligations of any Borrower except as to the Borrower with whom such agreement is made.  Except as specifically provided in this Agreement or any of the other Loan Documents, Agent shall have the exclusive right to determine the time and manner of application of any payments or credits, whether received from any Borrower or any other source, and such determination shall be binding on all Borrowers. All such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of the Obligations Agent shall determine in its sole discretion without affecting the validity or enforceability of the Obligations of the other Borrowers.

(d)    Each Borrower hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (i) the absence of any attempt to collect the Obligations from any obligor or other action to enforce the same; (ii) the waiver or consent by Agent with respect to any provision of any instrument evidencing the Obligations, or any part thereof, or any other agreement heretofore, now or hereafter executed by a Borrower and delivered to Agent; (iii) failure by Agent to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the Obligations; (iv) the institution of any proceeding under the Federal Bankruptcy Code, or any similar proceeding, by or against a Borrower or Agent's election in any such proceeding of the application of <u>Section 1111(b)(2)</u> of the Federal Bankruptcy Code; (v) any borrowing or grant of a security interest by a Borrower as debtor-in-possession, under <u>Section 364</u> of the Federal Bankruptcy Code; (vi) the disallowance, under <u>Section 502</u> of the Federal Bankruptcy Code, of all or any portion of Agent's claim(s) for repayment of any of the Obligations; or (vii) any other circumstance other than payment in full of the Obligations which might otherwise constitute a legal or equitable discharge or defense of a guarantor.

(e)    Until all Obligations have been paid and satisfied in full, no payment made by or for the account of a Borrower including, without limitation, (i) a payment made by such Borrower on behalf of the liabilities of the other Borrower or (ii) a payment made by any other person under any guaranty, shall entitle such Borrower, by subrogation or otherwise, to any payment from such other Borrower or from or out of such other Borrower's property and such Borrower shall not exercise any right or remedy against such other Borrower or any property of such other Borrower by reason of any performance of such Borrower of its joint and several obligations hereunder.

Section 11.29    <u>Agency</u>.

Both GECC and Lender agree that GECC shall act as agent for each Lender in all dealings with Borrowers, Principals, and Master Tenant and under or in connection with this Loan Agreement and each of the other Loan Documents, including without limitation, granting any consents or waivers, taking any enforcements actions, sending or receiving notices, dealing

with collateral, granting releases, accepting payments or otherwise. Borrowers, Principals and Master Tenants may rely without question upon any document signed by GECC as agent for each Lender hereunder or under any other Loan Documents. References to "Lender" in this Agreement and in the other Loan Documents shall refer to each of GECC and the other financial institutions who are or hereafter become parties to this Agreement as Lender, individually, or to all of GECC and the other financial institutions who are or hereafter become parties to this Agreement, collectively, as the context may require; provided any and all grants of security interests to a Lender under this Agreement or any other Loan Document shall be deemed to be a grant to GECC as agent for each Lender.

Section 11.30    Limitation on Liability.

Except as provided in this Section 11.30 and in the Agreement of Principals and the Environmental Indemnity, neither Borrower nor any Principal, nor any constituent member, partner, shareholder, officer, director, employee or agent of Borrowers or Principals shall have any personal liability with respect to the payment of performance of the Note or the other obligations under the Loan Documents. Notwithstanding the foregoing:

(a)    Nothing herein contained shall be construed as prohibiting Agent from exercising any and all remedies which the Loan Documents permit, including the right to bring actions or proceedings against Borrowers and to enter a judgment against the Borrowers, so long as the exercise of any remedy does not extend to execution against or recovery out of any property of the Borrowers other than the Collateral furnished under the Loan Documents;

(b)    There shall be no limitation, in any event of any Borrower's or Principal's personal liability under, and the exercise of any of Agent's rights under any indemnity from the Borrowers and Principals to Agent and Lender under the Environmental Indemnity and Agreements of Principals; and

(c)    Nothing herein contained shall constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Note or secured by the Loan Documents, and the same shall continue until paid or discharged in full.

Section 11.31    Post-Closing Obligations of Borrowers.

Notwithstanding the fact that Borrowers have not satisfied certain of the conditions to the initial advance of the Loan proceeds, Lender has agreed to advance the proceeds of the Loan to Borrowers, subject to the satisfaction of the other conditions to funding contained herein and each of the requirements set forth in Schedule 11.31 attached hereto, within the time periods specified therein.

**[Signatures Begin on Next Page]**

EXECUTED as of the date first written above.

LENDER:

**GENERAL ELECTRIC CAPITAL CORPORATION**, a Delaware corporation

By: _____

Its: _____

Jim McMahon
Vice President &
Duly Authorized Signatory

AGENT:

**GENERAL ELECTRIC CAPITAL CORPORATION**, a Delaware corporation

By: _____

Its: _____

Jim McMahon
Vice President &
Duly Authorized Signatory

**[Signatures Continued on Next Page]**

Loan Agreement – Signature Page
AREI Portfolio I
DALLAS: 35130.00028: 1432156v6

140

**BORROWERS:**

**NEWHALL CAPITAL RESOURCES, LLC**, a
Delaware limited liability company

By:    Capital Resources Fund, LLC,
        a California limited liability company,
        its Manager

        By: _____
            Name: Peary D. Wood
            Title: President

**AREI NEWHALL 1, LLC,** a Delaware limited
liability company

By:   Capital Resources Fund, LLC
      a California limited liability company
      its Vice President

By: _____
      Name: Peary D. Wood
      Title: President

**AREI NEWHALL 2, LLC,** a Delaware limited
liability company

By:    Capital Resources Fund, LLC
       a California limited liability company
       its Vice President

       By: _____
           Name: Peary D. Wood
           Title: President

**AREI NEWHALL 3, LLC,** a Delaware limited
liability company

By:   Capital Resources Fund, LLC
      a California limited liability company
      its Vice President


By: _____
    Name: Peary D. Wood
    Title: President

**AREI NEWHALL 4, LLC,** a Delaware limited
liability company

By:   Capital Resources Fund, LLC
      a California limited liability company
      its Vice President

      By: _____
           Name: Peary D. Wood
           Title: President

**AREI NEWHALL 5, LLC,** a Delaware limited
liability company

By:   Capital Resources Fund, LLC
      a California limited liability company
      its Vice President

By: _____
      Name: Peary D. Wood
      Title: President

**AREI NEWHALL 6, LLC,** a Delaware limited
liability company

By:   Capital Resources Fund, LLC
      a California limited liability company
      its Vice President

By: _____
    Name: Peary D. Wood
    Title: President

**AREI NEWHALL 7, LLC,** a Delaware limited liability company

By:   Capital Resources Fund, LLC
      a California limited liability company
      its Vice President

By: _____
      Name: Peary D. Wood
      Title: President

**AREI NEWHALL 8, LLC,** a Delaware limited
liability company

By:   Capital Resources Fund, LLC
      a California limited liability company
      its Vice President

By: _____
   Name: Peary D. Wood
   Title: President

**AREI NEWHALL 10, LLC,** a Delaware limited
liability company

By:   Capital Resources Fund, LLC
      a California limited liability company
      its Vice President

By: _____
Name: Peary D. Wood
Title: President

**AREI NEWHALL 12, LLC,** a Delaware limited
liability company

By:   Capital Resources Fund, LLC
      a California limited liability company
      its Vice President

By: _____
      Name: Peary D. Wood
      Title: President

**AREI NEWHALL 13, LLC,** a Delaware limited
liability company

By:   Capital Resources Fund, LLC
      a California limited liability company
      its Vice President

      By:_____
          Name: Peary D. Wood
          Title: President

**AREI NEWHALL 14, LLC,** a Delaware limited liability company

By:   Capital Resources Fund, LLC
      a California limited liability company
      its Vice President

By: _____
    Name: Peary D. Wood
    Title: President

**AREI NEWHALL 15, LLC,** a Delaware limited liability company

By:   Capital Resources Fund, LLC
      a California limited liability company
      its Vice President

      By: _____
      Name: Peary D. Wood
      Title: President