**AREI NEWHALL 17, LLC,** a Delaware limited liability company

By:   Capital Resources Fund, LLC
      a California limited liability company
      its Vice President

By: _____
      Name: Peary D. Wood
      Title: President

## SCHEDULE I

## SCHEDULE OF BORROWERS

NEWHALL CAPITAL RESOURCES, LLC, a Delaware limited liability company

AREI NEWHALL 1, LLC, a Delaware limited liability company

AREI NEWHALL 2, LLC, a Delaware limited liability company

AREI NEWHALL 3, LLC, a Delaware limited liability company

AREI NEWHALL 4, LLC, a Delaware limited liability company

AREI NEWHALL 5, LLC, a Delaware limited liability company

AREI NEWHALL 6, LLC, a Delaware limited liability company

AREI NEWHALL 7, LLC, a Delaware limited liability company

AREI NEWHALL 8, LLC, a Delaware limited liability company

AREI NEWHALL 10, LLC, a Delaware limited liability company

AREI NEWHALL 12, LLC, a Delaware limited liability company

AREI NEWHALL 13, LLC, a Delaware limited liability company

AREI NEWHALL 14, LLC, a Delaware limited liability company

AREI NEWHALL 15, LLC, a Delaware limited liability company

AREI NEWHALL 17, LLC, a Delaware limited liability company

## SCHEDULE II

## CERTAIN DEFINITIONS

As used herein, the following terms have the meanings indicated:

"**Adjusted Actual Rent**" has the meaning assigned to such term in Schedule III.

"**Affiliate**" means (a) any corporation in which any Borrower or any partner, shareholder, director, officer, member, or manager of any Borrower or any Principal directly or indirectly owns or controls more than ten percent (10%) of the beneficial interest, (b) any general or limited partnership, joint venture, limited liability company or limited liability partnership in which any Borrower or any partner, shareholder, director, officer, member, or manager of any Borrower is a partner, joint venturer or member, (c) any trust as to which any Borrower or any partner, shareholder, director, officer, member or manager of any Borrower is a trustee or beneficiary, (d) any entity of any type which is directly or indirectly owned or controlled by any Borrower or any partner, shareholder, director, officer, member or manager of any Borrower or by any Principal, (e) any partner, shareholder, director, officer, member, manager or employee of any Borrower or any Principal, (f) any Person related by birth, adoption or marriage to any partner, shareholder, director, officer, member, manager, or employee of any Borrower or any Principal, (g) any Principal, (h) any Person which owns or controls, directly or indirectly, more than ten percent (10%) of the beneficial interests of any Borrower or any Principal or (i) any entity of which more than ten percent (10%) of the beneficial interests are owned or controlled, directly or indirectly, by an Affiliate as defined in clauses (a) through (h).

"**Agent**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Agreement**" means this Loan Agreement, as amended from time to time.

"**Agreement of Principals**" has the meaning assigned to such term in Part A of Schedule 2.1.

"**Anti-Money Laundering Laws**" has the meaning assigned to such term in Sections 5.26(b).

"**Anti-Money Laundering Measures**" has the meaning assigned to such term in Section 5.26(b).

"**Anti-Terrorism Laws**" has the meaning assigned to such term in Section 5.26(a).

"**Approved Bank Account**" means an account maintained at a bank reasonably approved by Agent, as to which account, Borrowers or Master Tenant, said bank and Agent shall have entered into an agreement (the "**Blocked Account Agreement**") in form and substance reasonably acceptable to Agent to ensure Agent that Agent has "control" of such account as such

term is defined in the Uniform Commercial Code as in effect in the applicable state and as to a Borrower's and Master Tenant's right, title and interest in such amounts in such account Agent has a perfected first security interest (all costs and expenses of negotiating, documenting and maintaining such bank account, agreement and perfected security interest shall be paid for by Borrowers) and shall include the Lockbox Account.

"**Assignment Agreement**" has the meaning assigned to such term in Section 2.6.

"**Bankruptcy Party**" has the meaning assigned to such term in Section 9.1(h).

"**Borrower**" and "**Borrowers**" have the meaning assigned to such terms in the introductory paragraph of this Agreement.

"**Borrower Anti-Terrorism Policies**" has the meaning assigned to such term in Section 7.20(c).

"**Borrowers' Certificate**" has the meaning assigned to such term in Part A of Schedule 2.1.

"**Borrowers' Equity**" has the meaning assigned to such term in Part A of Schedule 2.1.

"**BSA**" has the meaning assigned to such term in Section 5.26(b).

"**Business Associate Agreement**" has the meaning assigned to such term in Part A of Schedule 2.1.

"**Business Day**" means a day other than a Saturday, a Sunday, or a legal holiday on which national banks located in the State of California and the State of Illinois are not open for general banking business.

"**Charges**" has the meaning assigned to such term in Section 7.3.

"**Closing Date**" shall be the date on which the Loan is closed and the Funding Amount is funded.

"**Collateral**" has the meaning assigned to such term in Section 2.10.

"**Collateral Assignment**" has the meaning assigned to such term in Part A of Schedule 2.1.

"**CON**" has the meaning assigned to such term in Section 8.1(c).

"**Control**" or "**controls**": When used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contractor or otherwise; and the terms "Controlling" and "Controlled" have the meaning correlative to the foregoing.

"**Debt**" means, for any Person, without duplication, the aggregate of: (a) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (b) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable, if such amounts were advanced under the credit facility, (c) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (d) all indebtedness guaranteed by such Person, directly or indirectly, (e) all obligations under leases that constitute capital leases for which such Person is liable, and (f) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as guarantee, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"**Debt Service**" means the aggregate interest, fixed principal, and other payments due under the Loan, and on any other outstanding permitted Debt relating to the Projects (if any) for the period of time for which calculated.

"**Debt Service Coverage Ratio**" means the ratio of (i) Net Operating Income (calculated in accordance with Schedule III attached hereto) from the Projects for a particular period, to (ii) Debt Service.

"**Default Rate**" means the lesser of (a) the maximum rate of interest allowed by applicable law, and (b) five percent (5%) per annum in excess of the Interest Rate.

"**Defeasance**" has the meaning assigned to such term in Section 2.6.

"**Defeasance Deposit**" has the meaning assigned to such term in Section 2.6.

"**Defeasance Period**" has the meaning assigned to such term in Section 2.5(a).

"**Designated Person**" has the meaning assigned to such term in Section 5.26(a).

"**Determination Date**" has the meaning assigned to such term in Section 7.27.

"**Environmental Indemnity**" has the meaning assigned to such term in Part A of Schedule 2.1.

"**ERISA**" means the Employment Retirement Income Security Act of 1974, as amended from time to time, and all rules and regulations promulgated thereunder.

"**Event of Default**" has the meaning assigned to such term in Section 9.1.

"**Executive Orders**" has the meaning assigned to such term in Section 5.26(a).

"**Extended Cure Period**" has the meaning assigned to such term in Section 9.2.

"**Expenses**"" has the meaning assigned to such term in Schedule III.

"**Federal Bankruptcy Code**" means Chapter 11 of Title II of the United States Code (11 U.S.C. § 101, et seq.), as amended.

"**FIRREA**" has the meaning assigned to such term in Part A of Schedule 2.1.

"**Fraudulent Conveyance**" has the meaning assigned to such term in Section 11.28(b).

"**Funding Amount**" has the meaning assigned to such term in Section 2.1.

"**GECC**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Governmental Approvals**" means, collectively, all consents, licenses and permits and all other authorizations or approvals required from any Governmental Authority to operate the Projects.

"**Governmental Authority**" means any federal, state, county or municipal government or political subdivision thereof, any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body (including, without limitation, the State Regulator), or any court, administrative tribunal, or public body, including but not limited to all such authorities relating to the quality and adequacy of medical care, distribution of pharmaceuticals, rate setting, equipment, personnel, operating policies, additions to facilities and services and fee splitting.

"**Hazardous Materials**" has the definition given to such term in the Environmental Indemnity.

"**HIPAA**" has the meaning assigned to such term in Section 8.1(a).

"**HIPAA Compliance Plan**" has the meaning assigned to such term in Section 8.1(b).

"**HIPAA Compliance Date**" has the meaning assigned to such term in Section 8.1(b).

"**HIPAA Compliant**" has the meaning assigned to such term in Section 8.1(b).

"**Healthcare Laws**" has the meaning assigned to such term in Section 8.1(a).

"**Improvements**" has the meaning assigned to such term in Recital B.

"**Indebtedness**" means all payment obligations of Borrowers or any Principal to Agent and Lender under the Loan or any of the Loan Documents.

"**Insurance Impound**" has the meaning assigned to such term in Section 3.4.

"**Interest Holder Agreement**" has the meaning assigned to such term in Section 7.20(b).

"**Interest Rate**" has the meaning assigned to such term in Section 2.2.

"**Investor Anti-Terrorism Policies**" has the meaning assigned to such term in Section 7.20(c).

"**Junior Lender**" means Meecorp Capital Markets, LLC, as agent for the lenders under the Junior Loan.

"**Junior Loan**" means that certain loan in the original principal amount of $4,000,000.00, from Junior Lender, and secured by a subordinate lien on the Properties.

"**Junior Loan Documents**" means the documents executed by Borrowers and/or Junior Lender, evidencing, securing, guaranteeing or otherwise pertaining to the Junior Loan

"**Laws**" means, collectively, all federal, state and local laws, statutes, codes, ordinances, orders, rules and regulations and guidances and judicial opinions or presidential authority in the applicable jurisdiction, including but not limited to quality and safety standards, accreditation standards and requirements of the State Regulator, each as it may be amended from time to time.

"**Lease Party**" shall be the party to any Lease that grants to the other party the right to use or occupy any portion of the Projects, whether it be a Borrower or Master Tenant.

"**Leases**" has the meaning assigned to such term in Part A of Schedule 2.1.

"**Lender**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Licensed Units**" means collectively, the assisted living units and Alzheimer's licensed under each of the Licenses, together with any independent living units, whether or not licensed.

"**Licenses**" has the meaning assigned to such term in Section 8.1(c).

"**Lien**" means any interest, or claim thereof, in the Projects securing an obligation owed to, or a claim by, any Person other than the owner of the Projects, whether such interest is based on common law, statute or contract, including the lien or security interest arising from a deed of trust, mortgage, assignment, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes. The term "**Lien**" shall include reservations, exceptions, encroachments, easements, rights of way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting the Projects.

"**Lists**" has the meaning assigned to such term in Section 5.26(a).

"**Loan**" means the loan to be made by Lender to Borrower under this Agreement and all other amounts payable under the Loan Documents, including the Make Whole Breakage Amount and Prepayment Premium.

"**Loan Documents**" means: (a) this Agreement, (b) the Note, (c) the Agreement of Principals, (d) the Blocked Account Agreement, (e) the Interest Holder Certificates, (f) the Business Associate Agreement, (g) the Security Documents, (h) the Environmental Indemnity, (i) Uniform Commercial Code financing statements, (j) such assignments of management agreements, contracts and other rights as may be required under the Commitment or otherwise requested by Agent, (k) the Collateral Assignment, (l) the Master Lease Subordination, (m) all other documents evidencing, securing, governing or otherwise pertaining to the Loan or executed by Borrowers, Principals, Property Managers, or Master Tenants in connection therewith, and (n) all amendments, modifications, renewals, substitutions and replacements of any of the foregoing.

"**Loan Party**" means Principals and Capital Resources Fund, LLC, the Vice President of each Borrower.

"**Loan Year**" means the period beginning on the Closing Date and ending on the last day of the month during which the first anniversary of the Funding Date occurs for the First Loan Year and, for each Loan Year thereafter, each one year period beginning on the anniversary of the date following the last day of the First Loan Year until the Maturity Date.

"**Lock-Out Period**" means the period commencing on the Closing Date and ending on January 12, 2008.

"**Make Whole Breakage Amount**" has the meaning assigned to such term in Schedule 2.5.

"**Management Agreements**" means those certain agreements between Master Tenant and Property Manager for the management of the Projects, each dated October 15, 2005.

"**Master Lease**" means that certain Master Lease Agreement between Borrowers, as landlord and Master Tenant, as tenant, dated of even date herewith and covering the Projects.

"**Master Lease Default**" has the meaning assigned to such term in Section 9.2.

"**Master Lease Payment**" means all amounts payable to Borrowers by Master Tenant under the Master Lease.

"**Master Lease Subordination Agreement**" means that Subordination Agreement dated of even date herewith, executed by Master Tenant, Borrowers and Agent.

"**Master Tenant**" means Newhall Senior Housing, LLC, a Delaware limited liability company.

"**Material Adverse Change**" or "**material adverse change**" means, in Agent's reasonable discretion, the business prospects, operations or financial condition of a Person or

property has changed in a manner which could impair the value of Agent's and Lender's security for the Loan, prevent timely repayment of the Loan or otherwise prevent the applicable Person, any Principal or any Borrower from timely performing any of its material obligations under the Loan Documents.

"**Maturity Date**" means the earlier of (a) January 12, 2013, or (b) any earlier date on which the entire Loan is required to be paid in full, whether at maturity, by acceleration or otherwise, under this Agreement or any of the other Loan Documents, or any later date to which the same may be extended in accordance with the terms of the Loan Agreement.

"**Minor Claim**" has the meaning assigned to such term in Section 3.2(a).

"**Money Market Rate**" has the meaning assigned to such term in Section 3.4.

"**Monthly Effective Rent**" has the meaning assigned to such term in Schedule III.

"**Monthly Reports**" has the meaning assigned to such term in Section 6.1(a).

"**Net Operating Income**" has the meaning assigned to such term in Schedule III.

"**Note**" has the meaning assigned to such term in Recital A.

"**Notice Agent**" has the meaning assigned to such term in Section 11.1.

"**Obligations**" has the meaning assigned to such term in Section 11.28.

"**OFAC**" has the meaning assigned to such term in Section 5.26(a).

"**OFAC Laws and Regulations**" has the meaning assigned to such term in Section 5.26(a).

"**Officer's Certificate**" means a certificate executed by an officer of Master Tenant or of Capital Resource Fund, LLC, certifying to the matter specified in this Agreement.

"**Operating Agreements**" has the meaning assigned to such term in Section 5.3.

"**Other Lists**" has the meaning assigned to such term in Section 5.26(a).

"**Payment Date**" has the meaning assigned to such term in Section 2.3.

"**Permitted Transfer**" means:

(a) a transfer of interests for estate planning purposes, of a Person owning an interest in a Borrower to a spouse or lineal descendant of such Person, or a spouse of such lineal descendant, or a trust established for the benefit of any of them or trusts established for the benefit of the spouses of any of them;

(b) a transfer of direct or indirect interests of a Person owning an indirect or direct ownership interest in a Borrower to the estate of such Person upon such Person's death;

(c) a transfer of the interest of a Person who owns a majority of the direct or indirect ownership interests in a Borrower (the "**Majority Owner**"), provided that after such transfer the Majority Owner owns not less than 51% of the ownership interest in such Borrower;

(d) the transfer of an undivided tenant in common interest in the Property (a "**TIC Interest**") to an existing Borrower in accordance with the terms of Section 10 of the TIC Agreement, provided that (1) such Borrower provides current financial information as requested by Agent, (2) Agent approves the increase in the percentage ownership in the Property by such Borrower (such approval to not be unreasonably withheld by Agent, and further provided that Agent shall provide its approval or disapproval within fifteen (15) Business Days after receipt of the financial information described in item (1) above) and (3) no Potential Default or Event of Default shall then be existing under the Loan Documents, unless the Transfer contemplated by this subparagraph will cure such Potential Default and/or Event of Default; and

(e) if Borrowers do not consist of thirty-five (35) TICs on the Closing Date, the transfer of an undivided interest in the fee title to any Project or the acquisition of all of the membership interests and the entire equity in the Sole Member of an existing TIC, provided all of the following conditions are satisfied in connection with such sale and transfer (herein "**Transfer**"):

(1)     There shall be no more than a total of thirty-five (35) TIC Interests and such transfer shall occur within twelve (12) months following the Closing Date;

(2)     The proposed transferee (each a "**Proposed Transferee**") shall be a Single Purpose Entity and such transfer shall be as a tenant in common with Borrowers;

(3)     Agent shall receive at least seven (7) Business Days advance written notice of the proposed transfer in question along with, to the extent applicable, (i) the broker/dealer representations and warranties statement and (ii) the Purchaser's Questionnaire completed by the Proposed Transferee;

(4)     Agent shall review and approve, in Agent's sole discretion, the Proposed Transferee and the entities or individuals comprising such Proposed Transferee (the "**TIC Investors**") and the subject transaction. Agent's review of the Proposed Transferee and TIC Investors and the subject transaction shall encompass various factors, including but not limited to, the Proposed Transferee's creditworthiness and financial strength (taking into account the size of the TIC Interest and the creditworthiness and financial strength of Borrowers as constituted after giving effect to such Transfer), as well as the proposed transaction's effect on the Projects, and the other security for the Loan. Each TIC Investor must have a net worth at the time of the Transfer of not less than One Million and 00/100 Dollars ($1,000,000.00) or individual income of $200,000.00 or more, or joint income with a spouse of $300,000.00 or more, in each of the two most recent years (the "**TIC Net Worth Requirement**"). The review process may include, but not necessarily be limited to, judgment, lien, criminal, and bankruptcy searches, the receipt

and review of the exact name, physical address and taxpayer identification number of the Proposed Transferee and each TIC Investor and the name, physical address, social security number and date of birth of anyone authorizing or signing on behalf of the Proposed Transferee and receipt and review of the standard subscription documents completed by each Proposed Transferee, in order for Agent to determine whether to approve or reject the acquisition of a TIC Interest, and the assumption of the Loan by any such Proposed Transferee on a joint and several basis with Borrowers pursuant to a loan assumption agreement (each a "**Loan Assumption Agreement**" and collectively "**Loan Assumption Agreements**") in the form attached hereto as <u>Exhibit F</u>;

(5)     Payment to Agent in each instance of a processing fee in the amount of $500.00 per Transfer, plus reasonable attorneys' fees or other costs incurred by Agent and Lender;

(6)     There shall be no change in the management or operational control of the Projects (i.e., the Master Tenant shall remain in control of the management of the Projects pursuant to the Master Lease);

(7)     At the time of each Transfer, at Borrower's cost and expense, Borrower shall have delivered to Agent, and Agent shall have approved in advance (i) an assignment and assumption of the existing TIC Agreement and Master Lease entered into with respect to the Projects, by the Proposed Transferee, in the form previously reviewed and approved by Agent; (ii) a fully executed copy of the applicable Loan Assumption Agreement, whereby the Proposed Transferee will assume, jointly and severally with Borrowers, the Loan and Loan Documents; (iii) UCC financing statements, as required by Agent in form satisfactory for filing; (iv) evidence of the Proposed Transferee's compliance with the Special Purpose Entity Requirements; (v) such endorsements to the existing Title Policies as may be reasonably required by Agent to reflect the addition of the Proposed Transferee as a Borrower and continued first lien priority of the Security Documents; (vi) drafts, and upon execution, fully executed copies of all documents and instruments evidencing the transfer of the TIC Interest to the Proposed Transferee (including copies of all conveyance, transfer and assignment documents); (vii) the Borrower's Certificate executed by the Proposed Transferee; and (viii) payment of all outside counsel fees, professional fees, title insurance fees and any and all other fees, costs and expenses related to the proposed Transfer.  Drafts of the items set forth in subsections (i), (ii), (iv) and (v) will be provided to Lender at least five (5) Business Days prior to the applicable closing date for the Transfer for Agent's prior review and approval. All other documents will be provided no later than the closing date of the Transfer;

(8)     Within fifteen (15) days of the effective date of a Transfer of a TIC Interest to a Proposed Transferee approved by Agent if required under applicable Laws, each such Proposed Transferee shall be duly qualified to do business in the State of California, and Borrowers shall provide to Agent an appropriate certificate of qualification or registration to do business in the State of California with respect to such transferee;

(9)     Each Proposed Transferee shall be in compliance with all representations, warranties and covenants applicable to Borrowers under the Security Documents and the other Loan Documents, including without limitation, those provisions pertaining to existence, good standing, and solvency of such entity or person; and

(10)     No Potential Default or Event of Default shall then be existing and such Transfer shall not cause any Borrower to be in default under this Loan Agreement or any of the other Loan Documents, unless the Transfer contemplated by this subparagraph will cure such Potential Default and/or Event of Default.

"**Permitted Transferee**" means a transferee of an undivided interest in the Property pursuant to a Permitted Transfer.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, limited partnership, limited liability, partnership, limited partnership, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

"**Potential Default**" means the occurrence of any event or condition which, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"**Prepayment Premium**" means an amount equal to two percent (2%) of the then outstanding principal balance of the Loan.

"**Principals**" means, collectively, Asset Real Estate & Investment Company, a California corporation and James S. Koenig.

"**Project**" and "**Projects**" have the meanings assigned to such terms in <u>Recital B</u>.

"**Project Yield**" means the ratio, expressed as a percentage, of (a) annualized Net Operating Income from the Projects, as determined by Agent for a particular period, to (b) the outstanding principal balance of the Loan.

"**Property**" and "**Properties**" have the meanings assigned to such terms in <u>Recital B</u>.

"**Property Condition Reports**" means those certain Property Condition Assessment Reports dated November, 2005, prepared by EMG Corp., regarding the Projects.

"**Property Manager**" means Oakdale Heights Management Corporation, the manager of the Projects approved by Agent and any successor manager approved by Agent.

"**Rating Agencies**" means at least two of Fitch, Inc., Moody's Investors Service, Inc. and Standard & Poor's Ratings Services or any other nationally recognized statistical rating organizations that are successors or substitutes for any such Person (or, if a Secondary Market Transaction has occurred in which Securities have been issued, each of the foregoing that rated such Securities).

"**Rating Confirmation**" means the written confirmation of the Rating Agencies that a proposed action shall not, in and of itself, result in the downgrading, withdrawal or qualification of the then-current ratings assigned to any of the Securities issued in connection with a Secondary Market Transaction.

"**Release Date**" has the meaning assigned to such term in Section 2.6.

"**REMIC**" has the meaning assigned to such term in Section 2.6.

"**Repayment Date**" means the date upon which the entire principal balance of the Loan and all interest thereon and other sums due pursuant to the Loan Documents, including, without limitation, the Exit Fee, in any, have been paid in full.

"**Replacement Deposit**" has the meaning assigned to such term in Section 3.6.

"**Replacement Master Lease**" has the meaning assigned to such term in Section 9.2.

"**Replacement Master Tenant**" has the meaning assigned to such term in Section 9.2.

"**Replacement Reserve**" has the meaning assigned to such term in Section 3.6.

"**Replacement Treasury Yield**" has the meaning assigned to such term in Schedule 2.5.

"**Revenue**" has the meaning assigned to such term in Schedule III.

"**Scheduled Defeasance Payments**" has the meaning assigned to such term in Section 2.6.

"**SDN List**" has the meaning assigned to such term in Section 5.26(a).

"**Secondary Market Transactions**" has the meaning assigned to such term in Section 7.24.

"**Security Agreement**" has the meaning assigned to such term in Section 2.6.

"**Security Deposits**" means any security deposit from any tenant or occupant of any Project collected or held by any Borrower, Property Manager or Master Tenant.

"**Security Documents**" means those certain first priority Deeds of Trust, Security Agreements and Fixture Filings (or documents of similar title) executed by Borrowers for the benefit of Agent, encumbering the Projects.

"**Single Purpose Entity**" means a Person (other than an individual, a government, or any agency or political subdivision thereof) that satisfies all of the Single Purpose Entity Requirements.

**"Single Purpose Entity Requirements"** has the meaning assigned to such term in Section 7.29.

**"Sole Member"** and **"Sole Members"** have the meanings assigned to such terms in Section 5.2(a).

**"Sole Member Formation Documents"** has the meaning assigned to such term in Section 5.4.

**"State Regulator"** has the meaning assigned to such term in Section 7.18(a).

**"Successor Borrower"** has the meaning assigned to such term in Section 2.6.

**"Taxes"** has the meaning assigned to such term in Section 3.5.

**"Tax Impound"** has the meaning assigned to such term in Section 3.5.

**"Tenant"** means any tenant or occupant of a Project under a Lease.

**"Term Sheet"** means that certain letter agreement dated August 19, 2005 between GE Commercial Finance – Healthcare Financial Services and Adam D. Peterson, on behalf of Borrowers.

**"Terrorism"** has the meaning assigned to such term in Section 3.1(b).

**"Third Party Payor Programs"** has the meaning assigned to such term in Section 8.2(f).

**"TIC"** has the meaning assigned to such term in Section 7.28(a).

**"TIC Agreement"** has the meaning assigned to such term in Section 7.28(a).

**"Title Policies"** has the meaning assigned to such term in Schedule 2.1 Part A.

**"U.S. Obligations"** has the meaning assigned to such term in Section 2.6.

**"U.S. Publicly-Traded Entity"** has the meaning assigned to such term in Section 5.26(a).

**"Violation"** has the meaning assigned to such term in Section 5.24.

**"Yield Maintenance Amount"** has the meaning assigned to such term in Section 2.6.

### SCHEDULE III

### CALCULATION OF NET OPERATING INCOME

"**Net Operating Income**" means annualized Revenue <u>less</u> Expenses, all as determined by Agent's audit (or otherwise estimated by Agent) in its sole discretion and at Borrower's expense.

"**Revenue**" for a period means the lesser of (i) annualized Adjusted Actual Rent for such period or (ii) annualized Monthly Effective Rent, excluding in each case, rent payable under a Master Lease. In determining Revenue, the occupancy factor utilized shall be the lesser of (a) actual occupancy ignoring for this purpose the Master Lease, or (b) an assumed ninety-five percent (95%) occupancy rate.

"**Adjusted Actual Rent**" means (a) all amounts collected from tenants of the Projects (excluding amounts due from Master Tenant) for the trailing twelve-month period, <u>excluding</u> nonrecurring income and non-property related income (as determined by Agent in its sole discretion) and income from tenants (i) that are thirty (30) or more days delinquent, (ii) that are in bankruptcy (even if current), (iii) non-residential tenants whose leases terminate within six (6) months (as adjusted for space re-leased upon terms acceptable to Agent in its sole discretion) and (iv) that have been delinquent two (2) or more times during the past twelve (12) months, and (b) other revenue for such period not to exceed ten percent (10%) of the amounts included in clause (a) above for laundry, vending, parking and other occupancy payments (but excluding late fees and interest income) based upon collections for such period.

"**Monthly Effective Rent**" means an amount equal to (x) total rent due over the term of the Leases (excluding rent due under the Master Lease) <u>less</u> any payments or concessions which Agent, in its sole discretion, deems to be a rent concession, <u>divided by</u> (y) the total number of months in the leases.

"**Expenses**" means actual and customary operating expenses related to the Projects on a stabilized accrual basis for the previous twelve (12) month period (as reasonably adjusted by Agent), including: (i) recurring expenses (e.g., tenant improvements, leasing commissions, carpeting replacement, appliance and drapery replacement and such others as determined by Agent), (ii) real estate taxes, (iii) management fees (whether paid or not) in an amount not less than five percent (5%) of effective gross income or the actual management fee paid, if higher, and (iv) a replacement reserve (whether reserved or not) of not less than Three Hundred Fifty and No/100 Dollars ($350.00) per Licensed Unit, per year.

**EXHIBIT A-1**

**The Projects**

| | |
|---|---|
| Borrower: | See Schedule I. |
| Name of Facility: | Cambridge House |
| Address of Land: | 8717 W. Olympic Boulevard<br>Los Angeles County<br>Los Angeles, CA 90035 |
| Master Tenant: | Newhall Senior Housing, LLC |

Number of Licensed Units
    Independent Living    26
    Alzheimer's    44

Number of Parking Spaces:    44 standard, 0 handicap

Legal Description of Land:    Lots 124, 125 and 126 of Tract No. 8439, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in Book 100 Page (s) 93 to 96 inclusive of maps, in the Office of the County Recorder of said county.

**EXHIBIT A-2**

**The Projects**

Borrower:                           See Schedule I.

Name of Facility:                   Capri Retirement Villa

Address of Land:                    24305 Lyons Avenue
                                    Los Angeles County
                                    Santa Clarita, CA 91321
Master Tenant:                      Newhall Senior Housing, LLC

Number of Licensed Units            86
(Assisted Living):

Number of Parking Spaces:           25 standard, 3 handicap

Legal Description of Land:

Parcel 1:
That portion of Lot 3 in Section 4, Township 3 North, Range 16 West, San Bernardino Meridian, in the City of Santa Clarita, County of Los Angeles, State of California, according to the Official Plat of said land filed in the district land office on March 18, 1976, described as follows:

Beginning at the southwest corner of the land described in the deed to Los Angeles District Advisory Board, a religious corporation, recorded on December 5, 1961 as Instrument No. 660, in Book d1439 Page 994, Official Records of said county, said corner being a point in the northerly line of Newhall Pico Canyon Road, 60 feet wide, as described in the deed to the County of Los Angeles, recorded on January 17, 1930 as Instrument No. 1434, in Book 9712 Page 68 Official Records of said county; thence along said northerly line south 85° 55' 55" west 10.00 feet; thence parallel with the westerly line of the land described in said deed to the Los Angeles Advisory Board, north 4° 04' 05" west 248.75 feet, more or less, to the northerly line of said section; thence along said last mentioned northerly line, north 88° 05' 00" east 10.12 feet, more or less, to the northwest corner of the land described in said deed to Los Angeles Advisory Board; thence along the westerly line of the land described in said last mentioned deed, south 4° 04' 05" east 248.38 feet to the Point of Beginning.

Parcel 2:
That portion of Lot 3 in Section 4, Township 3 North, Range 16 West, San Bernardino Meridian, in the City of Santa Clarita, County of Los Angeles, State of California, according to the Official Plat of said land filed in the district land office on March 18, 1976, described as follows:

Beginning at the southwest corner of the land described in the deed to William Mayhue, et al., recorded in Book 10271 Page 312, Official Records, in the Office of the County Recorder of said county, said corner being a point in the northerly line of Newhall Pico Canyon Road, 60 feet

wide, as described in the deed to the County of Los Angeles, recorded on January 17, 1930 as Instrument No. 1434 in Book 9712 Page 68 Official Records of said county; thence along said northerly line, south 85° 55' 55" west 140 feet; thence parallel with the westerly line of the land described in said deed to Mayhue north 4° 04' 05" west 248.38 feet to the northerly line of said section; thence along said last mentioned northerly line, north 88° 05' 00" east 140.12 feet to the northwest corner of the land described in said deed to Mayhue; thence along the westerly line of the land described in said deed to Mayhue, south 4° 04' 05" east 243.12 feet to the Point of Beginning.

## EXHIBIT A-3

### The Projects

| | |
|---|---|
| Borrower: | See Schedule I. |
| Name of Facility: | Stanford House |
| Address of Land: | 8755 W. Olympic Boulevard<br>Los Angeles County<br>Los Angeles, CA 90035 |
| Master Tenant: | Newhall Senior Housing, LLC |
| Number of Licensed Units<br>(Assisted Living): | 70 |
| Number of Parking Spaces: | 46 standard, 0 handicap |
| Legal Description of Land: | Lots 121, 122 and 123 of Tract No. 8439, in the City of Los Angeles, County of Los Angeles, State of California as per map recorded in Book 100 Page(s) 93 to 96 inclusive of maps, in the Office of the County Recorder of said county. |

**EXHIBIT B**

**Interest Holder Certificate and Agreement**

To:     General Electric Capital Corporation, as Agent
        500 West Monroe Street
        Suite 1500
        Chicago, Illinois 60661

Date: _____

Re:     Loan Agreement dated as of _____ ____, 2005 among _____
        _____ ("**Borrower**") and the other borrower parties listed on Schedule I
        to the Loan Agreement ("**Other Borrower Parties**"), and General Electric
        Capital Corporation, a Delaware corporation, as Agent and, in its individual
        capacity as a Lender, "**GECC**", and the other financial institutions who are or
        become parties to said Loan Agreement as lenders (collectively with GECC, the
        "**Lender**"), (as it may be amended from time to time, the "**Loan Agreement**")

To induce Agent and Lender to enter into the Loan Agreement with Borrower and the Other
Borrower Parties, and for other good and valuable consideration, the receipt and sufficiency of
which are hereby acknowledged, the undersigned represents, warrants, covenants and agrees for
the benefit of Agent and Lender as follows:

1.      The undersigned partners (collectively, "**Owners**" and in their individual
capacity, "**Owner**") represent and warrant to Agent and Lender that the Owners own, in the
aggregate, 100% of the direct ownership interests in Borrower, and that neither Borrower nor any
Owner is or shall be and, after due inquiry, that no Person who owns a controlling interest in or
otherwise controls Borrower or any Owner, is or shall be, (a) listed on the Specially Designated
Nationals and Blocked Persons List (the "**SDN List**") maintained by the Office of Foreign Assets
Control ("**OFAC**"), Department of the Treasury, and/or on any other similar publicly-available
United States government list ("**Other Lists**" and, collectively with the SDN List, the "**Lists**")
maintained by the OFAC pursuant to any authorizing statute, Executive Order or regulation
(collectively, "**OFAC Laws and Regulations**"); or (b) a Person (a "**Designated Person**") either
(i) included within the term "**designated national**" as defined in the Cuban Assets Control
Regulations, 31 C.F.R. Part 515, or (ii) designated under Sections 1(a), 1(b), 1(c) or 1(d) of
Executive Order No. 13224, 66 Fed. Reg. 49,079 (published September 25, 2001), or similarly
designated under any related enabling legislation or any other similar Executive Orders
(collectively, the "**Executive Orders**"). The OFAC Laws and Regulations and the Executive
Orders are collectively referred to in this Agreement as the "**Anti Terrorism Laws**". Each
Owner and Borrower shall require, and shall take reasonable measures to ensure compliance with
such requirement, that no Person who owns any other direct interest in any Owner or Borrower is
or shall be listed on any of the Lists or is or shall be a Designated Person. This Section 1 shall
not apply to any Person to the extent that such Person's interest in the Borrower is through a U.S.

Publicly-Traded Entity. As used in this Agreement, **"U.S. Publicly-Traded Entity"** means a Person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a Person. From time to time upon the written request of Agent, each Owner shall deliver to Borrower a schedule of the name, legal domicile address and (for entities) place of organization of each holder of a controlling ownership interest in such Owner.

2.      Each Owner represents and warrants that all evidence of identity provided by it to Borrower is genuine and that all related information is accurate and that it has acquired, or is acquiring, and shall hold, its interest in Borrower for its own account, risk and beneficial interest and without the obligation or intention to sell, distribute, assign or transfer all or a portion of such interest to any other Person.

3.      Each Owner represents and warrants that it has taken, and agrees that it shall continue to take, reasonable measures appropriate to the circumstances (and in any event as required by law), with respect to each holder of a controlling ownership interest in such Owner and Borrower, to assure that funds invested by such holders in Borrower are derived from legal sources (the **"Anti Money Laundering Measures"**). The Anti Money Laundering Measures have been and shall be undertaken in accordance with the Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.* ("BSA"), to the extent applicable and all applicable laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations under 18 U.S.C. §§ 1956 and 1957 (collectively, **"Anti Money Laundering Laws"**).

4.      Each Owner represents and warrants, to its knowledge after making due inquiry, that neither it nor any holder of a controlling ownership interest in any Owner or in Borrower (a) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering under 18 U.S.C. §§ 1956 and 1957, drug trafficking, terrorist related activities, other money laundering predicate crimes or any violation of the BSA, (b) has been assessed civil penalties under Anti Money Laundering Laws, or (c) has had its funds seized or forfeited in an action under any Anti Money Laundering Laws.

5.      Each Owner shall immediately notify Agent if such Owner obtains actual knowledge that Borrower, any Owner, or any holder of a direct or indirect interest in Borrower or any Owner, or any director, manager or officer of any of them, (a) has been listed on any of the Lists, (b) has become a Designated Person, (c) is under investigation by any governmental authority for, or has been charged with or convicted of, money laundering, drug trafficking, terrorist related activities, other money laundering predicate crimes, or any violation of the BSA, (d) has been assessed civil penalties under any Anti Money Laundering Laws, or (e) has had funds seized or forfeited in an action under any Anti Money Laundering Laws.

6.      Each Owner acknowledges and agrees that if any of the representations or warranties of the undersigned set forth herein are false, misleading or incorrect in any material respect as of the date made, Agent, in addition to all of its other rights and remedies, may declare that an Event of Default exists under the Loan Agreement. Each Owner agrees to notify Borrower and Agent promptly of any change in facts or circumstances that causes any of the representations or warranties contained herein to the untrue.

7.     Each Owner represents and warrants that it has taken, and agrees that it shall continue to take, reasonable measures, appropriate to the circumstances (and in any event as required by law), to ensure that it and Borrower are and shall be in compliance with all current and future applicable Anti-Money Laundering Laws, and other applicable laws, regulations and government guidance for the prevention of terrorism, terrorist financing and drug trafficking.

8.     In addition to the representations, warranties and covenants regarding full compliance with Anti-Terrorism Laws and Anti-Money Laundering Laws, each Owner represents and warrants that it is, and agrees that it shall remain, in compliance in all material respects with all other laws and requirements applicable to it, its business and its assets, the violation of which would have a material adverse effect on its ability to perform its obligations under the Borrower's partnership agreement or on the Borrower's ability to perform its obligations under the Loan Agreement.

9.     If the applicable Anti-Money Laundering Measures do not provide, in Agent's reasonable determination, adequate means to assure that Persons that are listed on any of the Lists, or that are Designated Persons, or whose funds are not derived from legal sources, are excluded from becoming or being direct or indirect investors in any Owner or Borrower, Agent shall notify Borrower of its determination in accordance with the notice provisions in the Loan Agreement.     If such inadequate Anti-Money Laundering Measures are not modified in a commercially reasonable manner to Agent's reasonable satisfaction within thirty (30) days following notice to Borrower of Agent's determination, each of the undersigned acknowledges that Agent, in addition to all of its other rights and remedies, may declare that an Event of Default exists.

10.     No transfer of any direct interest in Borrower or of any controlling ownership interest in Owner shall be effective unless and until the transferor has provided a written certification to Borrower that, after making due inquiry, (a) the transferee or any Person who owns a controlling interest in, or otherwise controls, the transferee is not listed on any of the Lists and is not a Designated Person, and the transferee has taken reasonable measures to assure that no holder of any other controlling ownership interest in the transferee is so listed or is so designated; provided, however, that none of the foregoing shall apply to any Person which is, or to the extent that such interest is through, a U.S. Publicly-Traded Entity, and (b) the funds for investment in Owner or Borrower are derived from legal sources.

11.     Each Owner acknowledges and agrees that if at any time Borrower or Agent reasonably believes that such Owner has breached its representations and warranties or its agreements set forth herein, Borrower has the right or may be obligated to block such Owner's investment in Borrower, to prohibit additional investments, to segregate the assets constituting such Owner's investment in accordance with applicable Anti-Terrorism Laws, to decline any redemption request or to redeem the Investor's investment.     Each Owner further acknowledges that it will have no claim against Borrower, Lender or Agent or any of their respective affiliates or agents for any form of damages as a result of any of the foregoing actions.

12.     Each Owner shall require each Person that proposes to become a holder of any direct interest in Borrower or of any controlling ownership interest in Owner to sign an

agreement substantially in the form of this Agreement and to deliver the same to Borrower and Agent.

13.     Capitalized terms used in this Agreement and not defined in this Agreement shall have the meanings assigned to them in the Loan Agreement. Any notice sent to Agent under this Agreement shall be sent in accordance with the notice provisions set forth in the Loan Agreement.

14.     The undersigned acknowledges that (a) Lender is relying on this Agreement and its rights hereunder in entering into the Loan Agreement and in advancing proceeds of the Loan, and (b) any terms hereof applying to more than one of the undersigned are made on a joint and several basis hereunder. This Agreement may be executed in counterparts.

IN WITNESS WHEREOF, each of the undersigned have executed and delivered this Interest Holder Certificate and Agreement as of the date set forth above.

**OWNER:**

_____,

a _____

By:_____
Its:_____

_____

_____

## EXHIBIT C

## INTELLECTUAL PROPERTY

None.

# EXHIBIT D

## PROVIDER PAYMENT/REIMBURSEMENT PROGRAMS

**Cambridge House**:   None.


**Capri Retirement Villa**:     None.


**Stanford House**:     None.

## EXHIBIT E

## GOVERNMENTAL APPROVALS/LICENSES

**Cambridge House**:

    Date:                                                  12/28/1995
    License Number:
    Facility Identification Number:               198200476
    Expiration Date:

**Capri Retirement Village**:

    Date:                                                  3/19/1998
    License Number:
    Facility Identification Number:               197601440
    Expiration Date:

**Stanford House**:

    Date:                                                  9/1/1995
    License Number:
    Facility Identification Number:               197601440
    Expiration Date:

**EXHIBIT F**

**FORM OF ASSIGNMENT AND ASSUMPTION OF LOAN DOCUMENTS**

| | |
|---|---|
| RECORDING REQUESTED BY | § |
| WHEN RECORDED MAIL TO: | § |
| | § |
| Janis H. Loegering, Esq. | § |
| Locke Liddell & Sapp LLP | § |
| 2200 Ross Avenue, Suite 2200 | § |
| Dallas, Texas  75201-6776 | § |

_____
Above Space for Recorder's Use

**Loan No. 07-0004232**

**ASSIGNMENT AND ASSUMPTION OF LOAN DOCUMENTS**

(Cambridge House, Capri Retirement Villa, and Stanford House)

This ASSIGNMENT AND ASSUMPTION OF LOAN DOCUMENTS ("**Agreement**") is made and effective as of the date of recordation hereof (the "**Effective Date**"), by and among GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation (in its individual capacity, "**GECC**" and in its capacity as agent for the Lenders, together with its successors, "**Agent**"), the financial institutions other than GECC who are or hereafter become parties to the Loan Agreement (as hereinafter defined) (together with GECC collectively, or individually, as the context may require, "**Lender**"), NEWHALL CAPITAL RESOURCES, LLC, a Delaware limited liability company (the "**Original Borrower**") and AREI NEWHALL ___, LLC, a Delaware limited liability company, attached hereto and incorporated herein ("**New Borrower**"), with reference to the facts set forth below.

RECITALS

A.    Lender made a loan to Original Borrower and the other borrower parties listed in Schedule I to the Loan Agreement (the "**Other Borrower Parties**") in the principal amount of $17,200,000.00 (the "**Loan**"), pursuant to that certain Loan Agreement, dated as of January _____, 2006 (the "**Loan Agreement**") between Original Borrower, the Other Borrower Parties, Agent and Lender, and evidenced by that certain Promissory Note, dated of even date with the Loan Agreement, in the principal amount of the Loan executed by Original Borrower and the Other Borrower Parties and payable to the order of Lender as therein provided (the "**Note**"). Capitalized terms used herein but not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Agreement.

B.    The Loan is secured by (1) a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (the "**Deed of Trust**"), dated of even date with the Loan Agreement, recorded or to be recorded in the Real Property Records of Los Angeles County, California, executed by Original Borrower and the Other Borrower Parties and encumbering the

real and other property, more particularly described therein and on <u>Exhibit A</u> attached hereto (the "**Project**"), and (2) liens and security interests created under other instruments (all instruments governing, securing, evidencing or otherwise pertaining to the Loan including, without limitation, the documents listed on <u>Exhibit B</u> attached hereto (herein referred to, collectively, as the "**Loan Documents**").

      C.     Concurrently herewith, Original Borrower is conveying to the New Borrower a _____% undivided tenant in common interest (the "**Interest**") in the Project and Original Borrower and New Borrower are entering into an Assignment and Assumption of Agreements pursuant to which New Borrower is assigning to the New Borrower, and the New Borrower is assuming, Original Borrower's rights and obligations under the TIC Agreement and Master Lease with respect to the Interest.

      D.     Original Borrower and New Borrower have requested that Agent, on behalf of Lender, consent to the transfer of the Interest from Original Borrower to New Borrower and permit the assumption by New Borrower of the Loan and the Loan Documents.

      NOW, THEREFORE, in consideration of the mutual covenants and conditions contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as set forth below.

      1.     <u>Consent to Transfer of Interest</u>. Agent, on behalf of Lender, hereby (a) consents to the transfer of the Interest subject to the terms and conditions of this Agreement and (b) waives any Event of Default or any other right, fees or acceleration of any obligation to which Lender otherwise would be entitled to declare under the Note, the Deed of Trust or any other Loan Documents resulting from the transfer of the Interest other than the fees payable pursuant to the terms of a "**Permitted Transfer**", as defined in the Loan Agreement.

      2.     <u>Assignment and Assumption</u>. Original Borrower hereby assigns to the New Borrower, and the New Borrower hereby assumes and unconditionally agrees to pay and fully discharge, all of the Original Borrower's rights and obligations under the Loan Documents, on a joint and several basis with the Other Borrower Parties as provided in and subject to the terms of the Loan Documents. The parties acknowledge and agree that (a) references in the Deed of Trust to "Grantor," all references in the Note to "Borrower" or "Borrowers" and all other references in any of the Loan Documents to "Borrower" or "Borrowers" shall hereafter include New Borrower and (ii) the New Borrower is conclusively deemed to have consented and agreed to every provision, covenant, right and limitation contained in the Loan Documents, as if the New Borrower was a "Borrower" initially executing such Loan Documents.

      3.     <u>Loan Documents</u>. The New Borrower acknowledges that it has reviewed the Loan Documents and agrees to be bound by such documents. Further, the New Borrower hereby makes all of the representations and warranties provided to be made by it in the Loan Documents and agrees to the terms and conditions in the Loan Documents.

      4.     <u>Certifications</u>. New Borrower hereby certifies to Lender that (a) New Borrower has no defenses, offsets or counterclaims to its obligations under the Loan Documents, and (b) this Agreement and the Loan Documents are valid, binding obligations of New Borrower,

enforceable in accordance with their terms, subject to the effect, if any, of applicable debtor relief laws and principles of equity.

5.    Renewal and Ratification of Lien.  The lien of the Deed of Trust is acknowledged by New Borrower to be a good, valid and subsisting first lien, and such lien is hereby renewed and reaffirmed so as to secure the payment of the Note and all obligations of Borrower arising under the other Loan Documents.

6.    Endorsement/Policy of Title Insurance.  Contemporaneously with the execution and delivery hereof, New Borrower shall cause the title insurance company that issued to Lender its Mortgagee Policy of Title Insurance in connection with the Loan (the "Policy"), to issue, an endorsement to such Policy, confirming that the execution of this Agreement will not impair the coverage under the Policy.

7.    Expenses.  Original Borrower agrees to pay to Lender, contemporaneously with the execution and delivery hereof, all reasonable out-of-pocket costs and expenses incurred by Lender in connection with this transaction, including without limitation, premiums for the endorsements to the Policy, the fees and expenses of Lender's counsel and recording fees as set forth in the Loan Agreement.

8.    Prior Agreements.  The Loan Documents, including this Agreement, (a) integrate all the terms and conditions mentioned in or incidental to the Loan Documents, (b) supersede all oral negotiations and prior and other writings with respect to the subject matter thereof, and (c) are intended by the parties as the final expression of the agreement with respect to the terms and conditions set forth in the Loan Documents and as the complete and exclusive statement of the terms agreed to by the parties.  If there is any conflict between the terms, conditions and provisions of this Agreement and those of any of the Loan Documents, the terms, conditions, and provisions of this Agreement, as applicable, shall prevail.

9.    Miscellaneous.

9.1    Attorneys' Fees.  If any action or proceeding is instituted between New Borrower and Agent or Lender arising from or related to or with this Agreement, the prevailing party in such action or arbitration shall be entitled to recover from the other party all of its costs of action or arbitration, including, without limitation, attorneys' fees and costs as fixed by the court or arbitrator therein.

9.2    Governing Law.  This Agreement shall be governed by and construed under the internal laws of the State of Illinois without regard to choice of law rules.

9.3    Modification.  No modification, waiver, amendment, discharge or change of this Agreement shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is or may be sought.

9.4    Successors and Assigns.  All provisions of this Agreement shall inure to the benefit of and shall be binding upon the successors-in-interest, assigns, and legal representatives of the parties hereto.

      9.5    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which, when taken together, shall be deemed one fully executed original.

      9.6    <u>Severability</u>. If any portion of this Agreement shall become illegal, null or void or against public policy, for any reason, or shall be held by any court of competent jurisdiction to be illegal, null or void or against public policy, the remaining portions of this Agreement shall not be affected thereby and shall remain in full force and effect to the fullest extent permissible by law.

      9.7    <u>Time is of the Essence</u>. Time is of the essence of each and every provision of this Agreement.

**[Signatures Begin on Next Page]**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**ORIGINAL BORROWER:**          **NEWHALL CAPITAL RESOURCES, LLC,**
                                a Delaware limited liability company

                                By:   Capital Resources Fund, LLC, a California
                                      limited liability company, its sole member


                                      By:_____
                                      Name:_____
                                      Title:_____

**[Signatures Continued on Next Page]**

NEW BORROWER:          **AREI NEWHALL \_\_\_, LLC,**
a Delaware limited liability company

By:    Capital Resources Fund, LLC,
a California limited liability company,
its Vice President


By:_____
Name:_____
Title:_____


**[Signatures Continued on Next Page]**

**AGENT/LENDER:**

GENERAL ELECTRIC CAPITAL
CORPORATION, a Delaware corporation

By:_____
   Name:_____
   Title:_____

STATE OF _____        §
                          § SS
COUNTY OF _____       §

  On _____ _____, 200___, before me, _____,
Notary Public, personally appeared _____, personally known
to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the
instrument the entity upon behalf of which the person(s) acted executed the instrument.


         _____
         Notary Public, State of _____


         _____
         (printed name)

My Commission Expires:


_____


STATE OF _____        §
                          § SS
COUNTY OF _____       §

  On _____ _____, 200___, before me, _____,
Notary Public, personally appeared _____, personally known
to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the
instrument the entity upon behalf of which the person(s) acted executed the instrument.


         _____
         Notary Public, State of _____


         _____
         (printed name)

My Commission Expires:


_____

STATE OF _____      §
                               § SS

COUNTY OF _____      §

This instrument was acknowledged before me on _____, 200__, by
_____, _____ of
GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation, on behalf of said
corporation.


_____

Notary Public, State of _____


_____

(printed name)


My Commission Expires:


_____

EXHIBITS

Exhibit A      Description of the Project

Exhibit B      List of Loan Documents

EXHIBIT A

DESCRIPTION OF THE PROJECT

**Stanford House, Los Angeles, California**
Lots 121, 122 and 123 of Tract No. 8439, in the City of Los Angeles, County of Los Angeles, State of California as per map recorded in Book 100 Page(s) 93 to 96 inclusive of maps, in the Office of the County Recorder of said county.

**Cambridge House, Los Angeles, California**
Lots 124, 125 and 126 of Tract No. 8439, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in Book 100 Page (s) 93 to 96 inclusive of maps, in the Office of the County Recorder of said county.

**Capri Retirement Villa, Santa Clarita, California**
Parcel 1:
That portion of Lot 3 in Section 4, Township 3 North, Range 16 West, San Bernardino Meridian, in the City of Santa Clarita, County of Los Angeles, State of California, according to the Official Plat of said land filed in the district land office on March 18, 1976, described as follows:

Beginning at the southwest corner of the land described in the deed to Los Angeles District Advisory Board, a religious corporation, recorded on December 5, 1961 as Instrument No. 660, in Book d1439 Page 994, Official Records of said county, said corner being a point in the northerly line of Newhall Pico Canyon Road, 60 feet wide, as described in the deed to the County of Los Angeles, recorded on January 17, 1930 as Instrument No. 1434, in Book 9712 Page 68 Official Records of said county; thence along said northerly line south 85° 55' 55" west 10.00 feet; thence parallel with the westerly line of the land described in said deed to the Los Angeles Advisory Board, north 4° 04' 05" west 248.75 feet, more or less, to the northerly line of said section; thence along said last mentioned northerly line, north 88° 05' 00" east 10.12 feet, more or less, to the northwest corner of the land described in said deed to Los Angeles Advisory Board; thence along the westerly line of the land described in said last mentioned deed, south 4° 04' 05" east 248.38 feet to the Point of Beginning.

Parcel 2:
That portion of Lot 3 in Section 4, Township 3 North, Range 16 West, San Bernardino Meridian, in the City of Santa Clarita, County of Los Angeles, State of California, according to the Official Plat of said land filed in the district land office on March 18, 1976, described as follows:

Beginning at the southwest corner of the land described in the deed to William Mayhue, et al., recorded in Book 10271 Page 312, Official Records, in the Office of the County Recorder of said county, said corner being a point in the northerly line of Newhall Pico Canyon Road, 60 feet wide, as described in the deed to the County of Los Angeles, recorded on January 17, 1930 as Instrument No. 1434 in Book 9712 Page 68 Official Records of said county; thence along said northerly line, south 85° 55' 55" west 140 feet; thence parallel with the westerly line of the land described in said deed to Mayhue north 4° 04' 05" west 248.38 feet to the northerly line of said section; thence along said last mentioned northerly line, north 88° 05' 00" east 140.12 feet to the

northwest corner of the land described in said deed to Mayhue; thence along the westerly line of the land described in said deed to Mayhue, south 4° 04' 05" east 243.12 feet to the Point of Beginning.

EXHIBIT B

Loan Documents

1.    Loan Agreement;

2.    Note;

3.    Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of January ___, 2006 and executed by Original Borrower and Other Borrower Parties (collectively the "**Borrower**") (the "**Deed of Trust**");

4.    Assignment of Leases and Rents and Security Agreement dated as of January ___, 2006 and executed by Wilmington Senior Housing, LLC, a Delaware limited liability company ("**Master Tenant**");

5.    Subordination Agreement (Master Lease) executed by Master Tenant, Borrower and Lender;

6.    Environmental Indemnity Agreement executed by Borrower, Asset Real Estate Investment Company, and James S. Koenig; and

7.    Collateral Assignment of Liens and Security Interests executed by Borrower (the "**Collateral Assignment**").

## SCHEDULE 2.1

## ADVANCE CONDITIONS

Part A – Conditions to Initial Advance
Part B - General Conditions
Part C – Capital Improvements Advances
Part D – Application of Insurance Proceeds

## PART A

## CONDITIONS TO INITIAL ADVANCE

The initial advance of the Loan shall be subject to the terms of the Term Sheet, and Agent's receipt, review, approval and/or confirmation of the following items set forth in Part A of this Schedule 2.1, at Borrowers' cost and expense, each in form and content satisfactory to Agent in its sole discretion:

1.    Loan Documents. The following Loan Documents:

(a)    the Loan Agreement executed by Borrowers;

(b)    the Note executed by Borrowers;

(c)    the Security Documents executed by Borrowers;

(d)    such Uniform Commercial Code financing statements as Agent may require;

(e)    an Agreement of Principals executed by the Principals (the "**Agreements of Principals**");

(f)    an Environmental Indemnity Agreement executed by Borrowers and Principals (the "**Environmental Indemnity**");

(g)    Interest Holder Certificates executed by each Borrower;

(h)    the Business Associate Agreement executed by Master Tenants and any other appropriate parties (the "**Business Associate Agreement**");

(i)    the Blocked Account Agreement executed by Agent and Lockbox Bank;

(j)    Borrower's Certificate (the "**Borrower's Certificate**") executed by each Borrower;

(k)    Collateral Assignment of Liens and Security Interests executed by Borrowers (the "**Collateral Assignment**");

(l)    the Master Lease Subordination Agreement; and

(m)     the Intercreditor and Subordination Agreement executed by Borrowers, Lender, Agents and Junior Lender, in form and substance satisfactory to Agent.

2.     <u>Loan Origination Fee</u>. The loan origination fee of $103,000, which fee shall be non-refundable and shall be deemed fully earned upon receipt.

3.     <u>Title Insurance Policies</u>. An ALTA standard form of mortgagee or loan policy or policies of title insurance in the maximum amount of the Loan, with reinsurance and endorsements as Agent may require, containing no exceptions to title (printed or otherwise) which are unacceptable to Agent, and insuring that the Security Documents are a first-priority Lien on the Projects and related collateral (the **"Title Policies"**).

4.     <u>Organizational and Authority Documents</u>.   Certified copies of all documents evidencing the formation, organization, valid existence, good standing, and due authorization of and for each Borrower and each Principal for the execution, delivery, and performance of the Loan Documents by each Borrower and each Principal, as applicable.

5.     <u>Legal Opinions</u>. Legal opinions issued by counsel for Borrower and each Principal, opining as to the due organization, valid existence and good standing of Borrowers, and the due authorization, execution and delivery of the Loan Documents by Borrowers and, if reasonably required by Agent, any Principal that is not a natural person, and the enforceability and validity of the Loan Documents with respect to, Borrowers and each Principal; that the Loan, as reflected in the Loan Documents is not usurious; and as to such other matters as Agent and Agent's counsel reasonably may specify.

6.     <u>Searches</u>. Current Uniform Commercial Code, tax, judgment lien and litigation searches for Borrowers (if not newly formed), Principals, Master Tenant, and the immediately preceding owner of the Projects.

7.     <u>Insurance</u>. Evidence of insurance as required by this Agreement, and conforming in all respects to the requirements of Agent.

8.     <u>Survey</u>. Three (3) originals of a current "as-built" survey of each Project, dated or updated to a date not earlier than forty-five (45) days prior to the Closing Date, prepared by a registered land surveyor in accordance with the American Land Title Association/ American Congress on Surveying and Mapping Standards and containing Agent's approved form of certification in favor of Agent and the title insurer. The surveyor shall certify that no portion of any Project is in a flood hazard area as identified by the Secretary of Housing and Urban Development (or, if any portion of any Project is in such a flood hazard area, then the survey shall certify to the hazard designation of the affected portion of the Projects,) and shall

conform to Agent's current survey requirements. The surveys shall be sufficient for the title insurer to remove the general survey exception.

9. <u>Property Condition Report</u>. A current engineering report or architect's certificate with respect to each Project, covering, among other matters, inspection of heating and cooling systems, roof and structural details and showing no failure of compliance with building plans and specifications, applicable legal requirements (including requirements of the Americans with Disabilities Act) and fire, safety and health standards. As requested by Agent, such report shall also include an assessment of each Project's tolerance for earthquake and seismic activity.

10. <u>Environmental Reports</u>. A current Site Assessment for each Project.

11. <u>Rent Roll</u>. A current rent roll of the Projects, certified by Borrowers or the current owner of the Projects. Such rent roll shall include the following information: (a) tenant names and, if applicable, guarantor names; (b) unit/suite numbers; (c) for non-residential tenants, area of each demised premises and total area of the Projects (stated in net rentable square feet); (d) rental rate (including escalations) (stated in gross amount and in amount per net rentable square foot per year); (e) lease term (commencement, expiration and renewal options); (f) expense pass-throughs; (g) cancellation/termination provisions; (h) security deposit; and (i) for non-residential tenants, material operating covenants and co-tenancy clauses. All leases of, subleases of and occupancy agreements affecting the Projects or any part thereof now existing or hereafter executed (including all patient and resident care agreements and service agreements which include an occupancy agreement, but excluding the Master Lease) and all amendments, modifications or supplements thereto ("**Leases**") shall be in form and substance, with tenants and for uses acceptable to Agent. On the Closing Date: (a) all Leases shall be in full force and effect; (b) Borrowers shall have submitted a revised and recertified rent roll; and (c) Agent shall have received subordination, attornment and nondisturbance agreements and estoppel letters in form and substance acceptable to Agent from non-residential tenants with respect to Leases comprising 1,000 square feet of the rentable non-residential square footage of each Project. All Leases shall limit the use of the premises which is subject to such Lease to uses permitted under any constitutionally enforceable restrictive covenant of record.

12. <u>Master Lease</u>. A copy of the fully executed Master Lease, in form and substance satisfactory to Agent, certified by Borrowers as being true, correct and complete.

13. <u>Reserved</u>.

14.    <u>Tax and Insurance Impounds</u>.  Borrowers' deposit with Agent of the amount required by Agent to impound for taxes and assessments, insurance premiums and to fund any other required escrows or reserves.

15.    <u>Compliance With Laws</u>.  Evidence that each Project and the operation thereof comply with all legal requirements, including that all requisite certificates of occupancy, building permits, and other licenses, certificates, approvals or consents required of any governmental authority have been issued without variance or condition and that there is no litigation, action, citation, injunctive proceedings, or like matter pending or threatened with respect to the validity of such matters.  If title insurance with respect to any Project described in item 3 above does not include a Zoning 3.1 (with parking) endorsement because such an endorsement is not available in the State where the Project is located, then Borrowers shall furnish to Agent a zoning letter from the applicable municipal agency with respect to such Project.  Borrowers shall, upon request of Agent, furnish Agent with utility letters from applicable service providers.

16.    <u>No Casualty or Condemnation</u>.  No condemnation or adverse zoning or usage change proceeding shall have occurred or shall have been threatened against any Project; no Project shall have suffered any significant damage by fire or other casualty which has not been repaired; no law, regulation, ordinance, moratorium, injunctive proceeding, restriction, litigation, action, citation or similar proceeding or matter shall have been enacted, adopted, or threatened by any governmental authority, which would have, in Agent's judgment, a material adverse effect on Borrowers, any Principal or any Project.

17.    <u>Audit Requirement</u>.  The annualized Net Operating Income of the Projects equals or exceeds $1,820,000 for the trailing twelve-month period ending October 31, 2005.

18.    <u>Borrowers' Equity</u>.  Borrowers' cash investment in the Projects is at least $6,630,000 ("**Borrowers' Equity**").

19.    <u>Broker's Fees</u>.  All fees and commissions payable to real estate brokers, mortgage brokers, or any other brokers or agents in connection with the Loan or the acquisition of the Projects have been paid, such evidence to be accompanied by any waivers or indemnifications deemed necessary by Agent.

20.    <u>Costs and Expenses</u>.  Payment of Agent's costs and expenses in underwriting, documenting, and closing the transaction, including fees and expenses of Agent's inspecting engineers, consultants and counsel.

21.    <u>Reserved</u>.

22.  Representations and Warranties.  The representations and warranties contained in this Loan Agreement and in all other Loan Documents are true and correct.

23.  No Defaults.  No Potential Default or Event of Default or default under any of the Loan Documents shall have occurred or exist.

24.  Appraisal.  Agent shall obtain an appraisal report for each Project, in form and content acceptable to Agent, prepared by an independent MAI appraiser in accordance with the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") and the regulations promulgated pursuant to such act.

25.  Property Management.  Agent shall have approved the Property Manager and the Management Agreement for the Projects and shall have received a copy of the Management Agreements certified by Borrowers as being true, correct and complete.

26.  Acquisition Documents.  Agent shall have reviewed and approved the purchase contract for the Projects and the closing statement with respect thereto.

27.  Other.  Agent shall have received such other items as Agent may reasonably require.

## PART B

### GENERAL CONDITIONS

Each advance of the Loan following the initial advance shall be subject to Agent's receipt, review, approval and/or confirmation of the following, each in form and content satisfactory to Agent in its sole discretion:

1.  There shall exist no Event of Default or Potential Default under any of the Loan Documents (currently and after giving effect to the requested advance).

2.  The representations and warranties contained in this Loan Agreement and in all other Loan Documents are true and correct.

3.  Such advance shall be secured by the Loan Documents, subject only to those exceptions to title approved by Agent at the time of Loan closing, as evidenced by title insurance endorsements satisfactory to Agent.

4.  Borrowers shall have paid Agent's costs and expenses in connection with such advance (including title charges, and costs and expenses of Agent's inspecting engineer and attorneys).

5.      No change shall have occurred in the financial condition of any Borrower or any Principal, or in the Net Operating Income of the Projects, or in the financial condition of Master Tenant or Property Manager, which would have, in Agent's judgment, a material adverse effect on the Loan, any Project, or any Borrower's or any Principal's ability to perform its obligations under the Loan Documents.

6.      No condemnation or adverse, as determined by Agent, zoning or usage change proceeding shall have occurred or shall have been threatened against any Project; no Project shall have suffered any damage by fire or other casualty which has not been repaired or is not being restored in accordance with this Agreement; no law, regulation, ordinance, moratorium, injunctive proceeding, restriction, litigation, action, citation or similar proceeding or matter shall have been enacted, adopted, or threatened by any governmental authority, which would have, in Agent's judgment, a material adverse effect on any Project or any Borrower's or any Principal's ability to perform its obligations under the Loan Documents.

## PART C

## APPLICATION OF INSURANCE PROCEEDS

Insurance proceeds applied to restoration will be advanced in accordance with Section 3.2 and on the following terms and conditions:

1.      Each request for such an advance shall specify the amount requested, shall be on forms satisfactory to Agent, and shall be accompanied by appropriate invoices, bills paid affidavits, lien waivers, title updates, endorsements to the title insurance, and other documents as may be required by Agent.  Such advances may be made, at Agent's election, either: (a) in reimbursement for expenses paid by Borrowers, or (b) for payment of expenses incurred and invoiced but not yet paid by Borrowers, or (c) with respect to non-residential tenant restorations, by funding allowances for tenant improvements undertaken to be constructed by non-residential tenants and completed in accordance with Leases.  Agent, at its option and without further direction from Borrowers, may disburse any restorations advance to the Person to whom payment is due or through an escrow satisfactory to Agent.  Borrowers hereby irrevocably directs and authorizes Agent to so advance the insurance proceeds.  Agent may, at Borrowers' expense, conduct an audit, inspection, or review of the Projects to confirm the amount of the requested restoration advance.

2.      Borrowers shall have submitted and Agent shall have approved (a) the restorations to be completed, (b) the plans and specifications for such restorations, which plans and specifications may not be changed without Agent's prior written consent, and (c) if requested by Agent, each contract or subcontract for an amount in excess of Fifty Thousand Dollars ($50,000.00) for the performance of labor or the furnishing of materials for such restorations.

3.      Borrowers shall have submitted and Agent shall have approved the time schedule for completing the restorations.  After Agent's approval of a detailed budget, such budget may not be changed without Agent's prior written consent.  If the estimated cost of such restorations exceeds the unadvanced portion of the amount allocated for such restorations in the

approved budget, then Borrowers shall provide such security as Agent may require to assure the lien-free completion of restorations before the scheduled completion date.

    4.    All restorations constructed by Borrowers prior to the date an restorations advance is requested shall be completed to the satisfaction of Agent and Agent's engineer and in accordance with the plans and budget for such restorations, as approved by Agent, and all legal requirements.

    5.    Borrowers shall not use any portion of any restorations advance for payment of any other cost except as specifically set forth in a request for advance approved by Agent in writing.

    6.    Each restorations advance, except for a final restorations advance, shall be in the amount of actual costs incurred less ten percent (10%) of such costs as retainage to be advanced as part of a final restorations advance.

    7.    Agent shall not under any circumstances be obligated to make any restorations advance after nine (9) months after the casualty or ninety (90) days prior to the Maturity Date.

    8.    No funds will be advanced for materials stored at the Projects unless Borrowers furnish Agent satisfactory evidence that such materials are properly stored and secured at the Projects.

    9.    Borrowers shall have delivered evidence satisfactory to Agent, in its sole discretion, that the amount remaining to be disbursed for such restorations is sufficient to complete the restorations or, if insufficient, Borrowers shall have deposited with Agent funds necessary to complete the restorations (Borrowers' deposit to be disbursed before any balance of the additional advance).

## SCHEDULE 2.5

As used herein, **"Make Whole Breakage Amount"** means, as calculated by Agent, the greater of (i) one percent (1%) of the amount being prepaid and (ii) the excess, if any, of (A) the sum of the net present values of each scheduled interest and principal payment of the Loan, including the payment of the balance of the Loan (together with accrued interest thereon) on the then scheduled Maturity Date, discounted to the date of the prepayment at an interest rate equal to the Replacement Treasury Yield plus fifty (50) basis points, over (B) the amount of principal being prepaid.

As used herein the term **"Replacement Treasury Yield"** shall mean the rate of interest equal to the yield to maturity of the most recently issued U.S. Treasury security as quoted in the Wall Street Journal on the prepayment date. If the remaining term is less than one year, the Replacement Treasury Yield will equal the yield for 1-Year Treasury's. If the remaining term is 1-Year, 2-Year, etc., then the Replacement Treasury Yield will equal the yield for the Treasury's with a maturity equaling the remaining term. If the remaining term is longer than one year but does not equal one of the maturities being quoted, then the Replacement Treasury Yield will equal the yield for Treasury's with a maturity closest to but not exceeding the remaining term. If the Wall Street Journal (i) quotes more than one such rate, the highest of such quotes shall apply, or (ii) ceases to publish such quotes, the U.S. Treasury security shall be determined from such financial reporting service or source as Agent shall determine.

## SCHEDULE 2.9

## SOURCES AND USES

|  | Amount | % of Total |
|---|---|---|
| Gross Offering Proceeds . . . . . . . . . . . . . . . . . . | 26,600,000 | 76.66% |
| Organizational Expenses . . . . . . . . . . . . . . |  | % |
| Selling Commissions . . . . . . . . . . . . . . . . . . | 1,400,000 | 4.03% |
| Marketing Allowances . . . . . . . . . . . . . . . . | 255,000 | 0.74% |
| Due Diligence Expenses . . . . . . . . . . . . . . . |  | % |
| Placement Fee . . . . . . . . . . . . . . . . . . . . . . . |  | % |
| Available for Investment . . . . . . . . . . . . . . . . . . . $ | 28,255,000 | 81.43% |
|  |  |  |
| Down Payment for Purchase of Real Property: |  | % |
| Loan Points . . . . . . . . . . . . . . . . . . . . . . . . . . | 516,000 | 1.49% |
| Acquisition Fee . . . . . . . . . . . . . . . . . . . . . . . |  | % |
| Due Diligence Expenses . . . . . . . . . . . . . . . . |  | % |
| Closing Costs . . . . . . . . . . . . . . . . . . . . . . . . . | 1,543,000 | 4.45% |
| Lender and Property Legal Fees |  | % |
| Reserves . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,587,000 | 7.45% |
| Proceeds Utilized . . . . . . . . . . . . . . . . . . . . . . | 4,646,000 | 13.39% |
| Organization and Offering Expenses and Fees . . . . | 1,799,000 | 5.18% |
| Total Application . . . . . . . . . . . . . . . . . . . . . . $ | 34,700,000 | 100.00% |

## SCHEDULE 11.31

## POST CLOSING REQUIREMENTS

1. <u>Stanford House</u>:   Within 60 days following the Closing Date, Borrower should have the hydroelectric elevator unit located in the parking garage level of the facility serviced/repaired to correct the current, apparent slow leak of hydraulic fluid, and to help ensure against future leaks.  Borrower shall also clean and properly dispose of the current pool of hydraulic oil that has resulted from the current leak, within the same time period.

2. <u>Immediate Repairs</u>:   Complete the following repairs identified in the Property Condition Reports within ninety (90) days following the Closing Date:

**Cambridge House (Los Angeles, CA)**

| Item Description | Quantity | Comments |
|---|---|---|
| Exterior doors, metal panel | 1 | Replace roof access door |
| ADA Compliance Items | 1 | See Section III G.2 of the Property Condition Report for detailed explanation. |

**Stanford House (Los Angeles, CA)**

| Item Description | Quantity | Comments |
|---|---|---|
| Concrete sectional replacement | 1 | Replace concrete and repair bollards |
| Sidewalk, concrete sectional replacement | 1 | Replace sidewalk and add bollard at service walk |
| ADA Compliance Items | 1 | See Section III G.2 of the Property Condition Report for detailed explanation. |

**Capri Retirement Villa (Newhall, CA)**

| Item Description | Quantity | Comments |
|---|---|---|
| Concrete sectional replacement | 800 | Replace trip hazards in drive and patch spalling |
| Sidewalk, concrete sectional replacement | 2 | Repair trip hazards at the north side sidewalks |
| Exterior doors, automatic opener | 1 | Install safety device on garage rolling door |
| ADA Compliance Items | 1 | See Section III G.2 of the Property Condition Report for detailed explanation. |